No. 23-2085

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

———————————————

JOSHUA CLAY MCCOY, et al.,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.,

Defendants-Appellants.

———————————————

On Appeal from the United States District Court
for the Eastern District of Virginia

———————————————

### BRIEF FOR APPELLANTS

———————————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

JESSICA D. ABER
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

STATEMENT OF JURISDICTION ...................................................................... 1

STATEMENT OF THE ISSUES ........................................................................... 1

PERTINENT STATUTES AND REGULATIONS ............................................. 1

STATEMENT OF THE CASE ............................................................................. 2

      A.    Statutory and Regulatory Background .......................................... 2

      B.    Prior Proceedings .......................................................................... 6

SUMMARY OF ARGUMENT ............................................................................ 7

STANDARD OF REVIEW .................................................................................. 9

ARGUMENT ...................................................................................................... 10

I.     The Second Amendment Allows Congress To Prohibit The Commercial Sale of Handguns To Individuals Under The Age Of 21 .................................. 10

II.    The District Court Erred By Certifying A Nationwide Class After It Had Already Resolved The Merits .......................................................... 25

CONCLUSION .................................................................................................. 31

STATEMENT REGARDING ORAL ARGUMENT .................................................. 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*American Pipe & Constr. Co. v. Utah,*
   414 U.S. 538 (1974) ................................................................ 9, 25, 26, 28, 29

*Andrews v. State,*
   50 Tenn. 165 (1871) ................................................................................ 17

*Brown v. Entertainment Merchs. Ass'n,*
   564 U.S. 786 (2011) ................................................................................ 14

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ........................................................................... 25, 27

*Carolina Youth Action Project v. Wilson,*
   60 F.4th 770 (4th Cir. 2023) ..................................................................... 9

*Costello v. BeavEx, Inc.,*
   810 F.3d 1045 (7th Cir. 2016) ....................................................... 7, 25, 26, 28

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ...................... 8, 9, 10, 11, 12, 14, 15, 17, 18, 21, 22, 24

*EQT Prod. Co. v. Adair,*
   764 F.3d 347 (4th Cir. 2014) ........................................................... 9-10, 10

*Hirschfeld v. ATF,*
   5 F.4th 407 (4th Cir. 2021), *as amended* (July 15, 2021),
   *vacated,* 14 F.4th 322, 325 (4th Cir. 2021). ................................................. 24

*Maryland Shall Issue, Inc. v. Moore,*
   86 F.4th 1038 (4th Cir. 2023) ............................................................... 21-22

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ........................................................................... 8, 11

*Naranjo, In re,*
   768 F.3d 332 (4th Cir. 2014) ..................................................................... 24

*National Rifle Ass'n of Am., Inc. v. ATF,*
   700 F.3d 185 (5th Cir. 2012) ..................................... 8, 10, 12, 18, 19, 20, 24

*National Rifle Ass'n v. Bondi*,
    61 F.4th 1317 (11th Cir.), *opinion vacated upon granting of reh'g en banc*,
    72 F.4th 1346 (11th Cir. 2023) ........................................................ 15, 17, 22

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ........................................ 6, 8, 10, 11-12, 15, 18, 19, 22, 23

*Opinion of the Justices, In re*,
    39 Mass. (22 Pick) 571 (1838) ........................................................ 20

*State v. Callicutt*,
    69 Tenn. 714 (1878) ........................................................ 17, 18

*United States v. Olano*,
    507 U.S 725 (1993) ........................................................ 30

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................ 28

## Constitutions:

U.S. Const. amend. II ........................................................ 11

N.C. Const. of 1868, art. XII, § 1 ........................................................ 20

## Statutes:

Act of Mar. 26, 1790, ch. 3, 1 Stat. 103, 103-04 ........................................................ 12

Act of Jan. 29, 1795, ch. 20, 1 Stat. 414, 414-15 ........................................................ 12

Bipartisan Safer Communities Act,
    Pub. L. No. 117-159, div. A, tit. II, § 12001(a)(1)(B)(i)(III),
    136 Stat. 1313, 1323 (2022)
    (codified as amended at 18 U.S.C. § 922(t)(1)(C)) ........................................................ 5

Gun Control Act of 1968,
    Pub. L. No. 90-618, tit. I, § 101, 82 Stat. 1213, 1213-14 ........................................................ 4

Militia Act, 1 Stat. 271 (1792):
    § 1, 1 Stat. at 271 ........................................................ 19
    § 2, 1 Stat. at 272 ........................................................ 19

Omnibus Crime Control and Safe Streets Act of 1968,
    Pub. L. No. 90-351, tit. IV, 82 Stat. 197:
        § 901(a)(2), 82 Stat. at 225.............................................................2, 23?
        § 901(a)(3), 82 Stat. at 225.............................................................4, 23?
        § 901(a)(6), 82 Stat. at 225-26 ..................................................... 2, 3

Violent Crime Control and Law Enforcement Act of 1994,
    Pub. L. No. 103-322, tit. XI, subtitle B, § 110201(a),
    108 Stat. 1796, 2010-11 ............................................................... 5

18 U.S.C. § 921(a)(21) ........................................................................ 4

18 U.S.C. § 921(a)(21)(C) .................................................................... 4

18 U.S.C. § 922(a)(1) .......................................................................... 4

18 U.S.C. § 922(b)(1) .............................................................. 1, 7, 10, 19

18 U.S.C. § 922(c)(1) ........................................................... 1, 4, 7, 10, 19

18 U.S.C. § 922(x) ............................................................................. 5

18 U.S.C. § 926 ................................................................................. 5

28 U.S.C. § 1291 ............................................................................... 1

28 U.S.C. § 1331 ............................................................................... 1

**Regulation:**

27 C.F.R. § 478.99(b) ......................................................................... 5,

**Rules:**

Fed. R. Civ. P. 8(c) ........................................................................... 29

Fed. R. Civ. P. 12(h)(1) ...................................................................... 29

Fed. R. Civ. P. 23(c) ........................................................................... 9

Fed. R. Civ. P. 23(c)(1) ...................................................................... 26

Fed. R. Civ. P. 23(c)(1) (1966) ......................................................... 25-26

Fed. R. Civ. P. 23 & advisory committee's note to the 2003 amendment ................... 29

**Legislative Materials:**

114 Cong. Rec. 12,309 (1968) ................................................................ 2

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 89th Cong. 67 (1965) ................................ 3

*Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 57 (1967) ................................ 3

S. Rep. No. 88-1340 (1964) .................................................................... 2

S. Rep. No. 89-1866 (1966) ............................................................... 3, 18

S. Rep. No. 90-1097 (1968) ............................................................... 4, 5

Act of Mar. 6, 1810, ch. 107, § 28, 1810 Mass. Acts 151, 176 ...................... 21

Act of Dec. 22, 1820, ch. 36, § 46, 1820 N.H. Laws 287, 321 ...................... 21

Act of July 4, 1825, ch. 1, § 24, 1825 Mo. Laws 533, 554 ............................ 21

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Laws 17, 17 ............................. 15

Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241, 245 .......................... 16

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59 § 1 ......................... 16

An Act to organize, govern, and discipline the Militia of this State ch. 164, § 34, 1821 Me. Laws 687, 716 ............................................ 21

**Other Authorities:**

Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867 (1994) ............................. 13

42 Am. Jur. 2d *Infants* § 6, Westlaw (database updated Oct. 2023) .............. 24

An Act for the better regulating and training the Militia, ch. II, §§ II- III, *reprinted in* 6 Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (William Waller Hening ed., 1819) ............................................ 20

An Act for raising levies and recruits to serve in the present expedition
against the French, on the Ohio, ch. II, §§ I-III, *reprinted in* 6 *The Statutes
at Large; Being a Collection of All the Laws of Virginia, from the First Session of
the Legislature, in the Year 1619* (William Waller Hening ed., 1819) ........................... 20

An Act for the settling and better Regulation of the Militia, ch. II, § II,
*reprinted in* 4 *The Statutes at Large; Being a Collection of All the Laws of
Virginia, from the First Session of the Legislature, in the Year 1619*
(William Waller Hening ed., 1820) ................................................................ 20

Act of Mar. 20, 1797, ch. 81, No. 1, § 15, *reprinted in* 2 *The Laws of the
State of Vermont, Digested and Compiled* (1808) ................................................. 21

An Act to exempt minors from Militia Duty in time of peace (1829),
*reprinted in A Compilation of the Public Laws of the State of New-Jersey,
Passed Since the Revision in the Year 1820* (Josiah Harrison ed., 1833) ........................ 20

1 William Blackstone, *Commentaries on the Laws of England* (1765) ........................... 12

Jacob Charles, *Armed in America: A History of Gun Rights from Colonial
Militias to Concealed Carry* (2019) ............................................................ 17

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) .................... 17

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second
Amendment: Making Sense of the Historical Record,*
40 Yale L. & Pol'y Rev. Inter Alia 1 (2021) ................................................... 12

John Faucheraud Grimké, *The South-Carolina Justice of Peace*
(R. Aitken & Son eds., 1788) .................................................................. 14

Vivian E. Hamilton, *Adulthood in Law and Culture*,
91 Tul. L. Rev. 55 (2016) ..................................................................... 12

*James Madison's Notes of the Constitutional Convention, August 7, 1787*,
Yale L. Sch. Avalon Project, https://perma.cc/QJ7B-D4J4 ...................................... 14

Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the
Right to Vote*, 71 U. Cin. L. Rev. 1345 (2003) ............................................... 13

2 James Kent, *Commentaries on American Law* (1827)........................................ 12, 12-13

*Letter from John Adams to James Sullivan, 26 May 1776*,
https://perma.cc/CE79-RA8K .................................................................... 13

*Militia Act, [25 November 1755]*, Nat'l Archives,
  https://perma.cc/2DFN-Z2GN ................................................................ 21

6 Newberg and Rubenstein on Class Actions § 18:14 (6th ed.),
  Westlaw (database updated Nov. 2023) .................................................25, 27

Randolph Roth, *Why Guns Are and Are Not the Problem*, in
  Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role*
  *of History in Contemporary Debates on the Second Amendment* (2019)................................. 15

Kara E. Rudolph et al., *Association Between Connecticut's Permit-to-Purchase*
  *Handgun Law and Homicides*, 105 Am. J. of Pub. Health e49 (2015),
  https://perma.cc/A5K8-ZZQT .................................................................... 3

4 *Statutes at Large of Pennsylvania* 153 (James T. Mitchell & Henry
  Flanders eds., 1897) .......................................................................... 12

1 Zephaniah Swift, *A System of the Laws of the State of Connecticut*
  (Windham & John Byrne eds., 1795).......................................................... 13

2 *The Code of North Carolina* ch. 35, § 3168, at 346-47 (William T. Dortch,
  John Manning, & John S. Henderson eds., 1883)....................................... 21

*The Code of Tennessee* pt. IV, tit. 1, ch. 9, art. II, § 4864
  (Return J. Meigs & William F. Cooper eds., 1858) ................................15-16

*The Code of the State of Georgia*, pt. 1, tit. 11, chs. 1, 2, §§ 981, 1027
  (Richard H. Clark et al. eds., 1861) ...................................................... 20

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331.  JA14.

The district court entered final judgment on August 31, 2023.  JA187.  The

government filed a timely notice of appeal on October 11, 2023.  JA191.  This Court

has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

For more than 50 years, Congress has prohibited the commercial sale of

handguns to 18-to-20-year-olds.  *See* 18 U.S.C. § 922(b)(1), (c)(1).  The federal

restrictions do not prevent those individuals from possessing and using handguns or

from acquiring handguns through other sources, including their parents or guardians.

The plaintiffs in this case are four 18-to-20-year-olds who assert that the restrictions

are inconsistent with the Second Amendment.  After the district court ruled for

plaintiffs on the merits, they moved to certify a nationwide class and the court granted

the motion.  The questions presented are:

1. Whether the Second Amendment allows Congress to bar the commercial

sale of handguns to 18-to-20-year-olds.

2. Whether plaintiffs were prohibited from waiting until after the district court

had conclusively resolved the merits before moving to certify a class.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

This case concerns legislatures' authority to set age qualifications on the commercial sale of firearms.

Following a multi-year inquiry into violent crime that included "field investigation and public hearings," S. Rep. No. 88-1340, at 1 (1964), Congress found "that the ease with which" handguns could be acquired by "juveniles without the knowledge or consent of their parents or guardians[] . . . and others whose possession of such weapons is similarly contrary to the public interest[] is a significant factor in the prevalence of lawlessness and violent crime in the United States," Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 901(a)(2), 82 Stat. 197, 225.  The legislative record established that "minors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence, including murder, rape, robbery, and aggravated assault," and 21 percent of the arrests for murder.  114 Cong. Rec. 12,309 (1968) (statement of Sen. Dodd).

Based on its investigations, Congress identified "a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior."  Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82 Stat. at 225-26. Federal law enforcement officials testified that "[t]he greatest growth of crime today is in the area of young people, juveniles[,] and young adults" and that "[t]he easy availability of weapons makes their tendency toward wild, and sometimes irrational

behavior that much more violent, that much more deadly." *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 57 (1967) (statement of Sheldon S. Cohen).   Law enforcement officers from New York City, Los Angeles, St. Louis, Chicago, Philadelphia, and Atlanta provided Congress with "statistics documenting the misuse of firearms by juveniles and minors." S. Rep. No. 89-1866, at 59 (1966); *see also id.* at 58, 60. These legislative findings accord with more recent empirical evidence identifying a relationship between setting the minimum age to purchase handguns at 21 and a decrease in violent crime. *See, e.g.*, Kara E. Rudolph et al., *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Pub. Health e49, e49-50 (2015), https://perma.cc/A5K8-ZZQT.

Congress's investigations revealed that "almost all of these firearms[] are put into the hands of juveniles by importers, manufacturers, and dealers who operate under licenses issued by the Federal Government." *Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 89th Cong. 67 (1965) (statement of Sheldon S. Cohen).  Thus, Congress found that concealable firearms (such as handguns) "have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior." Pub. L. No. 90-351, tit. IV, § 901(a)(6), 82 Stat. at 225-26.  Congress therefore concluded "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in

3

the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." *Id.* § 901(a)(3), 82 Stat. at 225.

To that end, Congress included statutory provisions designed to address "[t]he clandestine acquisition of firearms by juveniles and minors," S. Rep. No. 90-1097, at 79 (1968), in both the Omnibus Crime Control and Safe Streets Act of 1968 and the Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, § 101, 82 Stat. 1213, 1213-1214. Those provisions are codified at Sections 922(b)(1) and (c) of Title 18. In addition to prohibiting federal firearms licensees from selling "any firearm or ammunition to any individual" under the age of 18, Section 922(b)(1) limits licensee sales of firearms to individuals between the ages of 18 and 20 to "a shotgun or rifle, or ammunition for a shotgun or rifle."[1] And under Section 922(c)(1), a federal firearms licensee may "sell a firearm to a[n unlicensed] person who does not appear in person at the licensee's business premises" only if the purchaser submits a sworn statement attesting that "in the case of any firearm other than a shotgun or a rifle, [the purchaser is] twenty-one years or more of age, or that, in the case of a shotgun or a rifle, [the purchaser is] eighteen years or more of age." 18 U.S.C. § 922(c)(1).

---

[1] A federal firearms license is required to "engage in the business of importing, manufacturing, or dealing in firearms" or "ammunition." 18 U.S.C. § 922(a)(1). A person is "engaged in the business" of dealing in firearms, *id.* § 921(a)(21), if that person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms," *id.* § 921(a)(21)(C).

4

Sections 922(b)(1) and (c)(1) are restrictions on the commercial sale of handguns and do not prohibit the possession of handguns by 18-to-20-year-olds or the purchase of rifles or shotguns by those individuals. Congress recognized that, under these commercial sale restrictions, "a minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian." S. Rep. No. 90-1097, at 79. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), which is authorized to promulgate "such rules and regulations as are necessary to carry out" Title 18's provisions relating to firearms, 18 U.S.C. § 926, has issued implementing regulations that closely track the statutory restrictions, *see, e.g.*, 27 C.F.R. § 478.99(b).

In addition to enacting the commercial sale restrictions at issue here, Congress has also promulgated various other age-based firearms regulations. For example, Congress has limited the circumstances in which individuals under 18 years old may possess handguns. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. XI, subtitle B, § 110201(a), 108 Stat. 1796, 2010-11 (adding 18 U.S.C. § 922(x)). And in 2022, Congress adopted provisions that require enhanced background checks for individuals under the age of 21. *See* Bipartisan Safer Communities Act, Pub. L. No. 117-159, div. A, tit. II, § 12001(a)(1)(B)(i)(III), 136 Stat. 1313, 1323 (2022) (codified as amended at 18 U.S.C. § 922(t)(1)(C)).

**B.    Prior Proceedings**

Plaintiffs are four 18-to-20-year-olds who seek to purchase handguns from federal firearms licensees.  JA16, JA22.  They assert that the commercial sale restrictions violate the Second Amendment and request declaratory and injunctive relief.  JA25.  Although the complaint indicated that plaintiffs sought to represent a nationwide class, they did not initially move for class certification.

Instead, plaintiffs moved for summary judgment and the district court granted the motion.  JA28.  Under the test outlined in *New York State Rifle & Pistol Ass'n v. Bruen*, the Second Amendment's scope turns on "text, as informed by history" and "the Nation's historical tradition of firearm regulation."  597 U.S. 1, 19, 24 (2022).  In concluding that the Second Amendment prevents legislatures from restricting the sale of arms to underage individuals, the district court emphasized its view that "the Founders understood that militia service began at the age of 18" and that the Second Amendment therefore entitles 18-to-20-year-olds to acquire handguns.  JA81.  The court recognized that in the nineteenth century at least 20 jurisdictions enacted laws prohibiting the sale of handguns to 18-to-20-year-olds but declared that those laws "tell[] us nothing" about the Second Amendment's scope.  JA86.  Relying instead on its interpretation of Founding Era militia laws, the court held unconstitutional the federal restrictions.

Rather than enter final judgment, however, the district court permitted plaintiffs to move to certify a nationwide class.  JA115.  The court acknowledged that

6

"[t]he rule against one-way intervention prevents plaintiffs from moving for class certification after acquiring a favorable ruling on the merits of a claim." JA117 (quoting *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057 (7th Cir. 2016)). But the court believed that because the government did not invoke the rule against one-way intervention in its merits briefs, which were filed before plaintiffs moved for class certification, it "waived" reliance on the rule. JA120. The court then issued a series of orders certifying a nationwide class of all 18-to-20-year-old citizens, with exceptions for those subject to certain other federal firearms prohibitions and for the plaintiffs in two other suits challenging the commercial sale restrictions, entering declaratory and injunctive relief for the class, and adding a new named plaintiff. JA110, 142-143, 170-174. At the government's request, the court stayed all relief pending appeal. JA186.

## SUMMARY OF ARGUMENT

**I.** For over half a century, federal law has prohibited federal firearms licensees from selling handguns to individuals under the age of 21. *See* 18 U.S.C. § 922(b)(1), (c)(1). These restrictions do not prevent 18-to-20-year-olds from purchasing rifles and shotguns, from possessing and carrying handguns, or from obtaining handguns from their parents or guardians. Because the restrictions regulate only the commercial sale of handguns to underage individuals, they fall within the class of "conditions and qualifications on the commercial sale of arms" that the Supreme Court has taken

pains not to call into question. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).

Unlike the exceptional laws the Supreme Court invalidated in *Heller* and *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the commercial sale restrictions reflect a historical tradition that stretches from the founding to the present. At the founding, legislatures established an age qualification of 21 for a variety of important rights, and there is no evidence that the Second Amendment's ratifiers believed that the Amendment would preclude adoption of the same age qualification for the commercial sale of arms. During the nineteenth century, when handguns became more lethal and more widespread, at least 20 jurisdictions enacted laws barring the commercial sale of handguns to 18-to-20-year-olds. And in modern times, "all fifty States (and the District of Columbia)" have "imposed minimum-age qualifications on the use or purchase of particular firearms." *National Rifle Ass'n of Am., Inc. v. ATF* (*NRA*), 700 F.3d 185, 190 n.4 (5th Cir. 2012).

In nonetheless holding unconstitutional the federal restrictions, the district court relied in large part on mistaken legal and factual assumptions regarding militias at the time of the founding. First, although the court assumed that all individuals over the age of 18 were eligible to join the militia, Founding Era legislatures retained authority to exclude 18-to-20-year-olds. *See NRA*, 700 F.3d at 204 n.17 (collecting examples). Second, the ability to carry firearms while serving in the militia or its historical successors does not imply a right to bear arms outside the supervised

8

context of militia service.  As the Supreme Court has explained, the Second Amendment codifies "an individual right unconnected to militia service."  *Heller*, 554 U.S. at 611.

The district court likewise erred in excluding from its historical analysis nineteenth century evidence the Supreme Court has identified as germane.  *Heller* recognizes evidence from that period as a "critical tool of constitutional interpretation," 554 U.S. at 605, and the Supreme Court routinely consults such evidence in Second Amendment cases and in cases involving the historical scope of other constitutional provisions.

**II.** The district court compounded its error by certifying a nationwide class after deciding the merits.  Plaintiffs waited until after the district court had conclusively resolved the merits in their favor before moving for class certification. That delay allowed absent class members to reap the benefits of a merits victory without running the risk of an adverse merits result.  The Supreme Court has recognized that this profoundly unfair sequencing is incompatible with the Federal Rules of Civil Procedure.  *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974) (citing Fed. R. Civ. P. 23(c)).

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment de novo, *see Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 777 (4th Cir. 2023), and reviews the certification of a class for abuse of discretion, *see EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th

Cir. 2014).  "A district court abuses its discretion when it materially misapplies the requirements of Rule 23 [of the Federal Rules of Civil Procedure]."  *Id.*

## ARGUMENT

**I.    The Second Amendment Allows Congress To Prohibit The Commercial Sale of Handguns To Individuals Under The Age Of 21**

**A.** For more than 50 years, federal law has barred federal firearms licensees from selling handguns to 18-to-20-year-olds.  *See* 18 U.S.C. § 922(b)(1), (c)(1).  The restrictions do not prevent 18-to-20-year-olds from "possess[ing] and us[ing] handguns."  *NRA*, 700 F.3d 185, 189 (5th Cir. 2012).  Nor do the restrictions prevent those individuals from obtaining handguns "from parents or guardians" or "though unlicensed, private sales."  *Id.* at 190-91.  The restrictions also do not prevent 18-to-20-year-olds from purchasing rifles or shotguns.

Those limited restrictions comport with the Second Amendment.  The Constitution protects an individual right to keep and bear arms, but, "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  In identifying categories of lawful regulations, courts consult the Second Amendment's "text, as informed by history," and "the Nation's historical tradition of firearm regulation."  *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19, 24 (2022).  Both considerations thus require a review of history.

10

Two mutually reinforcing categories of historical evidence show that legislatures retain authority to restrict the commercial sale of arms to underage individuals. First, Founding Era evidence reflects that the ratifiers did not view the Second Amendment as stripping legislatures of authority to prohibit the commercial sale of handguns to 18-to-20-year-olds. Second, nineteenth century evidence demonstrates that at least 20 jurisdictions enacted laws that parallel the federal restrictions and that those laws were recognized as constitutional by courts, legislatures, and the public.

**1.** Nothing in the Second Amendment's text or original public meaning entitles 18-to-20-year-olds to obtain handguns from federal firearms licensees. By its terms, the Amendment addresses a right to "keep and bear arms," U.S. Const. amend. II, and does not codify a right of underage individuals to purchase handguns from commercial sellers when those weapons remain available through other sources. In keeping with the Second Amendment's text, in *Heller* the Court emphasized that nothing in its opinion "should be taken to cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms," 554 U.S. at 626-27 & 627 n.26 in *McDonald v. City of Chicago* the Court "repeat[ed]" those "assurances," 561 U.S. 742, 786 (2010), and in *Bruen* the Chief Justice and Justice Kavanaugh reiterated that nothing in the Court's opinion "should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms," 597 U.S. at 81

(Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting *Heller*, 554 U.S. at 626-27).

Evidence from the founding confirms that the Second Amendment's text was not understood as preventing legislatures from implementing age qualifications on access to arms. At the founding, as today, legislatures established age qualifications for a range of activities, from getting married, *see, e.g.*, 4 *Statutes at Large of Pennsylvania* 153 (James T. Mitchell & Henry Flanders eds., 1897), to becoming a naturalized citizen, *see* Act of Mar. 26, 1790, ch. 3, 1 Stat. 103, 103-04; Act of Jan. 29, 1795, ch. 20, 1 Stat. 414, 414-15, to forming enforceable contracts, *see* 2 James Kent, *Commentaries on American Law* 101 (1827); *see also* Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. Inter Alia 1, 9-10 (2021) (collecting examples).

For the Second Amendment's ratifiers, a natural point at which to draw the line between underage individuals and responsible adults was age 21. "The age of majority at common law was 21" and at the founding, individuals under that age were classified as "minor[s]" or "infant[s]." *NRA*, 700 F.3d at 201; *see* 1 William Blackstone, *Commentaries on the Laws of England* 451 (1765) ("So that full age in male or female, is twenty one years[] . . . who till that time is an infant, and so styled in law."). Consistent with the common law understanding, the "American colonies, then the United States, adopted age twenty-one as the near universal age of majority." Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016); *see* 2 Kent,

12

*supra*, at 191 (confirming that "the inability of infants to take care of themselves[] . . . continues, in contemplation of law, until the infant has attained the age of twenty-one years").

Legislatures thus set 21 as the age qualification for many important activities. Among other examples, under-21-year-olds generally could not "claim the right of petition," Cornell, *supra*, at 8-10; enter many kinds of contracts, *see* 1 Zephaniah Swift, *A System of the Laws of the State of Connecticut* 213-16 (Windham & John Byrne eds., 1795); serve on juries, *see* Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 877 n.52 (1994) (finding no evidence that historical legislatures authorized individuals under the age of 21 to serve on juries); or vote, *see* Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. Cin. L. Rev. 1345, 1345, 1358-59 (2003) (noting that state legislatures allowed individuals to vote only after they turned 21, a practice that persisted from the founding through the 26th Amendment's passage in 1971).

In explaining these age qualifications, the founders emphasized their view that reason and judgment are not fully developed before age 21. For example, John Adams observed that individuals under that age could not vote because they lack "[j]udgment" and "[w]ill" and are not "fit to be trusted by the [p]ublic." *Letter from John Adams to James Sullivan, 26 May 1776*, https://perma.cc/CE79-RA8K (on file with the National Archives). Gouverneur Morris, a signer of the Constitution and drafter of its Preamble, likewise warned that under-21-year-olds "want prudence" and "have

13

no will of their own." *James Madison's Notes of the Constitutional Convention, August 7, 1787*, Yale L. Sch. Avalon Project, https://perma.cc/QJ7B-D4J4. Similarly, although at the founding citizens generally had a duty to serve as peace officers, among those ineligible for such service were "infants"—that is, individuals under the age of 21. John Faucheraud Grimké, *The South-Carolina Justice of Peace* 117-18 (R. Aitken & Son eds., 1788). There is no basis for concluding that the founders nevertheless believed that 18-to-20-year-olds were constitutionally entitled to purchase lethal weapons without parental approval.

That conclusion accords with historical norms concerning parental supervision of 18-to-20-year-olds. Founding Era parents generally retained substantial authority to supervise individuals under the age of 21. *See Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 821-31 (2011) (Thomas, J., dissenting). Nothing in the historical record suggests that when the founders codified the Second Amendment, they intended to alter that paradigm.

**2.** Nineteenth century evidence supports the same conclusion. The Supreme Court has described evidence from that period as a "critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605. The Court explained that "the public understanding of a legal text in the period after its enactment" is probative as to its meaning. *Id.* Thus, the Court looks to nineteenth century sources in discerning the historical scope of various constitutional provisions, including the Second

14

Amendment, *see, e.g.*, *id.* at 605-19 (considering evidence "through the end of the 19th century"); *Bruen*, 597 U.S. at 35-36, 50-56 (same).

Within a lifetime of the founding, state legislatures enacted laws that parallel the restrictions challenged here. At the founding, handguns were rare, fired only one shot, often misfired, took a long time to load, and could not be kept loaded for extended periods. *See* Randolph Roth, *Why Guns Are and Are Not the Problem*, in Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 113, 117-18 (2019). By the mid-nineteenth century, "a burst of innovations in the arms industry" resulted in revolvers that could be loaded and fired quickly. *Id.* at 121-24. As handguns became more lethal and more widespread, legislatures moved to limit the sale of those weapons to underage individuals.

For as long as legislatures have codified age qualifications on the commercial sale of handguns, they have drawn the line at age 21. As early as 1856, Alabama forbade providing "to any male minor" any "air gun or pistol," Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Laws 17, 17, and "[a]t that time, the age of majority in Alabama was twenty-one years," *National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1325 (11th Cir.), *opinion vacated upon granting of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023). Two years later, Tennessee likewise barred providing "to any minor a pistol[] . . . or like dangerous weapon, except a gun for hunting or weapon for defence in travelling." *The Code of Tennessee* pt. IV, tit. 1, ch. 9, art. II, § 4864, at 871 (Return J. Meigs &

15

William F. Cooper eds., 1858).  A year after that, Kentucky similarly prevented anyone

other than parents or guardians from providing "any pistol[] . . . or other deadly

weapon[] . . . to any minor."  Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241,

245.

In the decades surrounding the passage of the Fourteenth Amendment, which

established that the Second Amendment, like other provisions of the Bill of Rights, is

applicable to the states, at least 20 jurisdictions restricted the purchase of firearms by

18-to-20-year-olds.  The scope of these laws varied, but all of them prohibited 18-to-

20-year-olds from purchasing handguns without the approval of their parents or

guardians.  An 1875 Indiana law, for example, made it a crime "for any person to sell,

barter, or give to any other person, under the age of twenty-one years, any pistol" or

similar deadly weapon.  Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59 § 1.  In

addition to the Alabama, Tennessee, and Kentucky laws cited above, similar

prohibitions were also enacted in Delaware (1881), the District of Columbia (1892),

Georgia (1876), Illinois (1881), Iowa (1884), Kansas (1883), Louisiana (1890),

Maryland (1882), Mississippi (1878), Missouri (1879), North Carolina (1893),

Oklahoma (1890), Texas (1897), West Virginia (1882), Wisconsin (1883), and

Wyoming (1890).  The prohibitions thus spanned every region of the country and

covered much of the population.  The addendum to this brief provides source and

citation information for each prohibition.

The prohibitions were widely recognized and approved by courts, commentators, and the public. One review of newspaper editorials and other sources of the period noted consistent support for "laws restricting the sale of dangerous weapons to minors." Jacob Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* ch. 4 & n.211-12 (2019). Thomas Cooley, who wrote a "massively popular" treatise that *Heller* cited with approval, 554 U.S. at 616, likewise explained "[t]hat the State may prohibit the sale of arms to minors," Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883).

In what appears to be the sole nineteenth century judicial decision addressing age prohibitions parallel to those at issue here, the Tennessee Supreme Court upheld a state law prohibiting the sale of pistols to under-21-year-olds. The court held that the law was "not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *State v. Callicutt*, 69 Tenn. 714, 716-17 (1878). In contrast, in a decision issued a few years earlier, the same court concluded that "a statute that forbade openly carrying a pistol" contravened the state constitution's Second Amendment analogue. *Heller*, 554 U.S. at 629 (citing *Andrews v. State*, 50 Tenn. 165, 187 (1871)). "[T]he fact that there was apparently only a single challenge to these [prohibitions'] constitutionality until well into the twentieth century" further illustrates that the public "considered the statutory prohibitions constitutionally permissible." *Bondi*, 61 F.4th at 1330.

17

Nineteenth century evidence thus provides overwhelming support for the challenged restrictions. In analyzing whether historical laws constitute "analogue[s]" justifying a modern firearms regulation, *Bruen* reviewed "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 28-30. Both metrics reflect that the restrictions at issue here rest on firm historical foundations. With respect to the "why" metric, historical laws were enacted "to prevent crime" by minors. *Callicutt*, 69 Tenn. at 716. The modern restrictions likewise address "the misuse of firearms by juveniles and minors." S. Rep. No. 89-1866, at 59. And with respect to the "how" metric, historical and modern laws both regulate the transfer of firearms by the same suppliers (commercial sellers) to the same recipients (18-to-20-year-olds).

It is a testament to the strength of this historical tradition that in modern times, "all fifty States (and the District of Columbia) have imposed minimum-age qualifications on the use or purchase of particular firearms." *NRA*, 700 F.3d at 190 n.4. The restrictions challenged here thus stand in stark contrast to the "outlier[]" laws the Supreme Court invalidated in *Bruen* and *Heller*. *Bruen*, 597 U.S. at 70; *see id.* at 78-79 (Kavanaugh, J., joined by Roberts, C.J., concurring) (highlighting the "unusual" nature and "extreme outlier" status of the New York law in *Bruen*); *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"). As Justice Alito emphasized in concurrence, *Bruen* therefore "does not expand the categories of people who may

18

lawfully possess a gun" and federal law thus continues to "bar[] the sale of a handgun to anyone under the age of 21." *Bruen*, 597 U.S. at 73 (Alito, J., concurring) (citing 18 U.S.C. §§ 922(b)(1), (c)(1)).

**B.** The district court's decision reflects significant misunderstandings of the relevant historical evidence and of the Supreme Court's methodology for analyzing that evidence.

**1.** A central premise of the district court's reasoning was that the Second Amendment's scope hinges on historical militia laws. The court believed that "the Founders understood that militia service began at the age of 18" and that 18-to-20-year-olds therefore had a right to acquire handguns outside the context of militia service. JA81.

But Founding Era legislatures retained discretion to exclude 18-to-20-year-olds from militia service. The district court cited (at JA74) the National Militia Act of 1792, which provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (*except as is herein after excepted*) shall severally and respectively be enrolled in the militia." Militia Act § 1, 1 Stat. 271, 271 (1792) (emphasis added). But the next section of the Act "gave States discretion to impose age qualifications on service." *NRA*, 700 F.3d at 204 n.17; *see* Militia Act § 2, 1 Stat. at 272 (excluding from the militia "all persons who now are or may hereafter be exempted by the laws of the respective states"). Indeed, when the governor of

19

Massachusetts requested legal advice on this issue, the Massachusetts Supreme Judicial Court concluded: "[I]t is competent for the State legislature by law to exempt from enrol[l]ment in the militia, all persons under twenty-one and over thirty years of age." *In re Opinion of the Justices*, 39 Mass. (22 Pick) 571, 576 (1838).

Thus, "in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need." *NRA*, 700 F.3d at 204 n.17. Virginia set a minimum age of 21, which it lowered in times of exceptional need, for example, in 1755 prior to the Seven Years War.[2] Other states— including Georgia, New Jersey, and North Carolina—enrolled only individuals over 21 in their respective militias at various points between the late eighteenth century and the mid-nineteenth century.[3] "Such fluctuation undermines [any] militia-based claim that the right to purchase arms must fully vest precisely at age 18." *Id.*

---

[2] *See* An Act for the settling and better Regulation of the Militia, ch. II, § II, *reprinted in* 4 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 118, 118 (William Waller Hening ed., 1820) (originally promulgated in 1723); An Act for raising levies and recruits to serve in the present expedition against the French, on the Ohio, ch. II, §§ I-III, *reprinted in* 6 Hening, *supra*, at 438, 438-39 (1819) (originally promulgated in 1754); An Act for the better regulating and training the Militia, ch. II, §§ II- III, *reprinted in* 6 Hening, *supra*, at 530, 530-31 (1819) (originally promulgated in 1755).

[3] *See, e.g.*, *The Code of the State of Georgia*, pt. 1, tit. 11, chs. 1, 2, §§ 981, 1027, at 189, 189, 199 (Richard H. Clark et al. eds., 1861); An Act to exempt minors from Militia Duty in time of peace (1829), *reprinted in A Compilation of the Public Laws of the State of New-Jersey, Passed Since the Revision in the Year 1820*, at 266, 266 (Josiah Harrison ed., 1833); N.C. Const. of 1868, art. XII, § 1.

Indeed, Founding Era militia laws exemplify the tradition of adult supervision over 18-to-20-year-olds' access to arms.  Pennsylvania's 1755 militia act, drafted by Benjamin Franklin, permitted individuals under 21 to enroll in the militia but provided "[t]hat no [y]outh, under the [a]ge of [t]wenty-one [y]ears, . . . shall be admitted to enroll himself[] . . .  without the [c]onsent of his or their [p]arents or [g]uardians, [m]asters or [m]istresses, in Writing under their Hands."  *Militia Act, [25 November 1755]*, Nat'l Archives, https://perma.cc/2DFN-Z2GN.  In a similar vein, at least six states—including Massachusetts (1810), New Hampshire (1821), Vermont (1807), North Carolina (1806), Maine (1821), and Missouri (1826)— required parents to furnish the firearms for their children's militia duty, presumably on the assumption that minors could not obtain arms themselves.[4]

In any event, authorization to carry a firearm while serving in the militia, or in successor forces such as the National Guard, does not determine the scope of the right to bear arms outside that context.  As the Supreme Court has emphasized, the founders understood the Second Amendment as codifying "an individual right unconnected with militia service."  *Heller*, 554 U.S. at 582; *see also Maryland Shall Issue,*

---

[4] *See* Act of Mar. 6, 1810, ch. 107, § 28, 1810 Mass. Acts 151, 176; Act of Dec. 22, 1820, ch. 36, § 46, 1820 N.H. Laws 287, 321; Act of Mar. 20, 1797, ch. 81, No. 1, § 15, *reprinted in* 2 *The Laws of the State of Vermont, Digested and Compiled* 122, 131-32 (1808); 2 *The Code of North Carolina* ch. 35, § 3168, at 346-47 (William T. Dortch, John Manning, & John S. Henderson eds., 1883); An Act to organize, govern, and discipline the Militia of this State ch. 164, § 34, 1821 Me. Laws 687, 716; Act of July 4, 1825, ch. 1, § 24, 1825 Mo. Laws 533, 554.

*Inc. v. Moore*, 86 F.4th 1038, 1048 (4th Cir. 2023) ("[T]he service burden [militia] laws imposed was divorced from gun ownership"). "[M]erely being part of the militia" thus did not establish an entitlement to Second Amendment rights. *Bondi*, 61 F.4th at 1331.

**2.** The district court also erred in disregarding the nineteenth century analogues for the commercial sale restrictions discussed above, concluding that evidence from that period "tells us nothing" about the Second Amendment's scope. JA85-86. The Supreme Court has explained, however, that while nineteenth century materials may "not provide as much insight into [the Second Amendment's] original meaning" as Founding Era sources, those materials nonetheless constitute a "critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20, 36 (quoting *Heller*, 554 U.S. at 605, 614). The Court's extensive review of nineteenth century evidence in both *Heller* and *Bruen* confirms that such evidence plays an important part in Second Amendment analysis. *See Heller*, 554 U.S. at 605-19 (considering evidence "through the end of the 19th century"); *Bruen*, 597 U.S. at 35-36, 50-56 (same); *see id.* at 30 (looking to "18th- and 19th-century" evidence in discussing the scope of the sensitive places doctrine). That numerous nineteenth century jurisdictions prohibited the purchase of handguns by 18-to-20-year-olds—and that there is no evidence that those prohibitions were viewed as infringing the right to keep and bear arms—thus provides strong support for the challenged restrictions.

22

**3.** The district court's reasoning is flawed in other respects as well. The court observed, for example, that if it were "to exclude 18-to-21-year-olds from the Second Amendment's protection, it would impose limitations on the Second Amendment that do not exist with other constitutional guarantees." JA 65. But permissible restrictions on the purchase of firearms are not determined by direct reference to the protections of the First or Fourth Amendments. As *Bruen* makes clear, any interpretation of the Second Amendment's text must be "informed by history," 597 U.S. at 19, and history shows that the Second, First, and Fourth Amendments do not share the same scope. If the scope of the Second Amendment was coterminous with that of the First or Fourth Amendments, the Supreme Court's focus on "the Nation's historical tradition of firearm regulation" would appear to be misplaced. *Id.* at 24.

It was similarly incorrect for the district court to conclude that other rights and privileges now accorded to 18-year-olds determine what age restrictions are permissible under the Second Amendment. The court placed great weight (at JA63-65) on the fact that the ratification of the Twenty-Sixth Amendment in 1971 established 18 as the national voting age. But the federal restrictions on the sale of handguns to 18-to-20-year-olds, which were enacted in 1968, *see* Pub. L. No. 90-351, tit. IV, 82 Stat. at 225, did not cease to be constitutional because the voting age was lowered. There is no reason whatsoever to conclude that Congress and state legislatures believed that the Twenty-Sixth Amendment divested legislatures of their historical authority to prohibit the commercial sale of handguns to 18-to-20-year-olds.

23

*See Heller*, 554 U.S. at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them").

Regardless, modern practices confirm that legislatures retain discretion to restrict 18-to-20-year-olds' access to arms. "There is no legal requirement that the same age of majority apply to all activities and circumstances, and statutes setting different ages at which a person may engage in an activity or be treated as an adult are within the province of the legislature." 42 Am. Jur. 2d *Infants* § 6, Westlaw (database updated Oct. 2023). Many state legislatures continue to set 21 as the minimum age for certain activities, including "purchas[ing] alcohol," "purchas[ing] lottery tickets," and—as particularly relevant here—acquiring handguns. *NRA*, 700 F.3d at 204 n.17; *see also id.* at 190 n.4 (collecting state laws).

In nonetheless holding unconstitutional the federal restrictions, the district court cited (at JA56-57) the decision of a divided panel of this Court invalidating the same restrictions. That case became moot before further review was possible, and the decision was accordingly vacated. *See Hirschfeld v. ATF*, 5 F.4th 407, 452 (4th Cir. 2021), *as amended* (July 15, 2021), *vacated*, 14 F.4th 322, 325 (4th Cir. 2021). A vacated opinion has no "precedential value within this circuit," *In re Naranjo*, 768 F.3d 332, 344 n.14 (4th Cir. 2014), and for the reasons given above, the challenged restrictions pass constitutional muster under *Bruen*'s history-focused test.

## II.  The District Court Erred By Certifying A Nationwide Class After It Had Already Resolved The Merits

**A.** As the Supreme Court has explained, class actions represent "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979).  The "core idea" of the class action is that both sides run the risk of an adverse class-wide judgment: If the class representatives prevail, "the class members may take advantage of that victory," but "if the representatives lose, the defendant—having risked a large class-wide loss—is entitled to take advantage of its victory by foreclosing litigation by any class member against it in the future."  6 Newberg and Rubenstein on Class Actions § 18:14 (6th ed.), Westlaw (database updated Nov. 2023) (6 Newberg).

A plaintiff therefore cannot wait until after a court has conclusively resolved the merits before deciding whether to seek class certification.  Otherwise, by delaying a motion for certification, a plaintiff could enable absent class members "to benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one." *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974).  That practice, known as one-way intervention, "is 'strikingly unfair' to the defendant." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057-58 (7th Cir. 2016).

The Federal Rules of Civil Procedure accordingly forbid one-way intervention.  In 1966, Rule 23 was updated to require that courts determine whether to certify a class "[a]s soon as practicable after the commencement of the action."  Fed. R. Civ. P.

23(c)(1) (1966).  This amendment was "designed, in part, specifically" to "assure that members of the class would be identified before trial on the merits and would be bound by all subsequent orders and judgments." *American Pipe*, 414 U.S. at 547. Although in 2003 the relevant language was modified to require certification "[a]t an early practicable time," Fed. R. Civ. P. 23(c)(1), the change "d[id] not restore the practice of 'one-way intervention' that was rejected by the 1966 revision," Fed. R. Civ. P. 23, advisory committee's note to 2003 amendment.  Rule 23 thus continues to "prevent[] plaintiffs from moving for class certification after acquiring a favorable ruling on the merits of a claim." *Costello*, 810 F.3d at 1057.

Those principles preclude class certification here.  Although the complaint indicated that plaintiffs sought to represent a class, they moved for summary judgment and litigated that motion without requesting class certification.  Only after the district court decided the merits in plaintiffs' favor did they move to certify a class. JA115.  Whatever leeway the "[a]t an early practicable time" requirement may allow, it does not authorize plaintiffs to withhold a motion for certification until after the district court has resolved the merits.  Fed. R. Civ. P. 23(c)(1).

That conclusion is reinforced by plaintiffs' failure to explain their delay. Nowhere do plaintiffs identify any reason it would not have been "practicable" for them to move for certification before the district court issued a merits decision.  Fed. R. Civ. P. 23(c)(1).  To the extent plaintiffs withheld their motion out of a concern that if they had successfully certified a nationwide class and then lost on the merits,

the resulting judgment would have prevented further challenge to the federal restrictions by 18-to-20-year-olds across the country, that concern only serves to underscore that plaintiffs sought to allow absent class members to reap the benefits of certification without accepting the risks. *See* 6 Newberg § 18:14.

The circumstances of this case highlight the unfairness inherent in one-way intervention. If the district court had ruled for the government on the merits, unnamed class members would not have been bound by the resulting judgment and would have been free to initiate independent challenges to the commercial sale restrictions. *See* 6 Newberg § 18:14. Now that the district court has ruled for plaintiffs, however, unnamed class members will receive the full benefit of the court's judgment. The Federal Rules do not support a system in which the government must prevail in every case, but challengers need only prevail in one.

The problems with plaintiff's approach are especially apparent given the nationwide scope of the class. The Supreme Court has recognized that "nationwide class actions may have a detrimental effect by foreclosing adjudication by a number of different courts and judges" and that it "often will be preferable to allow several courts to pass on a given class claim in order to gain the benefit of adjudication by different courts in different factual contexts." *Califano*, 442 U.S. at 702. Those considerations counsel against certification in this case, where certification of a nationwide class threatens to prevent most circuits from ever addressing an important constitutional issue.

27

For the same reasons that plaintiffs failed to support class certification, they also did not justify the addition of a new plaintiff after the district court had resolved the merits. *See* JA111 (D.C. order). Permitting a potential plaintiff to wait to see how a court will rule on the merits before deciding whether to participate would allow them "to benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one," *American Pipe*, 414 U.S. at 547, and would thus create an end-run around the prohibition on one-way intervention.

**B.** The district court recognized that the rule against one-way intervention "prevents plaintiffs from moving for class certification after acquiring a favorable ruling on the merits of a claim." JA117 (quoting *Costello*, 810 F.3d at 1057). The court also recognized that plaintiffs' belated motion for class certification ran afoul of the rule. The court believed, however, that the government "waived" the rule by not invoking it in the merits briefing, which was filed before plaintiffs moved for class certification. JA120.

But the government is not required to anticipate, in its merits briefs, motions that have not yet been filed. It is plaintiffs, not the government, that bear the burden of moving for class certification. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]"). And during the merits briefing, plaintiffs did not so much as mention class certification, let alone indicate that they planned to violate the rule against one-way intervention by moving for certification after a merits ruling. To

the extent waiver principles are relevant, they therefore apply against plaintiffs, not the government.

The Federal Rules confirm that a defendant has no obligation to raise objections based on the requirements of Rule 23 before a plaintiff seeks class certification. As relevant here, the Rules specifically identify the aspects of a complaint to which a defendant must respond, *see* Fed. R. Civ. P. 8(c), and specifically identify the defenses that are forfeited if a defendant does not raise them immediately in response to the complaint, *see* Fed. R. Civ. P. 12(h)(1). Neither of those provisions directs a defendant to preemptively raise objections to class certification.

Thus, the Federal Rules reflect a recognition that requiring a defendant to object to motions not yet filed would carry practical consequences. It is common for a complaint to include claims, including class claims, that the plaintiff ultimately decides not to pursue. A system in which defendants must raise objections to requests plaintiffs may never make would squander the resources of litigants and courts alike; set a trap for the unwary, as the text of the Federal Rules impose no requirement to preemptively object to class certification; and result in many more instances of one-way intervention, a practice the Supreme Court described as unjust and recognized that the Federal Rules forbid, *see American Pipe*, 414 U.S. at 547; Fed. R. Civ. P. 23 & advisory committee's note to the 2003 amendment.

In any event, even if the government was required to anticipate plaintiffs' motion for class certification, any inaction would at most amount to a forfeiture that

can and should be excused.  The government came nowhere near "intentional[ly]

relinquish[ing] . . . a known right," as would be required for waiver principles to apply.

*United States v. Olano*, 507 U.S 725, 733 (1993).  And any forfeiture should be excused

because the rule against one-way intervention plainly bars certification and because

the government raised that argument in its response to plaintiffs' certification motion.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs challenge the constitutionality of longstanding provisions of federal law. The federal government believes that oral argument is therefore appropriate.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JESSICA D. ABER
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

*s/ Steven H. Hazel*
STEVEN H. HAZEL
*Attorneys, Appellate Staff*
*Civil Division, Room 7217*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2498*
*Steven.H.Hazel@usdoj.gov*

December 2023

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,576 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven H. Hazel*
Steven H. Hazel

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Steven H. Hazel*
Steven H. Hazel

**ADDENDUM**

# TABLE OF CONTENTS

18 U.S.C. § 922................................................................................................ A1

27 C.F.R. § 478.99 ........................................................................................... A2

Table of Historical Laws Restricting the Sale of Handguns to Eighteen-to-
    Twenty-Year-Olds ................................................................................... A3

**18 U.S.C. § 922**

**§ 922. Unlawful acts**

. . .

(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver--

(1) any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age;

. . . .

(c) In any case not otherwise prohibited by this chapter, a licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer) only if--

(1) the transferee submits to the transferor a sworn statement in the following form:

"Subject to penalties provided by law, I swear that, in the case of any firearm other than a shotgun or a rifle, I am twenty-one years or more of age, or that, in the case of a shotgun or a rifle, I am eighteen years or more of age; that I am not prohibited by the provisions of chapter 44 of title 18, United States Code, from receiving a firearm in interstate or foreign commerce; and that my receipt of this firearm will not be in violation of any statute of the State and published ordinance applicable to the locality in which I reside.

Further, the true title, name, and address of the principal law enforcement officer of the locality to which the firearm will be delivered are_____.

Signature ........ Date ........"

and containing blank spaces for the attachment of a true copy of any permit or other information required pursuant to such statute or published ordinance;

. . . .

**27 C.F.R. § 478.99**

**§ 478.99. Certain prohibited sales or deliveries**

. . . .

(b) Sales or deliveries to underaged persons. A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver (1) any firearm or ammunition to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 18 years of age, and, if the firearm, or ammunition, is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 21 years of age, or (2) any firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of any State law or any published ordinance applicable at the place of sale, delivery, or other disposition, unless the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance.

. . . .

**Table of Historical Laws Restricting the Sale of Handguns to Eighteen-to-Twenty-Year-Olds**

| Jurisdiction | Year | Source | Available At |
|---|---|---|---|
| Alabama | 1856 | 1856 Ala. Acts 17, No. 26, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssal0178&i=17 |
| Chicago, Illinois | 1873 | Proceedings of the Common Council of the City of Chicago for the Municipal Year 1872-3, at 113-14 (1874) | https://hdl.handle.net/2027/uiug.30112089447939?urlappend=%3Bseq=192%3Bownerid=13510798902234869-196 |
| Delaware | 1881 | 16 Del. Laws 716 (1881) | https://heinonline.org/HOL/Page?handle=hein.ssl/ssde0173&id=430&collection=ssl |
| District of Columbia | 1892 | 27 Stat. 116-17 (1892) | https://hdl.handle.net/2027/hvd.hj1gjl?urlappend=%3Bseq=294%3Bownerid=27021597767057788-314 |
| Georgia | 1876 | 1876 Ga. Laws 112, No. CXXVIIII (O. No. 63), § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssga0180&i=112 |
| Illinois | 1881 | 1881 Ill. Laws 73, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssil0240&i=81 |
| Indiana | 1875 | 1875 Ind. Laws 59, ch. XL, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssin0221&i=59 |
| Iowa | 1884 | 1884 Iowa Acts and resolutions 86, ch. 78, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssia0095&i=114 |
| Kansas | 1883 | 1883 Kan. Sess. Laws 159, ch. CV, 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/ssks0111&i=169 |
| Kentucky | 1859 | Edward Bullock and William Johnson, *The General Statutes of the Commonwealth of Kentucky* 359, § 1 (1873) | https://heinonline.org/HOL/P?h=hein.sstatutes/gcucky0001&i=371 |

A3

| Lincoln, Nebraska | 1895 | 1895 Neb. Laws 237-38, *Laws of Nebraska Relating to the City of Lincoln*, Art. XXVI, §§ 2, 5 | https://heinonline.org/HOL/P?h=hein.ssl/ssne0123&i=247 |
|---|---|---|---|
| Louisiana | 1890 | 1890 La. Acts 39, No. 46, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssla0223&i=39 |
| Maryland | 1882 | 1882 Md. Laws 656, ch. 424, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/ssmd0444&i=656 |
| Mississippi | 1878 | 1878 Miss. Laws 175, ch. 66, §§ 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/ssms0207&i=207 |
| Missouri | 1879 | *Revised Statutes of the State of Missouri* 224, § 1274 (1879) | https://heinonline.org/HOL/P?h=hein.sstatutes/ristesm0001&i=320 |
| Nevada | 1885 | 1885 Nev. Stat. 51, ch. 51, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssnv0097&i=61 |
| North Carolina | 1893 | 1893 N.C. Pub. L. & Res. 468, ch. 514, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/ssnc0078&i=498 |
| Oklahoma | 1890 | 1890 Okla. Laws 495, ch. 25, art. 47, § 3 | https://heinonline.org/HOL/P?h=hein.ssl/ssok0081&i=511 |
| Tennessee | 1856 | 1856 Tenn. Acts 92, ch. 81, § 2 | https://heinonline.org/HOL/P?h=hein.ssl/sstn0249&i=108 |
| Texas | 1897 | 1897 Tex. Gen. Laws 221-22, ch. 155, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/sstx0251&i=245 |
| West Virginia | 1882 | 1882 W. Va. Acts 421-22, ch. 135, § 1 | https://heinonline.org/HOL/P?h=hein.ssl/sswv0101&i=421 |
| Wisconsin | 1883 | 1883 Wis. Sess. Laws 290, ch. 329, §§ 1-2 | https://heinonline.org/HOL/P?h=hein.ssl/sswi0136&i=290 |
| Wyoming | 1890 | 1890 Wyo. Sess. Laws 140, § 97 | https://heinonline.org/HOL/P?h=hein.ssl/sswy0076&i=138 |