**No. 23-2085**

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

JOSHUA CLAY MCCOY, et al.,

*Plaintiffs-Appellees*,

vs.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Eastern District of Virginia

### BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AND BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS-APPELLANTS AND IN SUPPORT OF REVERSAL

[Additional Counsel Listed on Signature Page]

Beatriz L. Albornoz
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Suite 700
Washington, DC 20006
(202) 956-6913
albornozb@sullcrom.com

December 28, 2023

*Counsel for* Amici Curiae *Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence*

# DISCLOSURE STATEMENT

Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence state that each organization does not have parent corporations. They do not have stock, and therefore no publicly held company owns 10% or more of their stock.

/s/ *Beatriz L. Albornoz*
Beatriz L. Albornoz
*Counsel for* Amici Curiae
*Giffords Law Center to Prevent*
*Gun Violence and Brady*
*Center to Prevent Gun Violence*

December 28, 2023

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 5

ARGUMENT ...................................................................................... 11

I.    The District Court Erred in Finding That the Challenged Laws Are Not Analogous to Longstanding Constitutional Firearm Regulations. ............................................................. 11

II.   Neuroscience and Social Science Confirm That the Challenged Laws Are Analogous to Historical Regulations of Groups Posing a Heightened Risk of Violence When Armed. ....................................................... 155

      A.    Eighteen-to-Twenty-Year-Olds Are Generally More Impulsive Than Older Cohorts. ................................... 17

      B.    Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit Violent Crimes with Firearms. .................................................. 19

      C.    Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates, and Access to Firearms Increases the Likelihood and Lethality of Those Suicide Attempts. ............................................ 266

      D.    Federal and State Minimum-Age Laws Have Proven Effective at Reducing Gun Violence Among Minors. .................................................................... 311

CONCLUSION ................................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*,
   910 F.3d 106 (3d Cir. 2018) ................................................................ 2

*Binderup* v. *Att'y Gen. U.S.*,
   836 F.3d 336 (3d Cir. 2016) .............................................................. 13

*District of Columbia* v. *Heller*,
   554 U.S. 570 (2008) ................................................................ *passim*

*Gall* v. *United States*,
   552 U.S. 38 (2007) ...................................................................... 10, 17

*Graham* v. *Florida*,
   560 U.S. 48 (2010) ...................................................................... 10, 17

*Hanson* v. *District of Columbia*,
   2023 WL 3019777 (D.D.C. Apr. 20, 2023) ........................................ 4

*Hirschfeld* v. *BATFE*,
   417 F. Supp. 3d 747 (W.D. Va. 2019) ................................................ 2

*Kanter* v. *Barr*,
   919 F.3d 437 (7th Cir. 2019) ............................................................ 14

*McDonald* v. *City of Chicago*,
   561 U.S. 742 (2010) ...................................................................... 2, 11

*Maryland Shall Issue* v. *Hogan*,
   353 F. Supp. 3d 400 (D. Md. 2018) .................................................... 2

*Maryland Shall Issue, Inc.* v. *Montgomery Cnty., Md.*,
   No. 23-1719 (4th Cir. 2023) ............................................................... 3

*Maryland Shall Issue, Inc.* v. *Moore*,
   86 F.4th 1038 (4th Cir. 2023) ............................................................ 7

*Miller* v. *Alabama*,
   567 U.S. 460 (2012) ............................................................................ 18

*Nat'l Ass'n for Gun Rights, Inc.* v. *City of San Jose*,
   2023 U.S. Dist. LEXIS 120797 (N.D. Cal. July 13, 2023) .................... 4

*Nat'l Paint & Coatings Ass'n* v. *City of Chicago*,
   45 F.3d 1124 (7th Cir. 1995) ............................................................... 34

*NRA* v. *BATFE*,
   700 F.3d 185 (5th Cir. 2012) ............................................... 9, 14, 15, 18

*NRA* v. *McCraw*,
   719 F.3d 338 (5th Cir. 2013) ............................................................... 14

*N.Y. State Rifle & Pistol Ass'n* v. *Bruen*,
   597 U.S. 1 (2022) ......................................................................... *passim*

*Peruta* v. *Cnty. of San Diego*,
   824 F.3d 919 (9th Cir. 2016) (en banc) ................................................. 3

*Stimmel* v. *Sessions*,
   879 F.3d 198 (6th Cir. 2018) ................................................................. 2

*United States* v. *Bena*,
   664 F.3d 1180 (8th Cir. 2011) ............................................................. 16

*United States* v. *Carter*,
   669 F.3d 411 (4th Cir. 2012) ............................................................... 12

*United States* v. *Hayes*,
   555 U.S. 415 (2009) .............................................................................. 4

*United States* v. *Jackson*,
   69 F.4th 495 (8th Cir. 2023) ............................................................... 13

*United States* v. *Masciandaro*,
   638 F.3d 458 (4th Cir. 2011) ............................................................... 35

*United States* v. *Price*,
   No. 22-4609 (4th Cir. 2022) ................................................................. 3

-iv-

## Constitution, Statutes, and Rules

U.S. CONST. amend. II ............................................................. *passim*

U.S. CONST. amend. XXVI .................................................................. 5

18 U.S.C. § 922(a)(1)(A) .................................................................. 6

18 U.S.C. § 922(a)(5) ........................................................................ 6

18 U.S.C. § 922(b)(1) ............................................................... 6, 8, 12

18 U.S.C. § 922(c)(1) ................................................................... 8, 12

18 U.S.C. § 922(x)(2)–(5) ................................................................. 8

21 U.S.C. § 387f(d)(5) ...................................................................... 5

23 U.S.C. § 158 ................................................................................ 5

278 C.F.R. § 478.99(b) ..................................................................... 6

278 C.F.R. § 478.102 ........................................................................ 6

278 C.F.R. § 478.124(a) .................................................................... 6

278 C.F.R. § 478.124(c)(1)–(5) ........................................................ 6

278 C.F.R. § 478.124(f) .................................................................... 6

Va. Code Ann. § 4.1-304 .................................................................. 5

Va. Code Ann. § 58.1-4015 ............................................................... 5

Fed. R. App. P. 29(a)(2) .................................................................... 1

## Other Authorities

*A Partial List of Mass Shootings in the United States in
    2022*, N.Y. TIMES (Jan. 24, 2023) ........................................... 23

Adam Winkler & Cara Natterson, *There's a Simple Way to
    Reduce Gun Violence: Raise the Gun Age*, WASH. POST
    (Jan. 6, 2016) ............................................................................ 17

Am. Pub. Health Assoc., *Reducing Suicides by Firearms* (Nov. 13, 2018) ................................................................... 29

Bonnie Berkowitz & Chris Alcantara, *The Terrible Numbers that Grow with Each Mass Shooting*, WASH. POST (last updated May 12, 2021) ....................................................... 22

Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Leading Cause of Death Reports, 1981–2020* (last visited Dec. 27, 2023) ........................................... 27, 28

Daniel A. Medina & Casey Tolan, *Highland Park Gunman's Family Was in Turmoil for Years Leading Up to Parade Shooting*, CNN (July 9, 2022) ........................................... 24

Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004) ............... 31

Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POL'Y & RSCH. (2012) ...................................................................... 21

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339 (2009) ........................................... 13

E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27 (2013) ........................... 27

Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLINICAL PSYCHIATRY 19 (2009) ................................. 27

Elise Hammond et al., *The Latest on Mass Shooting in Farmington, New Mexico*, CNN (May 16, 2023) ................................. 23

GUN VIOLENCE ARCHIVE (last visited Dec. 27, 2023) ................................. 6

Isabel Rosales et al., *6 People Face Murder Charges for the Sweet 16 Party Massacre that Left 4 Dead and 32 Injured*, CNN (Apr. 21, 2023) ........................................................................ 23

J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094 (2016) ...................................... 30

Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. TIMES (Nov. 7, 2016) ........................................... 30

Jay N. Giedd et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947 (2008) .................................................. 26

Jenna Fisher et al., *Teen and Woman Killed in Shooting at St. Louis High School*, N.Y. TIMES (Oct. 24, 2022) ........................... 24

Jennifer Mascia & Olga Pierce, *Youth Gun Suicide Is Rising, Particularly Among Children of Color*, THE TRACE (Feb. 24, 2022) ................................................................... 28

Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJ. PREVENTION 26 (2013) .............. 33

Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124 (2010) ....................................................... 19

Lexi Lonas, *US school shootings reach new high, doubled in past year*, THE HILL (Sept. 14, 2023) .................................... 25

Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013) ............. 17, 18

Mark Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Monterey Park and Uvalde*, BUSINESS INSIDER (last updated Jan. 23, 2023) ................................. 25

Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENGL. J. MED. 989 (2008)...................... 29

Matthew Miller et al., *Firearm Prevalence and the Risk of Suicide*, 2 HARV. HEALTH POL'Y REV. 2 (Fall 2001) ........................... 29

Matthew Miller et al., *Suicide Mortality in the United States*, 33 ANN. REV. PUB. HEALTH 393 (2012) ............................... 30

Maya Rossin-Slater et al., *Local Exposure to School Shootings and Youth Antidepressant Use*, 117 PNAS 23484 (2020)........................................................ 26

Merete Nordentoft et al., *Absolute Risk of Suicide After First Hospital Contact in Mental Disorder*, 68 ARCHIVES GEN. PSYCHIATRY 1058 (2011) .................................................... 26

Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220 (2014) ................................................. 19

Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS 2 (2019) ........................ 32

RAND Corp., *The Effects of Minimum Age Requirements* (last updated Jan. 10, 2023) ............................................... 30

Ryan Dickstein, *BPD: Dunbar High School student killed two people, shot six others within 11 hours*, WMAR (June 13, 2023)........................................................................ 6, 22

Sarah Rankin & Denise Lavoie, *Gunman who opened fire after Virginia high school graduation targeted graduate, Richmond police say*, ASSOCIATED PRESS (June 7, 2023) .............. 6, 23

Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLL. SURGEONS 150 (2019) ....................................... 32

Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT (2019)................................................................................. 13

*Ten Years of Mass Shootings in the United States*, Everytown (Nov. 21, 2019) ................................................................. 22

Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (Supp.) Suicide & Life-Threatening Behav. 49 (2001) .......................................... 27

U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex: April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010–2019 (last visited Dec. 27, 2023) ................................ 20

U.S. Dep't of Justice, Fed. Bureau of Investigation, *A Study of Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013* (June 2018) ....................... 32

U.S. Dep't of Justice, *Crime in the United States*, Arrests by Age, 2019, tbl.38 (last visited Dec. 27, 2023) ............... 20, 21

William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, 17 (Supp.) J. Stud. on Alcohol & Drugs 108 (2014) ........... 33

Zach Schonfeld, *School Shootings at Highest Number in 20 Years: Research*, The Hill (June 22, 2022) ........................ 25

# INTEREST OF THE *AMICI CURIAE*[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.[2]  The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords.  Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs

---

[1]     Defendants-Appellants and Plaintiffs-Appellees have both consented to *amici* filing this brief.  *See* Fed. R. App. P. 29(a)(2).  *Amici* Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence submit this brief in support of Defendants-Appellants.  No counsel for a party authored this brief in whole or in part. No person other than *amici* or their counsel contributed money to fund this brief's preparation or submission.

[2]     Giffords Law Center's website, www.giffords.org/lawcenter, is the premier clearinghouse for comprehensive information about federal, state, and local firearms laws and Second Amendment litigation nationwide.

proven to effectively reduce gun violence.  Together with its partner organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy.  *See, e.g.*, *District of Columbia* v. *Heller*, 554 U.S. 570 (2008); *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010); *N.Y. State Rifle & Pistol Ass'n* v. *Bruen*, 597 U.S. 1 (2022).  Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs* v. *Att'y Gen. N.J.*, 910 F.3d 106, 121–22 (3d Cir. 2018); *Hirschfeld* v. *BATFE*, 417 F. Supp. 3d 747, 754, 759 (W.D. Va. 2019); *Maryland Shall Issue* v. *Hogan*, 353 F. Supp. 3d 400, 403–05 (D. Md. 2018); *Stimmel* v. *Sessions*, 879 F.3d 198, 204,

208, 210 (6th Cir. 2018); *Peruta* v. *Cnty. of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring).[3]

*Amicus curiae* Brady Center to Prevent Gun Violence ("Brady") is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady works across Congress, courts, and communities, uniting gun owners and non-gun-owners alike, to take action to prevent gun violence. Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live. Brady also has a substantial interest in protecting the authority of democratically elected officials to address the nation's gun violence epidemic.

Brady has filed *amicus* briefs in many cases involving the regulation of firearms, including in this Court. *See, e.g.*, *Maryland Shall Issue, Inc.* v. *Montgomery Cnty., Md.*, No. 23-1719 (4th Cir. 2023); *United States* v. *Price*, No. 22-4609 (4th Cir. 2022); *Bruen*, 597 U.S. 1; *Heller*, 554 U.S. 570. Multiple decisions have cited Brady's research and expertise

---

[3]    Giffords Law Center filed the last two briefs under its former name, the Law Center to Prevent Gun Violence.

on these issues. *See, e.g.*, *United States* v. *Hayes*, 555 U.S. 415 (2009); *Nat'l Ass'n for Gun Rights, Inc.* v. *City of San Jose*, 2023 U.S. Dist. LEXIS 120797, at \*14–15, \*18–19 (N.D. Cal. July 13, 2023); *Hanson* v. *District of Columbia*, 2023 WL 3019777, at \*10, \*14, \*16 & nn.8, 10 (D.D.C. Apr. 20, 2023).

## INTRODUCTION AND SUMMARY OF ARGUMENT

When minors turn 18, certain privileges previously unavailable to them become accessible: they can cast a ballot in a federal election or purchase a lottery ticket.[4] But other things remain unavailable, such as buying a beer or a pack of cigarettes.[5] And for good reason: although 18-year-olds may be more mature than when they entered high school, scientific research reveals that their brains are still very much developing. Their prefrontal cortex—the part of the brain that governs impulsivity and emotional regulation—has not yet fully matured. That makes them more prone to risk-taking, and to deprioritizing long-term outcomes.

Recognizing the immaturity of this age group, when it comes to firearms, Congress has enacted a limited (and temporal) commercial restriction on 18-to-20-year-olds' ability to purchase handguns from federally licensed firearms dealers ("FFLs") without the involvement of their parents or legal guardians (the "Challenged Laws"). *See* 18 U.S.C.

---

[4]     U.S. CONST. amend. XXVI; Va. Code Ann. § 58.1-4015.

[5]     23 U.S.C. § 158; Va. Code Ann. § 4.1-304; 21 U.S.C. § 387f(d)(5).

§ 922(a)(1)(A), 922(a)(5), 922(b)(1) and 27 C.F.R. §§ 478.99(b); 478.102; and 478.124(a), (c)(1)-(5), (f).

The tragic and ongoing wave of mass shootings by 18-to-20-year-olds underscores the particular dangers posed by this age group's access to firearms. In 2023 alone, 18-to-20-year-olds committed at least 52 mass shootings in the United States—leaving 63 people dead and 236 wounded.[6] A number of these mass shootings involved handguns. For example, within this Court's jurisdiction, on March 23, 2023, an 18-year-old used a handgun to commit two shootings that left two dead and six injured in Baltimore, Maryland,[7] and on June 6, 2023, in Richmond, a 19-year-old retrieved a handgun from his car after a high school graduation, killing two people and injuring 12 others.[8]

---

[6]     GUN VIOLENCE ARCHIVE (last visited Dec. 27, 2023), https://www.gunviolencearchive.org/query.

[7]     Ryan Dickstein, *BPD: Dunbar High School student killed two people, shot six others within 11 hours*, WMAR (June 13, 2023), https://www.wmar2news.com/local/18-year-old-arrested-at-dunbar-high-allegedly-killed-two-people-shot-six-others.

[8]     Sarah Rankin & Denise Lavoie, *Gunman who opened fire after Virginia high school graduation targeted graduate, Richmond police say*, ASSOCIATED PRESS (June 7, 2023), https://apnews.com/article/richmond-high-school-graduation-shooting-6acc439941097597a2c9cc5220f9262c.

While the Second Amendment protects the right of "responsible" and "law-abiding" persons to keep and bear arms, it coexists with the extensive authority of federal and state governments to regulate firearm purchase, possession, and use, including by restricting certain categories of people from purchasing firearms. Indeed, in *District of Columbia* v. *Heller*, the Supreme Court provided a non-exhaustive list of "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. 570, 626–27 & n.26 (2008).

In its most recent Second Amendment decision, *N.Y. State Rifle & Pistol Ass'n, Inc.* v. *Bruen*, the Supreme Court adopted an approach that looks first at whether modern regulations implicate the plain text of the Second Amendment, and, if they do, compares the modern regulations to their historical counterparts, utilizing reasoning by analogy. 597 U.S. 1, 17 (2022).[9] To uphold a "modern-day regulation" implicating conduct at the core of the Second Amendment, courts need

---

[9]     *See also Maryland Shall Issue, Inc.* v. *Moore*, 86 F.4th 1038, 1042 (4th Cir. 2023) (adopting *Bruen*'s two-part inquiry).

-7-

not find that the regulation is "a dead ringer for historical precursors," but rather must identify a "well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30 (emphasis in original).

The Court in *Bruen* emphasized that the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 21. And Justice Alito's concurrence took pains to note that the Court's decision did "not expand the categories of people who may lawfully possess a gun," citing with approval one of the very provisions at issue here, which "bars the sale of a handgun to anyone under the age of 21." *Id.* at 73 (emphasis added) (citing 18 U.S.C. § 922(b)(1), (c)(1), (x)(2)–(5)).

Despite the district court's acknowledgement of these standards, it nonetheless found that the Challenged Laws' prohibition on 18-to-20-year-olds' ability to purchase handguns from FFLs is "not consistent with our Nation's history and tradition . . . [and] therefore, cannot stand." JA028, at -092. That conclusion is wrong.

The Challenged Laws survive constitutional review under *Bruen* because, as the Government has shown, they are analogous to historical regulations of individuals who were understood to present a

heightened risk of violence when armed and therefore were not considered "responsible" citizens. *See* Appellants' Br. at 12–19. These laws are consistent with both a specific historical tradition of "public-safety-based limitations of juvenile possession of firearms," and, at a "high[er] level of generality," the "longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *NRA* v. *BATFE,* 700 F.3d 185, 203–04 (5th Cir. 2012). Following in this tradition, Congress has determined that armed 18-to-20-year-olds pose a greater risk to public safety than do older, more mature adults and accordingly has enacted a temporal commercial restriction on 18-to-20-year-olds' ability to purchase handguns from FFLs.

*Amici* submit this brief to provide additional context for how the Challenged Laws are consistent with the Nation's tradition of firearm regulations for individuals who are particularly dangerous when armed (including individuals in this age group) and to highlight an established body of empirical research that likewise confirms that the Challenged Laws are analogous to historical regulations.[10]

---

[10]     While *amici*'s brief is focused on the second part of the test established in *Bruen*, nothing in this brief should be read to concede that the conduct regulated by the federal laws and regulations at issue is

Modern neuroscience and social science research demonstrates that 18-to-20-year-olds are, as a group, more impulsive than older adults because their brains are still developing. They are at a heightened risk of suicide, account for a disproportionate share of homicides and violent crimes, and are all-too-frequently involved in mass shootings. In other contexts, the Supreme Court has already recognized the critical developmental differences between 18-to-20-year-olds and older adults—particularly as it pertains to young adults' susceptibility to engaging in dangerous or risky behaviors. *See Graham* v. *Florida*, 560 U.S. 48, 68 (2010) ("As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence."); *Gall* v. *United States*, 552 U.S. 38, 58 (2007) ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage."). This reality underscores why regulation of this age group's

---

protected by the "plain text" of the Second Amendment at the first step of the test.

ability to purchase handguns from FFLs is consistent with longstanding and presumptively lawful firearms regulations, and thus comports with the Second Amendment.

## ARGUMENT

## I.    THE DISTRICT COURT ERRED IN FINDING THAT THE CHALLENGED LAWS ARE NOT ANALOGOUS TO LONGSTANDING CONSTITUTIONAL FIREARM REGULATIONS.

The district court's conclusion that there is no historical analogue for the Challenged Laws is inconsistent with Supreme Court precedent.  In *Heller*, the Supreme Court made clear that "nothing in [that] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms" by people with felony convictions and certain people suffering from severe mental illness nor on "laws imposing conditions and qualifications on the commercial sale of arms."  554 U.S. at 626–27 & n.26.  The Court added that those "presumptively lawful regulatory measures [serve] only as examples" and do "not purport to be exhaustive." *Id.* at 627 n.26.

In *McDonald* v. *City of Chicago*, the Supreme Court "repeat[ed] [*Heller*'s] assurances" that such laws should not be called into question.  561 U.S. 742, 786 (2010).  Likewise, Justice Kavanaugh's

concurrence in *Bruen*, joined by Chief Justice Roberts, reiterated the presumptive legality of such laws. 597 U.S. at 81. And Justice Alito's concurrence painstakingly explained that the Court's decision did "not expand the categories of people who may lawfully possess a gun," citing with approval one of the very provisions at issue here, which "bars the sale of a handgun to anyone under the age of 21." *Id.* at 73 (emphasis added) (citing 18 U.S.C. § 922(b)(1), (c)(1)). Moreover, as this Court has recognized, "[p]laced in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous." *United States* v. *Carter*, 669 F.3d 411, 415 (4th Cir. 2012).

Regulating firearm purchases or even possession by individuals who, because of their immaturity, temporarily pose a heightened risk of dangerousness to the public when armed was a familiar notion to the Founders. As the Eighth Circuit recently observed, "[h]istory shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people" including "those who are deemed more dangerous than a

-12-

typical . . . citizen." *United States* v. *Jackson*, 69 F.4th 495, 502 (8th Cir. 2023). "[T]he founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms." *Binderup* v. *Att'y Gen. U.S.*, 836 F.3d 336, 367 (3d Cir. 2016) (Hardiman, J., concurring); *see also* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L.J. 1339, 1360 (2009) ("[F]rom time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms. American legislators at the time of the Bill of Rights seem to have been aware of this tradition[.]").

Awareness of this tradition—and agreement with it—is evident from colonial ratifying conventions, where these notions were voiced with regularity. *See, e.g.*, Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT 190–215 (2019) (surveying debates at the constitutional ratifying conventions and highlighting the shared understanding that "dangerous persons could be disarmed").

This "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous

people from possessing guns" in order to protect the broader public. *Kanter* v. *Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting). Furthermore, this "common sense" understanding of presumptively lawful measures is not limited to the laws in place at the Founding. To uphold a "modern-day regulation," courts need not find that the regulation is "a dead ringer for historical precursors," but rather must merely identify a "well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30 (emphasis in original).

Thus, a "regulation can be deemed 'longstanding,'" and therefore constitutional, "even if it cannot boast a precise founding-era analogue." *BATFE*, 700 F.3d at 196. Indeed, *Heller*'s enumerated examples of presumptively lawful measures themselves "are of mid-20th century vintage." *Id.*

Like firearm regulations of people with felony convictions or those suffering from mental illness, laws "targeting minors under 21 are an outgrowth of an American tradition of regulating certain groups' access to arms for the sake of public safety." *BAFTE*, 700 F.3d at 205; *NRA* v. *McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) ("statutes enacted to

safeguard the public using age-based restrictions on access to and use of firearms are part of a succession of 'longstanding prohibitions,' that are likely outside the scope of the Second Amendment").  Indeed, numerous "revolutionary and founding-era gun regulations . . . targeted particular groups for public safety reasons," including "minors" and "infants," terms which were understood at the time to "appl[y] to persons under the age of 21, not only to persons under the age of 18."  *BATFE*, 700 F.3d at 200–01; *see also* Appellants' Br. at 12–14.

Here, the record amply demonstrates that the Challenged Laws fall squarely within "the Nation's historical tradition of firearm regulation," and thus the regulated conduct is not protected by the Second Amendment.  *Bruen*, 597 U.S. at 24.

Moreover, modern-day empirical research supports the conclusion that the federal laws and regulations are analogous to historical regulations.

## II.    NEUROSCIENCE AND SOCIAL SCIENCE CONFIRM THAT THE CHALLENGED LAWS ARE ANALOGOUS TO HISTORICAL REGULATIONS OF GROUPS POSING A HEIGHTENED RISK OF VIOLENCE WHEN ARMED.

Empirical research, which establishes that 18-to-20-year-olds' brains are still developing, demonstrates that the Challenged Laws are

-15-

analogous to historical regulations of certain groups that were understood to pose a heightened public safety threat when armed. *Bruen* contemplates a broad "reasoning by analogy" that compares "how and why [historical] regulations burden[ed] a law-abiding citizen's right to armed self-defense" to the "how and why" of modern regulations. 597 U.S. at 28–29. This comparative inquiry determines "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29. Furthermore, courts may look beyond "how and why" to identify other "features that render regulations relevantly similar." *Id.*

As part of this inquiry, this Court naturally should consider the modern-day "justifi[cations]" for the Challenged Laws. Indeed, considering modern-day justifications can provide insight into how modern laws comport with their historical analogues. *See United States* v. *Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (discussing modern empirical studies and findings from the Surgeon General on domestic violence in order to show how challenged law was justified in a manner "consistent with our common law tradition"). Here, those justifications include neuroscience and social science research confirming that 18-to-20-year-

olds with easy access to firearms pose a substantial risk of danger to themselves and others, similar to the justification for longstanding regulations of certain groups of people who were also understood to present a heightened risk of dangerousness when armed.

### A. Eighteen-to-Twenty-Year-Olds Are Generally More Impulsive Than Older Cohorts.

As the Supreme Court has recognized, *Graham*, 560 U.S. at 68; *Gall*, 552 U.S. at 58, scientific research establishes that the human brain does not finish developing until the mid-to-late twenties.[11] The *last* part of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and long-range planning.[12] The prefrontal cortex matures well after the limbic system, which controls basic

---

[11]     Adam Winkler & Cara Natterson, *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016), https://www.washingtonpost.com/posteverything/wp/2016/01/06/there-a-simple-way-to-fight-mass-shootings-raise-the-gun-age/?utm_term=.e8adc7e6c1da ("The scientific literature over the past two decades has demonstrated repeatedly that the brain does not fully mature until the mid-to-late 20s.").

[12]     *Id.*; *see also* Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453, 456 (2013) ("Behavioral control requires a great involvement of cognitive and executive functions. These functions are localized in the prefrontal cortex, which matures independent of puberty and continues to evolve up until 24 years of age.").

emotions like fear, anger, and pleasure, resulting in a period of reduced self-control in the late teens and early twenties.[13]

As a result, 18-to-20-year-olds are prone to taking risks and deprioritizing long-term outcomes. *See BATFE*, 700 F.3d at 210 n.21 ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over."); *Miller* v. *Alabama*, 567 U.S. 460, 471–72 (2012) (noting that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control"—and finding that juveniles possess "transient rashness, proclivity for risk, and inability to assess consequences").

Adolescents are also uniquely prone to negative emotional states.[14] Adolescents' responses to "frequent" negative states "tend to be more intense, variable and subject to extremes relative to adults."[15] And

---

[13]     Arain, *supra* note 12, at 453.

[14]     Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN & COGNITION 124, 125 (2010).

[15]     *Id.*

adolescents are also more likely to *act* on negative emotions like stress or rage because their limbic systems have matured while their cerebral cortices (*i.e.*, impulse control centers) are still developing.[16]

Because the behavior-regulating functions of their brains are still developing, 18-to-20-year-olds are at a higher risk of perpetrating and suffering from violence when they have unfettered access to firearms.[17]

### B.    Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit Violent Crimes with Firearms.

Nothing in the Second Amendment overrides the conclusion that, in order to protect public safety, firearms must be purchased and handled in a responsible, lawful way.  Gun ownership alone need not lead to violence.  However, when young people who are not mature enough to handle the full responsibility of gun ownership are given unrestricted

---

[16]    Arain, *supra* note 12, at 458 ("[T]he adolescent brain is structurally and functionally vulnerable to environmental stress.").

[17]    *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults in the USA and in nearly all industrialized cultures.  Their proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time.").

-19-

power to purchase any kind of firearm, the consequences are too often deadly. Eighteen-to-twenty-year-olds account for a disproportionate share of violent crimes and homicides—both as victims and as perpetrators.

Statistics demonstrate that 18-to-20-year-olds pose a heightened risk of dangerousness when armed, and illustrate why regulations on certain types of firearm purchases, such as the Challenged Laws, are analogous to historical regulations of groups who likewise posed an increased threat to public safety when armed:

- Arrests for homicide, rape, and robbery are higher among 18-to-20-year-olds than older adults.[18]

- Though 18-to-20-year-olds make up less than 5% of the U.S. population, they account for more than 15% of homicide and manslaughter arrests.[19]

---

[18]     U.S. Dep't of Justice, *Crime in the United States*, Arrests by Age, 2019, tbl.38 (last visited Dec. 27, 2023), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38.

[19]     *Id.*; U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex: April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010–2019 (last visited Dec. 27, 2023), https://www.census.gov/data/datasets/time-series/demo/popest/2010s-national-detail.html.

- 18-to-20-year-olds also account for more than 12% of property crime arrests.[20]

This general pattern is persistent. The following chart, showing homicide offending rate by age in 2009, vividly illustrates the disproportionate share of homicides committed by 18-to-20-year-olds that year:[21]



Moreover, the Challenged Laws' regulation of *handgun* purchases is especially relevant to mass shootings, a form of firearm violence that all too often involves 18-to-20-year-olds as both victims and

---

20    *Crime in the United States*, *supra* note 18.

21    Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POL'Y & RSCH. 1, 5 (2012).

perpetrators.  In a study of 189 mass shootings, 9mm semiautomatic handguns were the most commonly used weapons, including by the shooter who killed 32 people at Virginia Tech in 2007.[22]  Another study found that 81% of mass shootings involved the use of at least one handgun, and that 60% involved only handguns.[23]

In addition to these statistics, our nation has faced a disturbing and continuous wave of mass shootings over the past few years, many involving perpetrators in the age range at issue in the Challenged Laws.  For example, on March 23, 2023, an 18-year-old used a handgun to commit two shootings in Baltimore, Maryland, that left two dead and six injured;[24] in April 2023, a 19-year-old and two 20-year-olds were charged in a mass shooting at a Sweet 16 birthday party in Dadeville, Alabama that killed four people and injured 32 others, many

---

[22]    Bonnie Berkowitz & Chris Alcantara, *The Terrible Numbers that Grow with Each Mass Shooting*, WASH. POST (last updated May 12, 2021), https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

[23]    *Ten Years of Mass Shootings in the United States*, Everytown (Nov. 21, 2019), https://everystat.org/massshootingsreports/mass-shootings-in-america-2009-2019/.

[24]    Dickstein, *supra* note 7.

of them high school students;[25] on May 16, 2023, an 18-year-old gunman killed three people and wounded six others in Farmington, New Mexico, with a firearm purchased shortly after his 18th birthday;[26] on June 6, 2023, a 19-year-old killed two and injured 12 others with a handgun outside a high-school graduation in Richmond, Virginia.[27]

Similarly, 2022 was riddled with many of its own tragic firearms incidents, including: On May 14, 2022, an 18-year-old gunman at a supermarket in Buffalo, New York, killed ten people and wounded three others;[28] ten days later, on May 24, an 18-year-old killed 19 children and two teachers at an elementary school in Uvalde, Texas;[29] on July 4,

---

[25]    Isabel Rosales et al., *6 People Face Murder Charges for the Sweet 16 Party Massacre that Left 4 Dead and 32 Injured*, CNN (Apr. 21, 2023), https://www.cnn.com/2023/04/19/us/dadeville-alabama-birthday-party-shooting-wednesday/index.html.

[26]    Elise Hammond et al., *The Latest on Mass Shooting in Farmington, New Mexico*, CNN (May 16, 2023), https://www.cnn.com/us/live-news/farmington-new-mexico-shooting-05-16-23.

[27]    Rankin & Lavoie, *supra* note 8.

[28]    *A Partial List of Mass Shootings in the United States in 2022*, N.Y. TIMES (Jan. 24, 2023), https://www.nytimes.com/article/mass-shootings-2022.html.

[29]    *Id.*

a 21-year-old killed seven people and wounded dozens more at a parade in Highland Park, Illinois—with a gun he purchased prior to turning 21;[30] and on October 24, 2022, a 19-year-old killed two people and wounded seven others at his former high school in St. Louis, Missouri.[31]

Mass shootings committed by 18-to-20-year-olds are sadly not a new phenomenon in the United States. Several of the deadliest school shootings in our nation's history were committed by young adults in (or near) the age range encompassed by the Challenged Laws: the February 14, 2018 Parkland, Florida school shooting, in which a 19-year-old shooter killed 17 victims; the December 14, 2012 Newtown, Connecticut elementary school shooting, in which a 20-year-old shooter killed, among others, 20 schoolchildren; the April 16, 2007 shooting at Virginia Tech, in which a 23-year-old student killed 32 people; and the April 20, 1999 Littleton, Colorado shooting at Columbine High School, in

---

[30]     Daniel A. Medina & Casey Tolan, *Highland Park Gunman's Family Was in Turmoil for Years Leading Up to Parade Shooting*, CNN (July 9, 2022), https://www.cnn.com/2022/07/08/us/highland-park-suspect-family-turmoil-invs/index.html.

[31]     Jenna Fisher et al., *Teen and Woman Killed in Shooting at St. Louis High School*, N.Y. TIMES (Oct. 24, 2022), https://www.nytimes.com/2022/10/24/us/st-louis-high-school-shooting.html.

which an 18-year-old and a 17-year-old killed 12 fellow students and a teacher.[32]

But gun violence by young people in schools is—tragically—even more commonplace than the list of high-profile mass shootings suggests. According to recent analyses, there have been more than 70 school shootings annually since the 2018-19 school year.[33] These shootings have only become more frequent: the 2020-21 school year set a record with 93 shootings that caused injury or death, and the 2021-22 school year nearly doubled that record with 188.[34]

---

[32]    Mark Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Monterey Park and Uvalde*, BUSINESS INSIDER (last updated Jan. 23, 2022), https://www.businessinsider.com/deadliest-mass-shootings-in-us-history-2017-10/.

[33]    Zach Schonfeld, *School Shootings at Highest Number in 20 Years: Research*, THE HILL (June 22, 2022), https://thehill.com/policy/national-security/3539820-school-shootings-at-highest-number-in-20-years-research/; Lexi Lonas, *US school shootings reach new high, doubled in past year*, THE HILL (Sept. 14, 2023), https://thehill.com/homenews/education/4204651-us-school-shootings-reach-new-high-doubled-in-past-year/#:~:text=Based%20on%20that%20definition%2C%20the,shootings%20so%20far%20in%202023.&text=Copyright%202023%20Nexstar%20Media%20Inc.

[34]    Lonas, *supra* note 33.

In addition to the victims killed or injured in school shootings, there are lasting effects on youth who experience these traumatic incidents:  one study found that in the two years following a fatal school shooting, antidepressant use by youth aged 20 and younger in the area increased by 21.3%,[35] a statistic that is all the more troubling given the risk of suicide discussed in Section II.C below.

### C. Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates, and Access to Firearms Increases the Likelihood and Lethality of Those Suicide Attempts.

Eighteen-to-twenty-year-olds are also disproportionately at risk of attempting suicide, and unrestricted access to handguns exacerbates this risk.  Many major psychiatric conditions first develop in adolescence,[36] and "suicide risk increase[s] steeply during the first few years after [an individual's] first contact with psychiatric services."[37]

---

[35]    Maya Rossin-Slater et al., *Local Exposure to School Shootings and Youth Antidepressant Use*, 117 PNAS 23484, 23486 (2020).

[36]    Jay N. Giedd et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947, 952 (2008).

[37]    Merete Nordentoft et al., *Absolute Risk of Suicide After First Hospital Contact in Mental Disorder*, 68 ARCHIVES GEN. PSYCHIATRY 1058, 1061 (2011).

Eighteen-to-twenty-year-olds' impulsivity and propensity toward negative emotional states puts them at particular risk of suicide, which "is commonly an impulsive act by a vulnerable individual."[38]  One study found that, of 153 survivors of nearly lethal suicide attempts aged 13-to-34, close to 25% reported that *less than five minutes* passed between their decision to attempt suicide and their suicide attempt.[39]

In another study, 47.6% of people who were referred to a psychiatric hospital following a suicide attempt stated that fewer than ten minutes had passed between when they first began contemplating the act and their attempt.[40]  It is unsurprising, then, that suicide accounts for a higher percentage of deaths for 15-to-24-year-olds than for older age groups.[41]

---

[38]   E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27, 27 (2013).

[39]   Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (SUPP.) SUICIDE & LIFE-THREATENING BEHAV. 49, 50–52 (2001).

[40]   Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLINICAL PSYCHIATRY 19, 20 (2009).

[41]   Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Leading Cause of*

From 2010 to 2020, suicide was the third most common cause of death among 18-to-20-year-olds.[42]  And the upward trend in gun suicides among young people was especially acute among youth of color: from 2012 to 2020, the firearm suicide rate rose 35% among white teens.[43] During the same period it rose 88% among Native American teens and *more than doubled* among Black, Latino, and Asian teens.[44]

This striking increase in firearm suicides among our nation's youth constitutes an "unprecedented societal concern[]," requiring "a more nuanced approach" to the Second Amendment analysis to account for "circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 28.

---

*Death Reports, 1981–2020* (last visited Dec. 27, 2023), https://webappa.cdc.gov/sasweb/ncipc/leadcause.html.

[42]     *Id.* Centers for Disease Control and Prevention has not reported cause of death statistics post-dating 2020.

[43]     Jennifer Mascia & Olga Pierce, *Youth Gun Suicide Is Rising, Particularly Among Children of Color*, THE TRACE (Feb. 24, 2022), https://www.thetrace.org/2022/02/firearm-suicide-rate-cdc-data-teen-mental-health-research/.

[44]     *Id.*

Given the rapidity with which suicidal ideation gives way to action, "[a]ccess to firearms is a key risk factor for suicide."[45]  In fact, "at least a dozen U.S. case-control studies in the peer-reviewed literature . . . have found that a gun in the home is associated with an increased risk of suicide.  The increase in risk is large, typically two to ten times that in homes without guns."[46]  Those prone to "act impulsively . . . are more likely to be affected by availability of the means at hand," which explains why "the preponderance of current evidence indicates that gun availability is a risk factor for suicide, especially among youth."[47]

The inherent lethality of firearms compounds the increased risk of suicide posed by firearm access.  Firearm suicide is the suicide method with the highest fatality rate—the odds of completing a suicide attempt are 140 times greater when a gun is used than for any other

---

[45]     Am. Pub. Health Assoc., *Reducing Suicides by Firearms* (Nov. 13, 2018),  https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2019/01/28/reducing-suicides-by-firearms.

[46]     Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENGL. J. MED. 989, 990 (2008).

[47]     Matthew Miller et al., *Firearm Prevalence and the Risk of Suicide*, 2 HARV. HEALTH POL'Y REV. 2, 34 (Fall 2001).

commonly used method.[48]  In other words, while 4% of non-firearm suicide attempts are fatal, 85% of suicide attempts with a gun are fatal.[49] In 2020, more than half of the 3,305 suicide deaths among 16-to-21-year-olds involved firearms.[50]

Restricting 18-to-20-year-olds' ability to purchase handguns from FFLs can save lives from suicide.  Research shows that fewer than 3% of people who survive one suicide attempt later die by suicide.[51] Although "[s]uicide attempters often have second thoughts, . . . when a method like a gun works so effectively, there's no opportunity to reconsider."[52]  A young adult's access to firearms when contemplating a

---

[48]    J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 AM. J. PSYCHIATRY 1094, 1098 (2016).

[49]    Matthew Miller et al., *Suicide Mortality in the United States*, 33 ANN. REV. PUB. HEALTH 393, 397 (2012).

[50]    RAND Corp., *The Effects of Minimum Age Requirements* (last updated Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/minimum-age.html.

[51]    Bostwick, *supra* note 48, at 1098.

[52]    Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. TIMES (Nov. 7, 2016), https://www.nytimes.com/2016/11/08/well/live/after-a-suicide-attempt-the-risk-of-another-try.html.

suicide attempt, therefore, often determines whether that person will live or die.

###    D.    Federal and State Minimum-Age Laws Have Proven Effective at Reducing Gun Violence Among Minors.

Age-based regulations are also "justifi[ed]" under the *Bruen* framework because they are effective, underscoring the "why" of the Challenged Laws. Studies have found a connection between age-based regulations like the Challenged Laws and a decline in firearm-related adolescent deaths, especially suicides and unintentional shootings. For instance, a 2004 study found that state laws raising the minimum legal age to purchase a handgun to 21 were associated with a 9% decline in firearm suicide rates among 18-to-20-year-olds.[53]

Age-based regulations have also proven effective in reducing gun violence among young people, including in the 18-to-20-year-old range. While a 2019 study found that 18-to-21-year-olds made up more than half (68.7%) of the 21,241 firearm-related deaths among U.S. children and adolescents from 2011 to 2015, the study found that every 10-point increase in a score measuring the strength of a state's gun laws

---

[53]    Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004).

"decreases the firearm-related mortality rate in children by 4%."[54] Another study using the same gun-law scores found that the pediatric firearm mortality rate among children under 20 was almost twice as high in the quartile of states with the weakest laws than in the quartile of states with the strongest laws.[55]

Finally, research demonstrates that most mass shooters obtain their weapons lawfully. In a report examining active shootings from 2000 to 2013, the FBI concluded that "only very small percentages [of shooters] obtain[ed] a firearm illegally,"[56] indicating that the perpetrators seek easy access to weapons and are not necessarily sophisticated participants in the black market for firearms.

Indeed, a survey of convicted gun offenders in 13 states found that 17% of the offenders would have been prohibited from obtaining

---

[54]     Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS 2, at 3 & tbl. 1 (2019).

[55]     Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLL. SURGEONS 150, 152 (2019).

[56]     U.S. Dep't of Justice, Fed. Bureau of Investigation, *A Study of Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013*, at 7 (June 2018), https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view.

firearms at the time of the crime if the minimum legal age in that state had been 21 years, a finding that "underscore[d] the importance of minimum-age restrictions."[57]

The same concerns regarding minors' heightened impulsiveness motivated passage of laws in all 50 states establishing 21 as the minimum legal age for alcoholic beverage consumption. Studies confirm that these laws led to significant reductions in death from car crashes involving minor drivers.[58]

Lawmakers therefore can, and should, conclude that commercial restrictions on access to firearms will deter criminal use of firearms—precisely the type of reasonable conclusion that underlies virtually all laws aimed at regulating dangerous products, and consistent with our Nation's history and tradition of regulating access to firearms.

---

[57]    Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJ. PREVENTION 26, 29–30 (2013).

[58]    William DeJong & Jason Blanchette, *Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States*, (SUPP.) 17 J. STUD. ON ALCOHOL & DRUGS 108, 113 (2014).

*Cf., e.g.*, *Nat'l Paint & Coatings Ass'n* v. *City of Chicago*, 45 F.3d 1124, 1128–29 (7th Cir. 1995) (discussing the reasonableness of legislatures' restricting access to hazardous products including guns, fireworks, and liquor, despite the fact that other means of procurement exist).

## CONCLUSION

For the foregoing reasons and those set forth by the Government, the Challenged Laws easily survive *Bruen*'s historical analogy test. The use of a temporal restriction on 18-to-20-year-olds' ability to purchase handguns from FFLs (the "how") in order to protect the public from individuals who pose a heightened risk of violence when armed (the "why") is entirely consistent with a long history of analogous regulation. The "why" is further confirmed by modern neuroscience and social science research on the dangers of individuals under the age of 21 having easy access to firearms. Thus both the "how" and "why" of the Challenged Laws are consistent with a long history of analogous regulation.

Nothing in the Second Amendment requires this Court to overrule Congress's considered judgment on this critical public safety issue. As this Court has stated: "This is serious business. We do not

wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *United States* v. *Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011).

Dated:  December 28, 2023

*Of Counsel for* Amicus Curiae
*Giffords Law Center to Prevent
Gun Violence:*

Esther Sanchez-Gomez
Kelly Percival
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA 94104
(415) 433-2062

Robert A. Sacks
Leonid Traps
Sophie A. Kivett
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
(212) 558-4000

Elizabeth A. Rose
Madeline B. Jenks
Cason J.B. Reily
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Suite 700
Washington, DC 20006
(202) 956-7500

Respectfully submitted,

/s/ *Beatriz L. Albornoz*
Beatriz L. Albornoz
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Suite 700
Washington, DC 20006
(202) 956-6913
albornozb@sullcrom.com

*Counsel for* Amici Curiae *Giffords
Law Center to Prevent Gun
Violence and Brady Center to
Prevent Gun Violence*

*Of Counsel for* Amicus Curiae
*Brady Center to Prevent Gun
Violence:*

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT
GUN VIOLENCE
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100

## CERTIFICATE OF COMPLIANCE

I, Beatriz L. Albornoz, counsel for *amici curiae* Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence, and a member of the Bar of this Court, certify that this brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,203 words, excluding the parts of the brief exempted by Rule 32(f), and also complies with Federal Rule of Appellate Procedure 32(a)(5)–(6) because it is proportionately spaced and has a typeface of 14 points.

/s/ *Beatriz L. Albornoz*
Beatriz L. Albornoz

*Counsel for* Amici Curiae
*Giffords Law Center to Prevent*
*Gun Violence and Brady*
*Center to Prevent Gun Violence*

December 28, 2023

## CERTIFICATE OF SERVICE

I, Beatriz L. Albornoz, counsel for *amici curiae* Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence, and a member of the Bar of this Court, certify that I filed the foregoing brief through the Court's CM/ECF system and that it was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Beatriz L. Albornoz*
Beatriz L. Albornoz

*Counsel for* Amici Curiae
*Giffords Law Center to Prevent*
*Gun Violence and Brady*
*Center to Prevent Gun Violence*

December 28, 2023