# 23-2085

# United States Court of Appeals
### for the
# Fourth Circuit

JOSHUA CLAY MCCOY; TYLER DALTON MCGRATH; IAN
FLETCHER SHACKLEY; JUSTIN TIMOTHY FRASER,
on behalf of themselves and all others similarly situated as a Class,

*Plaintiffs/Appellees*,

– v. –

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES; STEVEN DETTELBACH, in his official capacity as
Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives;
MERRICK GARLAND, in his official capacity as
Attorney General of the United States,

*Defendants/Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

# BRIEF OF APPELLEES

Elliott M. Harding
HARDING COUNSEL, PLLC
1260 Clifden Greene
Charlottesville, Virginia 22901
(434) 962-8465

*Counsel for Appellees*

## Table of Contents

**Page**

Table of Authorities ................................................................. iii

Jurisdictional Statement ............................................................1

Statement of Issues.....................................................................1

Standard of Review.....................................................................1

Statement of the Case.................................................................1

Statement of Facts......................................................................2

Summary of the Argument.........................................................3

Argument.....................................................................................5

    I.    The Laws At Issue Violate The Second Amendment .........................5

        A.    The Commercial Purchase of A Handgun Is Conduct Which Falls Within The Second Amendment's Protection of the Right To Keep And Bear Arms......................6

        B.    The Status-based Restrictions On The Purchase of Handguns Are Materially Different From Those That Existed At The Time of The Founding .....................8

        C.    The Appellees Are Within The Definition of "The People" Protected By The Second Amendment ......................12

            1.    If The Age of Majority or "Adulthood" Is The Determinative Factor For Whether An Individual Falls Within "The People," The Plaintiffs Are Protected Because They Are Adults..............................14

            2.    If Nominal Age Rather Than Adulthood Is The Determinative Factor For Whether An Individual Falls Within "The People" Protected By The Second Amendment, The Appellees Are Protected Because Those Who Were Eighteen Routinely Purchased, Possessed, And Used Analogous Firearms And There Were No Founding-Era Age Restrictions ......................17

3.    Reliance on The Founding Era's Age of Majority is Misguided Because There Is No Age Limit In The Second Amendment And The Founders Knew How To Include Such If They Wanted To Do So ................................................................24

D.    The Regulations At Issue Are Not Consistent With This Nation's Historical Tradition of Firearms Regulation. ........................................................25

II.    The District Court Did Not Abuse Its Discretion By Certifying The Nationwide Class ......................................................26

Conclusion ................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*American Pipe and Construction Co. v. Utah*,
414 U.S. 538 (1974) ..................................................................27

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954) ..................................................................17

*Brown v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
No. 1:22-cv80 (N.D. W. Va. filed Aug. 30, 2022)................................3

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786, (2011) ..................................................................15

*Carolina Youth Action Project v. Wilson*,
60 F.4th 770 (4th Cir. 2023)............................................................1

*Coleman v. State*,
32 Ala. 581 (1858)......................................................................25

*District of Columbia v. Heller*,
554 U.S. 570 ................................................................... *passim*

*Eisen v. Carlisle & Jacquelin, et al.*,
417 U.S. 156 (1973) ..................................................................30

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014)............................................................1

*Firearms Policy Coal., Inc. v. McCraw*,
623 F. Supp. 3d 740 (N.D. Tex. 2022)................................................9

*Gariety v. Grant Thornton, LLP*,
368 F.3d 356 (4th Cir. 2004)..........................................................28

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ..................................................................28

*Goss v. Lopez*,
419 U.S. 565 (1975) ..................................................................17

*Hirschfeld v. BATFE*,
5 F.4th 407 (4th Cir. 2021) .......................................................7, 9

ii

*Horsley v. Trame*,
  808 F.3d 1126 (7th Cir. 2015) .............................................................16

*In re Packaged Seafood Prods. Antitrust Litig.*,
  2020 U.S. Dist. LEXIS 93230, 2020 WL 2745231
  (S.D. Cal. May 26, 2020) ................................................. 26, 28

*In re Zetia Ezetimibe Antitrust Litig.*,
  2021 U.S. Dist. LEXIS 263455, 2021 WL 9870367
  (E.D. Va. May 7, 2021) .................................................... 26, 28

*Kim v. Commandant, Defense Language Inst.*,
  772 F.2d 521 (9th Cir. 1985) ...............................................................29

*Maryland Shall Issue, Inc. v. Moore*,
  86 F.4th 1038 (4th Cir. 2023) ...................................... 6, 7, 13

*Miller v. Mackey International*,
  452 F.2d 424 (5th Cir. 1971) ...............................................................30

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ....................................................................... *passim*

*National Rifle Ass'n v. BATFE*,
  700 F.3d 185 (5th Cir. 2012) .................................................................8

*New Jersey v. T.L.O.*,
  469 U.S. 325 (1985) ...........................................................................17

*NRA v. BATFE*,
  714 F.3d 334 (5th Cir. 2013) ........................................ 12, 18, 19, 20

*Planned Parenthood v. Danforth*,
  428 U.S. 52 (1976) ...................................................... 14, 17

*Reese v. ATF*,
  No. 6:20-CV-01438, 2022 WL 17859138 (W.D. La. Dec. 21, 2022),
  *appeal docketed*, No. 23-30033 (5th Cir. Jan. 20, 2023) ..................3, 7

*Roper v. Simmons*,
  543 U.S. 551 (2005) ..................................................... 15, 16, 17

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ...........................................................................17

*United States Term Limits v. Thornton*,
  515 U.S. 779 (1995) ...........................................................................24

*United States v. Bartucci*,
   658 F. Supp. 3d 794 (E.D. Cal. 2023) ...................................................6

*United States v. Booker*,
   644 F.3d 12 (1st Cir. 2011) .................................................................9

*United States v. Hicks*,
   649 F. Supp. 3d 357 (W.D. Tex. 2023) ...............................................6

*United States v. Jackson*,
   __ F. Supp. 3d __, 2023 U.S. Dist. LEXIS 33579 (D. Md. Feb. 27, 2023) ...........7

*United States v. Kays*,
   624 F. Supp. 3d 1262 (W.D. Okla. 2022) .............................................6

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) ..............................................................7, 8

*United States v. Quiroz*,
   629 F. Supp. 3d 511 (W.D. Tex. 2022) .............................................5-6, 7

*United States v. Rowson*,
   652 F. Supp. 3d 436 (S.D.N.Y. 2023) ...............................................5, 6

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ..............................................................10

*West Lynn Creamery Inc. v. Healy*,
   512 U.S. 186 (1994) ..........................................................................19

*White v. Bank of Am., N.A.*,
   2012 LEXIS 44044, 2012 WL 1067657 (D. Md. Mar. 27, 2012) .......... 27, 28, 29


**Statutes & Other Authorities:**

U.S. Const., amend. I ................................................................ 13, 17

U.S. Const., amend. II .................................................................. *passim*

U.S. Const., amend. IV ...................................................................13

U.S. Const., amend. V......................................................................3

U.S. Const., amend. VIII..................................................................17

U.S. Const., amend. IX ...................................................................13

iv

U.S. Const., amend. XIV ................................................................. 17, 25

U.S. Const., amend. XXVI ........................................................ 15, 16, 24

U.S. Const., Art. I, § 2 ........................................................................24

U.S. Const., Art. I, § 3 ........................................................................24

U.S. Const., Art. II, § 1 .......................................................................24

18 U.S.C. § 922(b)(1) ................................................................. 2, 3, 11

18 U.S.C. § 922(c) ..............................................................................11

18 U.S.C. § 922(c)(1) .......................................................................2, 3

18 U.S.C. § 922(g) ..............................................................................11

18 U.S.C. § 922(g)(1) ........................................................................10

18 U.S.C. § 922(g)(4) ........................................................................10

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

27 C.F.R. § 478.96(b) ...........................................................................2

27 C.F.R. § 478.99(b)(1) .......................................................................2

27 C.F.R. § 478.124(a) ..........................................................................2

1792 Militia Act ..................................................................... 19, 20, 22

1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce
   to One the Several Acts in Relation to the Town of Harrodsburg," § 23 ...........25

Act of February 2nd, 1856 (Pamphlet Acts of 1855-56) ........................................25

Act of May 8, 1792, 1 Stat. 271 ..........................................................22

Carlton F. W. Larson, *Four Exceptions in Search of A Theory:* District of
   Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L. J. 1371 (2009) ........10

Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON
   FIREARMS & PUB. POL'Y (2004) ....................................... 11, 20, 21, 22

Fed. R. Civ. P. 23 ................................................................. *passim*

Fed. R. Civ. P. 23(a) ..........................................................................27

Fed. R. Civ. P. 23(b)(2) ................................................................... 4-5, 27

Fed. R. Civ. P. 23(c)(1) ............................................................... 26, 27

James Lindgren, *Counting Guns In Early America*, 43 Wm. & Mary L. Rev. 1777 (2002) ..................................................................... 18-19, 23

Richard Henry Lee, Walter Bennett, ed., *Letters from the Federal Farmer to the Republican* (Univ. of Alabama Press 1975) ......................... 23-24

Robert J. Spitzer, *The Second Generation of Second Amendment Law & Policy: Gun Law History In The United States And Second Amendment Rights*, 80 Law & Contemp. Prob. 55 (2017) ........................................ 18

S. Rep. No. 90-1097 ........................................................................ 16

Tench Coxe, "A Pennsylvanian, No. 3," Pennsylvania Gazette, Feb. 20, 1788 ..... 24

The Federalist No. 46 (Gideon, J. ed. 1818) (J. Madison) ...................... 23

William Blackstone, 1 Commentaries on the Laws of England 451 (1st ed. 1765) ........................................................................... 14

## Jurisdictional Statement

The Court has jurisdiction to consider this appeal from the final decision of the Eastern District of Virginia pursuant to 28 U.S.C. § 1291 and involves federal questions according to 28 U.S.C. §1331.

## Statement of Issues

I.    Whether the Second Amendment protects adult citizens who are younger than twenty-one years old and prohibits the federal Government from barring such persons from the commercial purchase of handguns.

II.   Whether the Appellees were prohibited from moving for class certification after the district court granted their motion for summary judgment.

## Standard of Review

The Court reviews the grant of summary judgment de novo, *see Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 777 (4th Cir. 2023), and reviews the certification of a class for abuse of discretion. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).

## Statement of the Case

This case concerns the United States' prohibition on the commercial sale of handguns to law-abiding adult citizens under the age of twenty-one. Mr. John "Corey" Fraser initially filed his Complaint on behalf of himself and those similarly situated on June 1, 2022. Joint Appendix at 3 ("JA"). The Appellants (hereinafter

"the Government") filed a motion to dismiss, JA28, and the parties agreed that the disposition of the case should be made on the legal merits, as there is no factual dispute. JA29. The Appellees opposed the Government's motion and moved for summary judgment. *Id*. The district court denied the Government's motion to dismiss and granted the Appellees' motion for summary judgment. JA28.

Mr. Joshua McCoy, Mr. Ian Shackley, and Mr. Tyler McGrath joined as Plaintiffs via the First Amended Complaint. The district court held that 18 U.S.C. §§ 922(b)(1) and (c)(1), and derivative regulations such as 27 C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b) (hereinafter "the laws at issue") violate the Appellees' rights to keep and bear arms as secured by the Second Amendment. The Appellees also argued that these laws violate due process as secured by the Fifth Amendment to the United States Constitution. JA11–27. Mr. Justin Fraser moved to join the case after turning eighteen, JA99, 111, and the Appellees moved for class certification and a nationwide injunction. The district court granted the motions and stayed the injunction pending appeal. JA99, 111; 113, 142; 144, 169.

## Statement of Facts

The Appellees are four individuals with a desire to purchase handguns from local Federal Firearm Licensed Dealers (hereinafter "FFL") but would ultimately be denied due to the laws at issue. The Appellees also consist of a class comprising of every adult citizen between the ages of eighteen and twenty-one who would

2

otherwise be lawfully permitted to purchase a handgun from an FFL but for the laws at issue (hereinafter "the Class"). The Class consists of:

> Natural persons and citizens of the United States of America who have attained the age of eighteen but who are not yet twenty-one and who have not been convicted of a felony, who are not fugitives from justice, have not been discharged from the Armed Forces under dishonorable conditions, are not unlawful users of or addicted to any controlled substances, have not been adjudicated as mental defectives or committed to a mental institution, are not on parole or probation, are not under indictment or restraint and are not plaintiffs in the pending cases of *Brown v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 1:22-cv80 (N.D. W. Va. filed Aug. 30, 2022); *Reese v. ATF*, NO. 6:20-CV-01438, 2022 WL 17859138 (W.D. La. Dec. 21, 2022), appeal docketed, No. 23-30033 (5th Cir. Jan. 10, 2023).

JA142.

Mr. John "Corey" Fraser attempted to purchase a handgun from an FFL in Virginia. JA29. He was denied due to his age and the laws at issue. *Id*. Aware of Mr. Fraser's denial, the remaining Appellees entered the suit to defend their ability to purchase handguns from FFLs for lawful purposes. *Id*.

## Summary of the Argument

**I.** Title 18 U.S.C. § 922(b)(1) and (c)(1), and attendant regulations, prohibit FFLs from selling handguns and ammunition to persons under the age of twenty-one. The Appellees argue these laws violate the Second Amendment. Because the district court held that the laws at issue violate the Second Amendment, it did not engage in a review as to whether such laws also violate the Fifth Amendment's due process clause. JA92. The laws at issue are unconstitutional because the Appellees

3

are ordinary, law-abiding, adult citizens and therefore fall within the scope of "the people" protected by the Second Amendment. There are no Founding-era or longstanding prohibitions which suggest these laws are of the sort that would have been permitted at the time of the Second Amendment's ratification. The conduct at issue—the commercial purchase of a firearm—falls within the "scope" of conduct that is protected and the nature of the firearms at issue—handguns—are not of the sort that are so uniquely dangerous such that the Second Amendment does not apply. Because the laws at issue are not consistent with our Nation's history and tradition, they cannot withstand Second Amendment scrutiny.

**II.**     The district court's order granting class certification after summary judgment was not an abuse of discretion because the Appellees made clear their intention in their Complaint and First Amended Complaint to prosecute this case as a class action, JA30, they alleged facts sufficient for such certification, the parties agreed to the procedure to resolve the matter on the merits in a timely manner, both parties agreed that there was no issue of material fact, and there was no dispute by the Government concerning the class-based claims that were presented. The case involves a facial-challenge to federal laws and regulations that apply equally to all members of the Class. There was no prejudice to the Government by granting class certification. This case fits squarely within the requirements of Fed. R. Civ. P.

23(b)(2). The concerns underlying the generally applicable rule against "one-way intervention" proffered by the Government are not present.

## ARGUMENT

### I.    The Laws At Issue Violate The Second Amendment.

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects such conduct. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). To justify regulation, the Government must establish that it is consistent with the Nation's historical tradition of firearm regulation. *Id*. Only if a regulation is consistent with this historical tradition may a court conclude that an individual's conduct falls outside the Second Amendment's "unqualified command." *Id*. It is the Government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at 19. The Court's first inquiry is whether the *conduct* is covered by the plain text, not whether the plaintiff's *status* falls within the plain text. *See id*. at 31–34; *United States v. Rowson*, 652 F.Supp.3d 436, 459 (S.D.N.Y. 2023) (noting *Bruen* focused on the "conduct" the statute proscribed, not on disqualifying status of individuals challenging the statute); *United States v. Quiroz*, 629 F. Supp. 3d 511,

516 (W.D. Tex. 2022) (noting conduct, rather than status, is what is analyzed to determine if it is protected by the plain text of the Second Amendment); *United States v. Bartucci*, 658 F. Supp. 3d 794, 798 (E.D. Cal. 2023) (same); *United States v. Kays*, 624 F. Supp. 3d 1262, 1265 (W.D. Okla. 2022) (same); *United States v. Hicks*, 649 F. Supp. 3d 357, 359–60 (W.D. Tex. 2023) (analyzing conduct and finding that receiving a firearm is encompassed by "to keep and bear arms").

Courts have refused to analyze an individual's status in the first prong of *Bruen*'s analysis. *See, e.g.*, *Bartucci*, 658 F. Supp. 3d at 798; *Kays*, 624 F. Supp. 3d at 1265, n.4 ("[T]he Court reiterates that an individual's Second Amendment rights are not predicated on their classification, but rather their conduct"); *Rowson*, 652 F.Supp.3d at 459–61 (noting *Bruen*'s focus was on conduct rather than status when joining post-*Bruen* courts deciding the same). The Appellees fall within the core definition of "the People" protected by the Second Amendment and the purchase of a handgun is conduct which falls within the Second Amendment's protection of the right to "keep and bear arms." The laws at issue violate the Second Amendment.

### A. The Commercial Purchase of A Handgun Is Conduct Which Falls Within The Second Amendment's Protection of the Right To Keep And Bear Arms.

Since *Bruen*, courts have found that the receipt of a firearm is protected by the plain text of the Second Amendment. *See, e.g.*, *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023); *United States v. Quiroz*, 629 F.Supp. 3d 511

(W.D. Tex. 2022); *United States v. Jackson*, __ F. Supp. 3d __, __, 2023 U.S. Dist. LEXIS 33579 at \*20, WL 2242874 (D. Md. Feb. 27, 2023) (citing *Quiroz* among post-*Bruen* cases and finding receipt of a firearm is protected). Other courts have assumed, without deciding, that the commercial purchase of handguns is conduct protected by the plain text of the Second Amendment by incorporating pre-existing Circuit precedent as consistent with *Bruen*. *Reese v. BATFE*, 647 F.Supp.3d 508, 521 (W.D. La. 2022). Similar reliance on pre-*Bruen* precedent in the Fourth Circuit held that the commercial purchase of a handgun is protected. *See Hirschfeld v. BATFE*, 5 F.4th 407, 416–18 (4th Cir. 2021) (vacated for mootness). The Government does not appear to argue that the conduct at issue is unprotected. Instead, it focuses its argument on the theory that the Appellees do not fall within the scope of "the people" protected by the Second Amendment. "Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment." *See United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010); *Maryland Shall Issue, Inc.*, 86 F.4th at 1043. If there were categorical exceptions from the Second Amendment for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms altogether but such a result would be untenable. *Id*.

### B. The Status-based Restrictions On The Purchase of Handguns Are Materially Different From Those That Existed At The Time of The Founding.

In *District of Columbia v. Heller*, the Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. 570, 626. *Heller*'s exception for "longstanding," "presumptively lawful regulatory measures" has proven to be a challenge to apply. *National Rifle Ass'n v. BATFE*, 700 F.3d 185, 196 (5th Cir. 2012). Courts have found it "difficult to discern" whether *Heller*'s reference to "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626–27, by "virtue of their presumptive validity, either (i) presumptively fail to burden conduct protected by the Second Amendment, or (ii) presumptively trigger and pass constitutional muster under a lenient level of scrutiny." *National Rifle Ass'n*, 700 F.3d at 196; *Marzzarella*, 614 F.3d at 91 (recognizing that the designation of "longstanding" "presumptively lawful measure" is ambiguous). The Fifth Circuit determined "that a longstanding, presumptively lawful regulatory measure—whether or not it is specified on *Heller*'s illustrative list—would likely fall outside the ambit of the Second Amendment . . . ." *National Rifle Ass'n*, 700 F.3d at 196. The Fourth Circuit has not provided similar guidance

8

as to whether courts should consider "longstanding prohibitions" to be presumptively lawful because the conduct "presumptively" falls outside of the Second Amendment's scope or because the laws "presumptively" withstood pre-*Bruen* heightened scrutiny. Nevertheless, this Court considered the same issue presented here and ruled in favor of the Appellees exact argument in *Hirschfeld*. 5 F.4th 407 (vacated as moot). This Court should recognize that *Heller*'s examples of "longstanding prohibitions" are only "presumptively lawful" because they presumably satisfy the review of the text, history, and tradition of the Second Amendment even though they encompass conduct within the scope of protection.

*Heller* listed the firearm-possession bans for felons and the mentally ill to be "longstanding" and presumptively lawful, yet the conduct itself—possession—fell within the "core" of the Second Amendment. 554 U.S. at 630. A reference to specific laws "that targeted particular groups for public safety reasons" are insufficient historical analogs to support the statutory and regulatory scheme at issue. This recognition "of specific 'longstanding prohibitions' does not support a general prohibition on almost all 18-to-20-year-olds—just because of their age." *Firearms Policy Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 755 (N.D. Tex. 2022).

*Heller* referred to the class-based restrictions on firearm possession by felons and the mentally ill as "longstanding" even though such bans were of mid-Twentieth century vintage. *See United States v. Booker*, 644 F.3d 12, 23–24 (1st Cir. 2011)

(explaining that the federal felony firearm possession ban, 18 U.S.C. § 922(g)(1), "bears little resemblance to laws in effect at the time the Second Amendment was ratified," as it was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968); *United States v. Skoien*, 614 F.3d 638, 640–41 (7th Cir. 2010) (explaining 18 U.S.C. § 922(g)(4), which forbids firearm possession by a person who has been adjudicated to be mentally ill, was enacted in 1968); Carlton F. W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L. J. 1371, 1376–80 (2009) (showing that a strictly originalist argument for *Heller*'s examples—including bans on firearm possession by felons and the mentally ill, and laws imposing conditions on commercial arms sales—is difficult to make). The defining characteristics of felons or the mentally ill materially distinguish them from those otherwise free to engage in the same conduct. It is their status rather than the possession itself that allows for the restriction to withstand scrutiny. *Heller* suggested that a regulation can be "longstanding" even if it does not boast a Founding-era analogue. *See Skoien*, 614 F.3d at 640–41 ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791."). *Heller* did not go so far as to say that a restriction is presumably lawful merely because it has gone unchallenged and nothing in the Second Amendment limited Constitutional protections to adults at the time.

10

*Bruen* noted that there is "ongoing scholarly debate" on whether the Fourteenth Amendment's" ratification in 1868 imbued the Second Amendment with a new and different meaning to the States than it had to the Federal Government in 1791. 142 S. Ct. at 2138. *Bruen* "should not be understood to endorse freewheeling reliance on historical practice form the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 2163 (Barrett, J., concurring). *Heller*'s examples of class-based restrictions on felons and the mentally ill materially differ from the age-related restrictions at issue in this case. The ban on felons comes only after a conviction via our justice system that must otherwise comport with constitutional safeguards. The ban on the mentally ill must also generally satisfy due process. Those restrictions maintain a defining quality of individualized assessment and due process while the restrictions in this case apply universally to all adults under a particular age by default. *Compare* 18 U.S.C. § 922(g), *with* 18 U.S.C. §§ 922(b)(1) and (c).

A "status" or class-based prohibition exists here, in that the law relies on the distinguishing characteristics of a group rather than the inherent risk of the conduct or dangerous quality of the firearm. At the time of the Founding, class-based or status restrictions targeted Native Americans, African-Americans, and Catholics. See Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON. FIREARMS & PUB. POL'Y at 16–20 (2004). None of those would be permitted today. The only Founding-era

regulations that could compare to the laws at issue were those for "Loyalists to the Crown," and they are only similar in that they applied to law-abiding, adult citizens absent consideration of race, ethnicity, national origin, or religion, yet these regulations contradict the position taken by the Government in this case. *NRA v. BATFE*, 714 F.3d 334, 343 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc). "Loyalty Tests" were applicable to persons "above eighteen and stated that those who did not swear allegiance would be disarmed," which inherently suggests that eighteen-year-olds were considered to have the rights to be armed even if equally subject to being restricted with other suspect class members. *Id*. (citing Massachusetts' age cut-off of sixteen in 1775 and Pennsylvania's at eighteen). "Loyalty Tests" applied to individuals on a case-by-case basis and are therefore most similar to contemporary restrictions on felons and the mentally ill in that they required an individualized assessment. There are no Founding-era analogues or longstanding prohibitions against the sale of items commonly used in self-defense to law-abiding adult citizens. The restrictions in this case lack the material features of those illustrated in *Heller* and the "longstanding prohibition" exception is inapplicable.

### C. The Appellees Are Within The Definition of "The People" Protected By The Second Amendment.

Courts start "with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 580. The

"first salient feature" of the Second Amendment's operative clause is that it codifies a "right of the people." *Id*. at 579. The Bill of Rights uses the phrase "right of the people" two other times—in the First Amendment's Assembly-and-Petition Clause and in the Fourth Amendment's Search-and-Seizure Clause. *Id*. ("The Ninth Amendment uses very similar terminology, 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.'"). All three instances "unambiguously refer to individual rights, not 'collective' rights, or rights that may be exercised only through participation in some corporate body." *Id*. In the six other provisions of the Constitution that mention "the people," the term refers to all members of the recognized political community, not an unspecified subset. *Id*. at 580 ("This contrasts markedly with the phrase 'the militia' in the prefatory clause [of the Second Amendment].").

Law abiding citizens who are eighteen and older fall within the "the people" due to their unqualified presence as adult citizens within the body-politic or political community. Because this case considers adult citizens legally eligible to own firearms, the Appellees fall squarely within the Amendment's definition of "the people." *Maryland Shall Issue, Inc.*, 86 F.4th at 1043 (citing *Bruen*) ("'the people' whom the Second Amendment protects" includes, at minimum, "ordinary, law-abiding, adult citizens.")).

13

1. **If The Age of Majority or "Adulthood" Is The Determinative Factor For Whether An Individual Falls Within "The People," The Plaintiffs Are Protected Because They Are Adults.**

The Government suggests that the Second Amendment allows Congress to enact age discrimination because the common law age of majority was twenty-one at the time of the Founding. *See* Opening Brief at 12 (citing William Blackstone, 1 Commentaries on the Laws of England 451 (1st ed. 1765)). This is not only an extreme position, it goes well-beyond the issue in this case. The Government asks this Court to adopt an interpretation of the Second Amendment that would effectively authorize the ban of all firearms for those younger than twenty-one because, as it argues, the Appellees do not fall within the scope of such Constitutional protection *at all*. The Government states "[f]or the Second Amendment's ratifiers, a natural point at which to draw the line between underage individuals and responsible adults was age 21," *id*., yet the ratifiers did not draw such a definitive line and the Government cannot cite one. The Government argues[1]

---

[1] The Government originally argued the Appellees lacked standing because FFLs may sell handguns to the parents or guardians of those under twenty-one and Appellees could buy them in private transactions. It seemingly waived this argument but the Appellees address it out of an abundance of caution. Adult citizens do not maintain "legal guardians" or other intermediaries for the purpose of exercising fundamental liberties. There is no example in the history of Constitutional jurisprudence of adult citizens of able mind and body having to subject the exercise of fundamental liberties to the approval or participation of their parent. Parental-oversight restrictions have been routinely invalidated, even where minors are involved. *See, e.g.*, *Planned Parenthood v. Danforth*, 428 U.S. 52, 74–75 (1976). The "parent as a third-party intermediary" doctrine does not exist and the

14

that the legal threshold of adulthood is the determinative factor for whether the Second Amendment applies, *id*., and points to the historical age threshold of twenty-one for things such as jury service, the right to petition, or the right to vote. Assuming, *arguendo*, that adulthood is the definitive factor for Second Amendment protection, then the relevant threshold is the age of majority at the time of the Court's inquiry in this case rather than a forever-fixed age of twenty-one at the time of the Founding-era. Every relevant civic activity that the Government cites as having an age-threshold of twenty-one at the time of the Founding has a contemporary threshold of eighteen. *See, e.g.*, U.S. Const. XXVI; *Roper v. Simmons*, 543 U.S. 551, 574 (2005) ("The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.").

When upholding a firearms restriction, courts must be able to conclude modern and historical regulations impose a "comparable burden" that is "comparably justified." *Id*. The Government cites the Congressional intent from 1968, stating that the statutory provisions were designed to address "[t]he clandestine acquisition of firearms by juveniles and minors," Op. Brief, at pp. 2–5;

---

Government cites no decision that has ever gone so far. JA33–39; *see also Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802, (2011) (rejecting similar argument in First Amendment context involving California's prohibition on the direct sale of violent video games to children under the age of 18). The district court's dismissal of the standing arguments was sound, JA33–39, and the Appellees adopt the reasoning of the memorandum opinion as argument.

S. Rep. No. 90-1097, at 79. When Congress enacted the laws in 1968, the age of majority was twenty-one. Our federal constitutional standard now delineates between a "minor" and "adult" at the age of eighteen, *see, e.g., Roper*, 543 U.S. at 574, and is defined as eighteen in every relevant federal context that includes a specified age.

Three years after the passage of the Omnibus Crime Control and Safe Streets Act of 1968, eighteen-year-olds received the universal right to vote. U.S. Const. amend. XXVI; *see also Horsley v. Trame*, 808 F.3d 1126, 1130 (7th Cir. 2015) ("The age of majority was 21 until the 1970s."). Eighteen-year-old males have been required to register for Selective Service for over a century and eighteen-year-olds are treated as adults for federal criminal trials, jury service, and emancipation from parental oversight. At eighteen, one can enter a binding contract, work without restriction, vote, and be held responsible for taxes. Nothing distinguishes an eighteen-year-old from any other contributing, constitutionally-protected adult in civic society and they fall squarely within "the People." For these and other reasons, the age of majority is eighteen for the protections of the Second Amendment. The Government seeks to sever Constitutional guarantees from law-abiding adults because they would have been minors in 1791. No fundamental liberty has ever been held inapplicable to a class of law-abiding citizens in such a fashion and, even more, the Supreme Court has consistently ruled that the Constitution's protections

16

generally apply to minors and adults alike. *See, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (recognizing First Amendment protections for minors in high school); *Goss v. Lopez*, 419 U.S. 565 (1975) (due process for minors in civil proceedings); *Roper*, 543 U.S. 551 (Eighth Amendment applies to minors); *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) (recognizing Fourteenth Amendment protections for minors); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (Fourth Amendment right to privacy for purposes of search and seizure). If the Government's position were tenable, every liberty could be subject to the age established in the Founding-era rather than the ages determined by the States or common-law developments. "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of maturity." *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74 (1976). The age of majority at the time of the Court's inquiry is, at maximum, the delineation between whether liberties fully vest or remain subject to age-related interference.

**2. If Nominal Age Rather Than Adulthood Is The Determinative Factor For Whether An Individual Falls Within "The People" Protected By The Second Amendment, The Appellees Are Protected Because Those Who Were Eighteen Routinely Purchased, Possessed, And Used Analogous Firearms And There Were No Founding-Era Age Restrictions.**

Courts must apply the "text, history, and tradition analysis" used by the Supreme Court in *Bruen*. 142 S. Ct. at 2126; *see also Heller*, 554 U.S. at 576. Considering the unique role that eighteen-year-olds played at the time of the

Revolutionary War and our Nation's Founding, together with the text, history, and tradition of the Second Amendment, this Court must find that the laws at issue are invalid. An exhaustive list of historical firearm regulations shows that there were no laws governing the possession or purchase of firearms by minors prior to 1791 and only two states adopted them between the Constitution's ratification and 1867. *See* Robert J. Spitzer, *The Second Generation of Second Amendment Law & Policy: Gun Law History In The United States And Second Amendment Rights*, 80 LAW & CONTEMP. PROB. 55, 58–59 (2017). As for licensure, regulation, or prohibition on the commercial sale of firearms, it was not until the early Twentieth-century that such laws were enacted in certain states and there were effectively no federal requirements until the National Firearms Act in 1934. *Id*. at 75 (Georgia (1902), North Carolina (1905), New York (1911), New Hampshire (1917), West Virginia (1925), New Jersey (1927), and Florida (1927)). Historical materials "couldn't be clearer: the right to keep and bear arms belonged to citizens 18 to 20 years old at the crucial period of our nation's history." *NRA*, 714 F.3d at 339 (Jones, J., dissenting).

At the time of our Declaration of Independence and Revolutionary War, colonial militias were comprised of boys as young as sixteen and thousands entering service while even younger. *See id*. George Washington's Continental Army consisted of young men under twenty-one. *Id*. Young males were commonly required to possess firearms as part of their militia service. *Id*., *see also* James

Lindgren, *Counting Guns In Early America*, 43 WM. & MARY L. REV. 1777, 1782 (2002). Thought by many as the "father of the Constitution," *cf. West Lynn Creamery Inc. v. Healy*, 512 U.S. 186, 193, n.9 (1994), James Madison was only twenty-five on July 4, 1776 and he ultimately served in George Washington's Continental Army along with those who were younger. His military contemporaries included an eighteen-year-old James Monroe and Charles Pinckney along with the twenty-year-old Henry Lee III, John Trumbull, Aaron Burr, and John Marshall. Additionally, the French officer Marquis de Lafayette was only eighteen in 1776 yet gained the rank of Major General in the Continental Army while leading battles including the Siege of Yorktown. Eighteen-year-olds regularly bought, used, possessed, and traded pistols, ammunition, and other firearms at this time. These firearms continue to serve as the "most preferred firearm in the nation to 'keep' and use for protection of one's home and family." *See Heller*, 554 U.S. at 628.

Following the ratification of the Bill of Rights on December 15, 1791, eighteen-year-olds were required by the 1792 Militia Act to be available for service and militia members were required to furnish their own weapons. Therefore, eighteen-year-olds were inherently allowed to "keep" firearms for personal use. *NRA*, 714 F.3d at 339 (Jones, J., dissenting from denial of rehearing en banc). Because they were within the "core" rights-holders at the Founding, their rights cannot be infringed today. *Id*.

The Government places a significant amount of its argument challenging the district court's reliance on the 1792 Militia Act. The reason for such reliance by the district court should be obvious, as it was the only Founding-era legislation that had any reference to age and a well-regulated militia was an intricately related purpose of the Second Amendment. In sum, it was the only relevant place for the district court to start when it comes to a post-*Bruen* analysis of the laws at issue. The Government failed to mention that the laws existing prior to, and immediately surrounding, ratification of the Second Amendment illuminate the contemporary understanding that those who were at least eighteen were within the scope of "the people" expected to engage in regular receipt of firearms.

The age of sixteen was the minimum for colonial militias almost exclusively for 150 years prior to ratification of the Second Amendment. *NRA*, 714 F.3d at 340. In 1650, it was the duty of all persons aged sixteen and above in Connecticut to bear arms. *See* Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. ON FIREARMS & PUB. POL'Y 1, 3 (2004). Other colonies had similar laws, *id*. at 8, with Delaware's minimum of seventeen as the lone exception. *Id*. At the time of the Second Amendment's ratification and shortly thereafter, the minimum age for militia service in every state[2] became eighteen. Nearly every state adopted the Militia Act of 1792

---

[2] Alphabetically by state, the minimum militia ages set around the time of ratification of the Second Amendment and the federal Militia Act of 1792: **Connecticut**: 18 /Acts and Laws, 308 (1792); **Delaware**: 18/ Ch. XXXVI, An Act for Establishing

by reference and began using its age structure. *Id*. Historical data confirms that those eighteen and above had the right to keep and bear arms. The Government is correct that this right was not coextensive with militia service, but it was intimately related. *Id*. Gun ownership was necessary for militia service, but militia service was not

---

the Militia In This State, 1134 (1793); **Georgia**: 18/ An Act to Revise and Amend the Militia Law of This State, and to Adapt the Same to the Act of the Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety-Two, Entitled "An Act More Effectually to Provide for the National Defence by Establishing and Uniform Militia Throughout the United States," as contained in Digest of the Laws of Georgia, 460 (1792); **Maryland**: 18 / Ch. LIII, An Act to Regulate and Discipline the Militia of This State, Laws of Maryland (1793); **Massachusetts**: 18 / Ch. 1, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose; excepting an Act Entitled, "An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within This Commonwealth, and Also the Militia, When Called Into Actual Service," 172 (1793); **New Hampshire**: 18 / An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose, 251 (1792); **New Jersey**: 18 / Ch. CCCCXIII, An Act for Organizing and Training the Militia of This State, Sec. 4, Acts of the General Assembly of the State of New Jersey, 825 (1792); **New York**: 18 / Ch. 45, An Act to Organize the Militia of This State. Laws of New York 440 (1793); **North Carolina**: 18 / Ch. XXII, An Act for Establishing a Militia in This State, Laws of North Carolina—1786, 813 (amended by An Act to Carry Into Effect an Act of Congress, Entitled, "An Act More Effectually to Provide for the National Defence, by Establishing an Uniform Militia Throughout the United States," Also to Amend an Act, Passed at Fayetteville, in he Year One Thousand Seven Hundred and Eighty Six, Entitled, "An Act for Establishing the Militia in This State," (1793)); **Pennsylvania**: 18/ Ch. MDCXCVI, An Act for Regulating the Militia of the Commonwealth of Pennsylvania, Statutes at Large of Pennsylvania, 455 (1793); **South Carolina**: 18/ An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress, 21 (1794) (enrolling citizens turning eighteen and evidencing a shift from the former militia age of sixteen as seen in: No. 1154, An Act for the Regulation of the Militia of This State, 682 (1782-91)); **Virginia**: 18/ Ch. CXLVI, An Act for Regulating the Militia of this Commonwealth, 182 & 184 (1792).

necessary for gun ownership. *Id*. Not only had the colonies employed sixteen-year-olds in the militia for more than a century prior to the Second Amendment's ratification, other firearm laws at the time serve as indicia of the Founders' mindset. *Id*.

Minors were in the militia and expected, and oftentimes required, to own and provide their own weapons. Referring to permissible historic limitations on gun ownership, *Heller* never mentioned a minimum age for exercise of the right. To the contrary, the *Heller* Court, like the district court in this case, positively quoted the first federal Militia Act of 1792 to explain the "militia clause," and provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years . . . shall . . . be enrolled in the militia." *Heller*, 554 U.S. at 596 (quoting Act of May 8, 1792, 1 Stat. 271). The *Heller* Court explained that the right of able-bodied citizens to keep and bear arms for self-defense was constitutionally codified "to prevent elimination of the militia," which some feared the newly created Federal Government, like past tyrants, might do by taking away the citizens' arms. *Id*. at 599. Those subject to militia duty are therefore a subset of citizens entitled to be armed and the right was considered to be essential. The Founders expressly resisted the notion of a standing army in the United States and preferred a strong, decentralized system of militias which consisted of thousands of men younger than twenty-one. "[T]he conception of the

militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Id*. at 627. James Madison discussed the interplay between state militias and a federal army in Federalist No. 46. While defending the notion of keeping a federal military small, he posited that state militias and an armed citizenry could outweigh threats of a standing military force. *See* The Federalist No. 46, pp. 247–48 (Gideon, J. ed. 1818) (J. Madison). Militias consisted and relied on young people, not just adults. They were decentralized bands of able-bodied males comprised of adults and minors alike. *See* Lindgren, *Counting Guns In Early America*, 43 WM. & MARY L. REV. 1777, 1782 (2002). Militias were the first and last line of domestic defense before and after the American Revolution, and their presence was a vital consideration when the Founders formulated America's system of federalism. *See, e.g.*, The Federalist No. 46, pp. 247–48 (Gideon, J. ed. 1818) (J. Madison). To think the Founders would have permitted a federal limitation on the purchase of new, commonly-used firearms by the same body that served as "the militia" is fundamentally at odds with the Second Amendment. Not only does the conduct proscribed by the laws at issue fall squarely within the scope of what our Founders meant to protect, but a reading of early-American documents show that the Founders would have affirmatively rejected such bans. *See, e.g.*, Richard Henry Lee, Walter Bennett, ed., *Letters from the Federal Farmer to the Republican*,

at 21, 22, 24 (Univ. of Alabama Press 1975) ("[T]o preserve liberty, it is essential that the whole body of the people always possess arms and be taught alike, *especially when young*, how to use them." (emphasis added)); *see also* Tench Coxe, "A Pennsylvanian, No. 3," Pennsylvania Gazette, Feb. 20, 1788 ("[T]he powers of the sword are in the hands of the yeomanry of America from 16 to 60 . . . . Their swords . . . are the birthright of an American.").

3. **Reliance on The Founding Era's Age of Majority is Misguided Because There Is No Age Limit In The Second Amendment And The Founders Knew How To Include Such If They Wanted To Do So.**

If the Founders wanted to attach an age restriction on the Second Amendment, they knew how to do so. *See, e.g.*, U.S. Const. Art. I, § 2 (minimum age of 25 for holding office in House of Representatives), § 3 (minimum age of thirty for serving in Senate), Art. II, § 1 (minimum age of thirty-five for President). Further, if the People want to apply an age threshold, they know how to do so. *See, e.g.*, U.S. Const. amend. XXVI (providing eighteen-year-olds with universal suffrage). The maxim *expressio unius est exclusio alterius* applies. *See, e.g.*, *United States Term Limits v. Thornton*, 515 U.S. 779, 868 (1995) (Thomas, J., dissenting). "When the Framers decided which qualifications to include in the Constitution, they also decided not to include any other qualifications in the Constitution." *Id.*

### D. The Regulations At Issue Are Not Consistent With This Nation's Historical Tradition of Firearms Regulation.

The lack of Founding-era age-based restrictions on the sale, purchase, or possession of firearms signals that such regulations are not consistent with this Nation's historical tradition of firearms regulations. The earliest age-based restriction in the United States came in 1856 when Alabama made it a misdemeanor to "sell, or give, or lend to any male minor a pistol." *See Coleman v. State*, 32 Ala. 581 (1858); Act of February 2nd, 1856 (Pamphlet Acts of 1855-56, at 17). No regulations enacted prior to 1776, 1789, 1791, or 1815 provided analogous laws to those at issue in this case. Three years after Alabama passed the first age-based restriction, Kentucky passed a law which imposed a fine for similar conduct. *See* 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg," § 23 ("If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars."). These are the only age-restrictions that existed prior to the ratification of the Fourteenth Amendment and the Second Amendment did not apply. Whether adulthood or the age of eighteen is the historical threshold for the purposes of the Second Amendment's protection of the right to purchase a handgun by a law-abiding citizen, the Appellees are entitled to exercise this fundamental liberty.

25

## II.    The District Court Did Not Abuse Its Discretion By Certifying The Nationwide Class.

The Appellees' motion for class certification was ripe for review at the time the Complaint was filed pursuant to Rule 23(c)(1), which states: "*Certification Order. Time to Issue. At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.*" Fed. R. Civ. P. 23(c)(1). Rule 23 was amended in 2003 with the requirement that a court determine class certification "at an early practicable time" after the commencement of an action rather than "as soon as practicable." *Id.* (advisory committee's notes to 2003 amendments). When making this change, the advisory committee noted that "[t]he 'as soon as practicable' exaction neither reflects prevailing practice nor captures the many valid reasons that may justify deferring the initial certification decision," such as a defendant's desire to seek dismissal or summary judgment without class certification. *Id.* The 2003 amendments "restored some flexibility in deferring the certification questions in appropriate cases." *See In re Zetia Ezetimibe Antitrust Litig.*, 2021 U.S. Dist. LEXIS 263455, at *24, 2021 WL 9870367 (E.D. Va. May 7, 2021); *see also In re Packaged Seafood Prods. Antitrust Litig.*, 2020 U.S. Dist. LEXIS 93230, at *51, 2020 WL 2745231 (S.D. Cal. May 26, 2020) (describing "one-way intervention" not as a "rule," but as an "argument" that "is often raised when the parties disagree whether a summary judgment motion should be decided before or after class certification

26

certification"); *White v. Bank of Am., N.A.*, 2012 LEXIS 44044, at *11–12, 2012 WL 1067657 (D. Md. Mar. 27, 2012) ("Whether substantive rulings can be made before class certification is a question subject to the court's discretion."). The Government claims that the doctrine disfavoring "one-way intervention" prohibited certification[3] because the district court ruled on the motion for summary judgment before the Appellees filed a motion to certify. Neither Rule 23, the Supreme Court of the United States, nor this Court has suggested that there is a rule of absolute prohibition against certifying a class in this situation. The "potential problem" posed by "one-way intervention," *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 546–47 (1974), is not at issue.

When the Complaint and First Amended Complaint named the "person" suing on behalf of the Class and defined the purported Class, the scope of the Class, and the merits of classification, the issue of certification was ripe for review. *See* Fed. R. Civ. P. 23(c)(1). The Complaint and First Amended Complaint sought classification in the prayer for relief, *see* JA30, and there was no requirement for the Appellees to submit a

---

[3] As stated in the Complaint and the First Amended Complaint, Class certification was appropriate in this case and the Class fits all of the material elements for certification governed by Rule 23(a). The Government does not challenge that the relevant Rule 23 factors are satisfied, but merely argues the timing of the certification was inappropriate. Therefore, the Appellees will not engage in defending the propriety of the district court's assessment of Rule 23(a) factors such as numerosity, common questions of law, typicality of the claims and adequacy of the claims and named plaintiffs, predominance and superiority of the claims, or the appointment of counsel. They also forego a defense of the certification based on Rule 23(b)(2).

subsequent motion[4] before the Court had jurisdiction to consider classification. The Government's argument against one-way intervention may have merit if the Appellees did not bring suit on behalf of the Class in their Complaints. The *introduction* of a purported class should come prior to ruling on a dispositive issue but this is not a situation where individuals brought suit in their personal capacity and failed to state that they are also suing on behalf of a defined class while choosing to subsequently move for such later. "[T]here is nothing explicit in Rule 23 that requires a determination on class certification prior to decisions on other motions. Often the court 'may need to probe behind the pleadings before coming to rest on the certification question.'" *White*, 2012 LEXIS 44044, at *11–12, 2012 WL 1067657 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004)); *In re Zetia Ezetimibe Antitrust Litig.*, 2021 U.S. Dist. LEXIS 263455 at *24, 2021 WL 9870367 (E.D. Va. May 7, 2021); *In re Packaged Seafood Prods. Antitrust Litig.*, 2020 U.S. Dist. LEXIS 93230, at *51, 2020 WL 2745231 (S.D. Cal. May 26, 2020).

---

[4] The Eastern District of Virginia did not have a local rule requiring a Plaintiff enter a separate motion seeking certification after initiating suit on behalf of a class. Additionally, Rule 23 does not reference a motion requirement. The timing of the Appellees' motion remained early and practicable for the district court to determine whether to certify the action as a class action and this decision came "after a person sue[d] . . . as a class representative." *Id.*

There are material reasons that such a prohibition is not absolute. An early decision on the merits can protect both parties and the court from needless expenditure of resources. *Id.*; *Kim v. Commandant, Defense Language Inst.*, 772 F.2d 521, 524 (9th Cir. 1985) (holding it was not improper for the district court to have reached the merits before class certification). In cases where a defendant files a potentially dispositive motion, the defendant waives the procedural safeguards of Rule 23, limiting the possible impropriety of an early decision on the merits, at least as far as the defendant's protections are concerned. *Id.*; *Kim*, 772 F.2d at 524 (stating that where the defendant assumes the risk that judgment will have only stare decisis effect, it is within the district court's discretion to rule on the merits first). It is within the court's discretion to determine whether judicial economy is served by an early decision on the merits. *White*, 2012 LEXIS 44044 at *11–12, 2012 WL 1067657 (D. Md. Mar. 27, 2012). Waiver is even more evident in a case such as this, where the parties agreed that the facts were not at issue, the Complaints presented all relevant information underlying Class certification and noted their intent, and the case presents a facial challenge to laws that contain equally applied discrimination based on codified classification. The Class has always been involved in this matter, as referenced in the district court's opinion granting summary judgment. JA30. The Government would have maintained the right to seek certification and use the decision to their benefit via stare decisis had they proven

successful. When "determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin, et al.,* 417 U.S. 156, 178 (1973) (quoting *Miller v. Mackey International,* 452 F.2d 424, 427 (5th Cir. 1971)). All requirements of Rule 23 were met and there no local rules prohibited certification at the relevant stage or required a formal motion for certification beforehand.

## Conclusion

WHEREFORE, the Appellees respectfully request for this Court to AFFIRM that the laws at issue violate the Appellees' rights as protected by the Second Amendment of the Constitution; HOLD that that Class certification was not an abuse of discretion; and REMAND this case for further proceedings.

## Request For Oral Argument

The Appellees respectfully request for the opportunity to present an oral argument to address the issues before the Court.

Respectfully submitted,

/s/ Elliott M. Harding

Elliott M. Harding, Esq.
VSB# 90442
*Counsel for the Appellees*
HARDING COUNSEL, PLLC
1260 CLIFDEN GREENE,
Charlottesville, VA 22901
Tel: 434-962-8465
E: Elliott@HardingCounsel.com

## <u>Certificate of Compliance</u>

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(A) it contains 7,801 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14- point font, a proportionally spaced typeface.

/s/ Elliott M. Harding
_____

Elliott M. Harding, Esq.
VSB# 90442
*Counsel for the Appellees*
HARDING COUNSEL, PLLC
1260 CLIFDEN GREENE,
Charlottesville, VA 22901
Tel: 434-962-8465
E: Elliott@HardingCounsel.com

## <u>Certificate of Service</u>

On January 22, 2024, I electronically submitted the foregoing document with the clerk of court for the United States Court of Appeals for the Fourth Circuit, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

/s/ Elliott M. Harding
_____

Elliott M. Harding, Esq.
VSB# 90442
*Counsel for the Appellees*
HARDING COUNSEL, PLLC
1260 CLIFDEN GREENE,
Charlottesville, VA 22901
Tel: 434-962-8465
E: Elliott@HardingCounsel.com