No. 23-2085

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

JOSHUA CLAY MCCOY, et al.,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Eastern District of Virginia

———————————

**REPLY BRIEF FOR APPELLANTS**

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JESSICA D. ABER
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT
STEVEN H. HAZEL
*Attorneys, Appellate Staff
Civil Division, Room 7217
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2498*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........................................................... 1

ARGUMENT ........................................................................................ 3

I.    The Federal Restrictions on the Sale of Handguns to 18-to-20-Year-Olds
      Are Consistent with the Second Amendment ........................................ 3

II.   The Federal Rules of Civil Procedure Preclude Class Certification ................... 11

CONCLUSION ..................................................................................... 16

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**Page(s)**</span>

*American Pipe & Constr. Co. v. Utah*,
  414 U.S. 538 (1974) ...................................................................... 2, 11, 12, 13

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................................... 14

*Chiafalo v. Washington*,
  140 S. Ct. 2316 (2020) ............................................................................... 10

*Citizens Bank, N.A., In re*,
  15 F.4th 607 (3d Cir. 2021) ................................................................... 12-13

*Costello v. BeavEx, Inc.*,
  810 F.3d 1045 (7th Cir. 2016) ........................................................ 2, 12, 13

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ........................................................... 2, 4, 6, 7, 10

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) ..................................................................... 15

*Kim v. Commandant, Def. Language Inst.*,
  772 F.2d 521 (9th Cir. 1985) ..................................................................... 15

*Lara v. Commissioner Pa. State Police*,
  91 F.4th 122 (3d Cir. 2024) .......................................................................... 9

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ............................................................................... 7, 10

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) ..................................................................................... 6

*National Rifle Ass'n of Am. v. ATF*,
  700 F.3d 185 (5th Cir. 2012) .............................................................. 1, 4, 8

*New York State Rifle & Pistol Ass'n v. Bruen,*
  597 U.S. 1 (2022) ................................................ 2, 4, 6, 7, 10, 11

*Opinion of the Justices, In re,*
  39 Mass. (22 Pick) 571 (1838) ........................................ 8

*Sprogis v. United Air Lines, Inc.,*
  444 F.2d 1194 (7th Cir. 1971) ...................................... 13

*Stastny v. Southern Bell Tel. & Tel. Co.,*
  628 F.2d 267 (4th Cir. 1980) ....................................... 12

*United States v. Rene E.,*
  583 F.3d 8 (1st Cir. 2009) ............................................ 8

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) .................................................... 14

**U.S. Constitution:**

Art. I, § 2 .................................................................. 3

Art. I, § 3 .................................................................. 3

Art. II, § 1 ................................................................. 3

Amend. XXVI ............................................................ 3

**Statutes:**

18 U.S.C. § 922(b)(1) .................................................. 7

18 U.S.C. § 922(c)(1) .................................................. 7

21 U.S.C. § 387f(d)(3)(A)(ii) ........................................ 5

**Rules:**

Fed. R. Civ. P. 8(c) .................................................... 15

Fed. R. Civ. P. 12(h)(1) ................................................................ 15

Fed. R. Civ. P. 23(c)(1) ............................................ 2, 11, 12, 13, 14

Fed. R. Civ. P. 23(c)(1) (1966) ...................................................... 12

Fed. R. Civ. P. 23(c)(1) (2003) ...................................................... 12

**Legislative Material:**

2 *Annals of Cong.* 1808 (1790) ...................................................... 9

**Other Authorities:**

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*
    (Jan. 15, 2021), https://ssrn.com/sol3/papers/cfm?abstract_id3766917 ..........10-11

Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship
    Between Guns and Homicide in American History*, in *A Right to Bear Arms?:
    The Contested Role of History in Contemporary Debates on the Second Amendment*
    (Jennifer Tucker et al. eds. 2019) ...................................................... 6

## INTRODUCTION AND SUMMARY

**I.** Plaintiffs urge that the provisions codified at Sections 922(b)(1) and (c) of Title 18 defy historical tradition and strike at the heart of Second Amendment protections. At times they appear to urge (*see* Pls.' Br. 24-25) that any age limit on the purchase of firearms would contravene the Second Amendment. At other times they argue (Pl.'s Br. 16) that an age restriction on handgun purchases can be no higher than the age for voting; thus, an age limitation for 21-year-olds would have been valid when the provision was enacted in 1968 but became invalid when the federal voting age was lowered to 18.

Plaintiffs themselves appear to recognize that their first proposition is implausible. And their second proposition accords with neither common sense nor the history on which plaintiffs seek to rely. As our opening brief explained, legislatures at the time of the founding established an age qualification of 21 for a variety of activities, and plaintiffs do not dispute that contemporaries regarded under-21-year-olds as "infants" generally subject to parental supervision. *National Rifle Ass'n of Am. v. ATF* (*NRA*), 700 F.3d 185, 201 (5th Cir. 2012). The provisions at issue here accord with those historical principles. The provisions do not prevent plaintiffs from purchasing firearms other than handguns. Nor do the provisions prevent plaintiffs from possessing handguns. The provisions do no more than require parents to determine whether it is appropriate for their children under the age of 21 to obtain handguns.

1

That the Second Amendment does not strip legislatures of authority to limit the commercial sale of handguns to 18-to-20-year-olds is confirmed by nineteenth century evidence. When handguns became both more lethal and more widespread in the nineteenth century, at least 20 jurisdictions prohibited the sale of those weapons to 18-to-20-year-olds. Although plaintiffs maintain (Pls.' Br. 25) that these nineteenth century laws have no relevance to the inquiry here, the Supreme Court has recognized such evidence as "a critical tool of constitutional interpretation" and reviewed it in both *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008), and *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 35 (2022).

**II.** Plaintiffs fare no better in urging that a plaintiff can wait to move for class certification until after obtaining a favorable merits decision. That course is precluded by Rule 23(c)(1) of the Federal Rules of Civil Procedure. Were it otherwise, a plaintiff could enable members of the newly certified class "to benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one." *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974). Plaintiffs do not acknowledge that "strikingly unfair" result or attempt to reconcile their delay with the text of the Federal Rules. *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057-58 (7th Cir. 2016) (quotation marks omitted).

## ARGUMENT

### I.    The Federal Restrictions on the Sale of Handguns to 18-to-20-Year-Olds Are Consistent with the Second Amendment

As our opening brief explained, two principles emerge from the Founding Era evidence.  First, legislatures established an age qualification of 21 for various activities, and there is no evidence they were viewed as lacking authority to impose the same qualification on the purchase of handguns.  *See* Opening Br. 12-14.  Second, the founders regarded under-21-year-olds as "infants" generally subject to parental supervision.  *See id.* at 11-12, 15.  These principles are consistent with the provisions at issue here, which Congress enacted to limit 18-to-20-year-olds' ability to obtain handguns without their parents' approval.

**A.**  Plaintiffs offer a variety of theories for their contrary view, the most extreme of which is a text-based claim that no age restrictions are permissible.  They declare that "[i]f the Founders wanted to attach an age restriction on the Second Amendment, they knew how to do so.  *See, e.g.*, U.S. Const. art. I, § 2 (minimum age of 25 for holding office in House of Representatives), § 3 (minimum age of thirty for serving in Senate), art. II, § 1 (minimum age of thirty-five for President)."  Pls.' Br. 24.  Plaintiffs further declare that "if the People want to apply an age threshold, they know how to do so.  *See, e.g.*, U.S. Const. amend. XXVI (providing eighteen-year-olds with universal suffrage).  The *maxim expressio unius est exclusio alterius* applies."  Pls.' Br. 24.  This

3

categorical theory would cast doubt on *any* age-related firearm restriction; the Court should reject this level of absolute ahistoricism.

Plaintiffs' other arguments likewise give short shrift to relevant historical evidence. Plaintiffs' alternative textual contention is that *Heller* referred to the "people" covered by the Second Amendment as the "members of the recognized political community," Pls.' Br. 12-13 (quoting 554 U.S. at 580), and that, inasmuch as the voting age is now 18, the Amendment must extend in full measure to 18-to-20-year-olds. This argument depends largely on the observation that "[w]hen Congress enacted the laws in 1968, the age of majority was twenty-one. Our federal constitutional standard now delineates between a 'minor' and 'adult' at the age of eighteen." Pls.' Br. 16. But as our opening brief demonstrated (at 23-24), the Twenty-Sixth Amendment did not alter the scope of the Second Amendment. In any event, *Bruen* indicates that any interpretation of the Second Amendment's text must be "informed by history" and "the Nation's historical tradition of firearm regulation." 597 U.S. at 19, 24. The Twenty-Sixth Amendment, which was ratified in 1971, does not shed meaningful light on that history.

Plaintiffs also err in suggesting (at 15-17) that modern statutes invariably draw the line between underage individuals and responsible adults at age 18. To the contrary, legislatures continue to set 21 as the age requirement for many activities, including purchasing alcohol, *see NRA*, 700 F.3d 185, 204 n.17 (5th Cir. 2012), lottery tickets, *see id.*, tobacco products, 21 U.S.C. § 387f(d)(3)(A)(ii), and—particularly

4

relevant here—handguns.  As the states' amicus brief details (at 10-13), a substantial majority of states have laws that independently restrict the possession or purchase of arms by 18-to-20-year-olds.

No more successful is plaintiffs' emphasis on other constitutional protections that apply to minors.  Plaintiffs reason (Pls.' Br. 17) that the Second Amendment must apply on the same terms, urging that "[i]f the Government's position were tenable, every liberty could be subject to the age established in the Founding-era rather than the ages determined by the States or common-law developments."  But the Supreme Court's historical inquiry in Second Amendment cases reflects concerns distinct from those involved in the application of free speech, due process, equal protection, or Eighth Amendment protections.  And in any event, were plaintiffs' attempt to equate the relevant standards correct, their logic would dictate that no firearms age restriction is permissible, not that the restrictions on handgun purchases by 18-to-20-year-olds is impermissible.

**B.** Plaintiffs also misunderstand the nature of the historical evidence germane to the Second Amendment analysis.  That is particularly clear in their suggestion (Pls.' Br. 17) that modern age qualifications satisfy the Second Amendment only if Founding Era legislatures adopted similar laws.  *Bruen* does not reduce the interpretation of the Second Amendment to a rote archival search for Founding Era laws that match a modern statute.  To the contrary, it directs courts to use text, history, and tradition to discern the "constitutional *principles*" that delimit Congress's

5

power to regulate firearms. *Bruen*, 597 U.S. at 31 (emphasis added; citation omitted).

And it makes clear that modern laws may be consistent with the Second Amendment

even if they lack "historical twin[s]." *Id.* at 30 (emphasis omitted). As Justice Scalia

has explained, "[q]uite obviously, not every restriction . . . that did not exist in 1791 or

in 1868 is *ipso facto* unconstitutional." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334,

373 (1995) (Scalia, J., dissenting).

There is no evidence that any Founding Era legislature declined to establish age

qualifications for the commercial sale of handguns because of the Second

Amendment or the principles it embodies. Legislatures simply had little reason to

adopt such qualifications given the cumbersome nature and relative rarity of handguns

at the founding. *See* Randolph Roth, *Why Guns Are and Are Not the Problem: The

Relationship Between Guns and Homicide in American History*, *in A Right to Bear Arms?: The

Contested Role of History in Contemporary Debates on the Second Amendment* 113, 117-18

(Jennifer Tucker et al. eds. 2019). Other forms of historical evidence—including

legislatures' discretion to establish age qualifications, parents' authority to supervise

under-21-year-olds, and nineteenth century laws—thus assume heightened

importance.

As our opening brief showed, that evidence is consistent with the Supreme

Court's refusal to cast doubt on "laws imposing conditions and qualifications on the

commercial sale of arms." *Heller*, 554 U.S. at 626-27. A plurality of the Court

repeated that statement in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); Justice

6

Kavanaugh and the Chief Justice reiterated the point in *Bruen*, 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring); and Justice Alito similarly underscored that federal law continues to "bar[] the sale of a handgun to anyone under the age of 21," *id.* at 73 (Alito, J., concurring) (citing 18 U.S.C. § 922(b)(1), (c)(1)).

In response to the extensive evidence regarding Founding Era practice discussed in our opening brief, plaintiffs cite only selective features of historical militia practice. Although plaintiffs assert (Pls.' Br. 21) that the Second Amendment right "[i]s intimately related" to militia service, *Heller* explained that the Second Amendment codifies "an individual right unconnected with militia service." 554 U.S. at 582. Consistent with that determination, *Bruen* conducted a detailed analysis of historical evidence without placing significant emphasis on militia laws. *See* 597 U.S. at 31-70.

In any event, plaintiffs' reliance on militia laws fails on its own terms. Plaintiffs contend (Pls.' Br. 18) that "colonial militias" included "boys as young as sixteen and . . . even younger" and that those individuals were therefore entitled to obtain handguns outside the context of militia service. But militia service involves access to arms in a supervised setting. Permitting a 16-year-old to drill with a musket under the oversight of militia officers does not imply that the same individual would have a right to obtain handguns outside that context and without parental approval. Plaintiffs do not appear to contend that the Second Amendment gives 16-year-olds a Second Amendment right to purchase handguns. *Cf. United States v. Rene E.*, 583 F.3d 8, 15

7

(1st Cir. 2009) (upholding, based on a review of Founding and Reconstruction Era evidence, the federal prohibition on the possession of handguns by individuals under the age of 18).  The cited militia practices likewise do not establish a constitutional right to purchase handguns at age 18.

To the extent that militia laws are relevant to the inquiry here, they serve to underscore legislatures' discretion to set age qualifications for access to arms at the Founding.  Plaintiffs insist (Pls.' Br. 20-23) that the Militia Act of 1792 required states to admit 18-to-20-year-olds into the militia.  In fact, however, the Act "gave States discretion to impose age qualifications on service." *NRA*, 700 F.3d at 204 n.17 (citing Militia Act § 2, 1 Stat. 271, 272 (1792)).  A leading judicial decision of the time confirms that the Act allowed legislatures "to exempt from enrol[l]ment in the militia, all persons under twenty-one." *In re Opinion of the Justices*, 39 Mass. (22 Pick) 571, 576 (1838).  And on multiple occasions, states exercised their authority to exclude 18-to-20-year-olds from militia service.  Plaintiffs do not address the examples from Georgia, New Jersey, North Carolina, and Virginia discussed in our opening brief.  *See* Opening Br. 20 & n.3.

Plaintiffs similarly fail to address the evidence that 18-to-20-year-olds serving in Founding Era militias generally depended on their parents for access to firearms.  For example, many state legislatures directed parents to supply weapons for their children's militia duty.  *See* Opening Br. 21 & n.4 (collecting citations from Maine, Massachusetts, Missouri, New Hampshire, North Carolina, and Vermont).  And when

8

Congress considered whether the federal government should furnish firearms to persons unable to equip themselves, Representative John Vining asked "by what means minors were to provide themselves with the requisite articles?" 2 *Annals of Cong.* 1808 (1790). The remedy, according to Representative Jeremiah Wadsworth, was that "as to minors, their parents or guardians would prefer furnishing them with arms themselves." *Id.* at 1809. The Second Amendment's ratifiers thus presumed that 18-to-20-year-olds could not acquire firearms without their parents' support. [1]

**C.** Evidence from the nineteenth century demonstrates the same understanding. Plaintiffs do not dispute that in the decades surrounding the Fourteenth Amendment's passage, at least twenty jurisdictions prohibited the commercial sale of handguns to 18-to-20-year-olds. *See* Opening Br. 15-16. Plaintiffs also do not dispute that those prohibitions were approved by courts, accepted by commentators, and endorsed by the public. *See id.* at 17-19. Instead, plaintiffs urge (Pls.' Br. 25) that nineteenth century evidence is to be given little or no weight.

---

[1] Plaintiffs appropriately do not seek to derive support from the Third Circuit's recent decision in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024). In that case, a divided panel held unconstitutional under the Second Amendment certain state laws that "when combined with a state or municipal emergency declaration[,] have the practical effect of preventing most 18-to-20-year-old adult Pennsylvanians from carrying firearms." *Id.* at 127. In contrast to the federal age restrictions at issue here, the state age restrictions in *Lara* applied to all firearms, not just handguns, and prevented the public carriage of those weapons, not just their sale by federal firearms licensees.

9

That is incorrect. The Supreme Court has explained that the Second Amendment codified a "pre-existing right" regarded as "venerable" when the Amendment was ratified in 1791, *Heller*, 554 U.S. at 603, 605, and that "was still recognized to be fundamental" in the mid-to-late nineteenth century, *McDonald*, 561 U.S. at 773. Sources from both before and after 1791 thus provide insight into what the right to bear arms entails. Nineteenth century history assumes particular importance because the Supreme Court has determined that the Second Amendment and the Fourteenth Amendment, which was ratified in 1868 and which confirmed that the right to bear arms is enforceable against the states, "have the same scope." *Bruen*, 597 U.S. at 37. Tracing the meaning of a right codified in 1791 and renewed in 1868 necessarily permits the review of sources from both periods. *Bruen* similarly recognized that "a regular course of practice" arising after ratification "can 'liquidate [and] settle the meaning of' disputed or indeterminate 'terms'" in the Constitution. *Id.* at 35-36 (quoting *Chiafalo v. Washington*, 140 S. Ct. 2316, 2326 (2020)).

Consistent with these principles, *Heller* described nineteenth century evidence as a "critical tool of constitutional interpretation," 554 U.S. at 605; both *Heller* and *Bruen* conducted an extensive review of nineteenth century sources, *see Heller*, 554 U.S. at 605-19 (considering evidence "through the end of the 19th century"); *Bruen*, 597 U.S. at 34, 50-70 (same); *see id.* at 30 (looking to "18th- and 19th-century" evidence in discussing the scope of the sensitive places doctrine); and *Bruen* cited scholarship emphasizing the importance of those sources, *id.* at 38 (quoting Kurt T. Lash, *Re-*

*Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021),

https://ssrn.com/sol3/papers/cfm?abstract_id=3766917 ("When the people adopted

the Fourteenth Amendment into existence, they readopted the original Bill of Rights,

and did so in a manner that invested those original 1791 texts with new 1868

meanings.")).  The Supreme Court in *Bruen* noted that "late-19th-century evidence

cannot provide much insight into the meaning of the Second Amendment when it

contradicts earlier evidence."  597 U.S. at 66.  Here, however, in contrast to the

"outlier" statute the Court addressed in *Bruen*, *id.* at 70, the commercial sale

restrictions are consistent with modern and historical evidence including evidence

from well before the end of the nineteenth century.

## II.    The Federal Rules of Civil Procedure Preclude Class Certification

It is well-established that a plaintiff cannot wait until after a district court has

resolved the merits before deciding whether to move for class certification.  *See* Fed.

R. Civ. P. 23(c)(1).  This prohibition, which is known as the rule against one-way

intervention, ensures that absent class members cannot "benefit from a favorable

judgment without subjecting themselves to the binding effect of an unfavorable one."

*American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974).  That rule barred class

certification here.

Plaintiffs make no meaningful attempt to reconcile their belated certification

motion with the Federal Rules of Civil Procedure.  Rule 23(c)(1) specifies that "the

court must determine . . . whether to certify the action" at "an early practicable time."

Despite that requirement, plaintiffs withheld their motion for certification until after the district court had conclusively resolved the merits. Because of plaintiffs' delay, the court decided class certification not "[a]t an early practicable time," but at the end of the case. Fed. R. Civ. P. 23(c)(1); *see Stastny v. Southern Bell Tel. & Tel. Co.*, 628 F.2d 267, 276 n.13 (4th Cir. 1980) (recognizing that under Rule 23 "the ultimate class action determination . . . must necessarily precede any final decision on the merits").

A 2003 amendment to Rule 23 on which plaintiffs seek to rely did not alter the prohibition against one-way intervention. Plaintiffs do not dispute that in 1966 Rule 23(c)(1) was added "in part, specifically" to "assure that members of the class would be identified before trial on the merits." *American Pipe*, 414 U.S. at 547. Plaintiffs nonetheless urge (Pls.' Br. 26) that the 2003 amendment to Rule 23 relaxed the rule against one-way intervention by requiring that a court determine whether to certify a class "[a]t an early practicable time," Fed. R. Civ. P. 23(c)(1) (2003), rather than "[a]s soon as practicable after the commencement of an action," Fed. R. Civ. P. 23(c)(1) (1966). The advisory note accompanying the 2003 update makes clear, however, that the amendment "d[id] not restore the practice of 'one-way intervention' that was rejected by the 1966 revision." Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment; *see also id.* (explaining that the amendment was intended to make clear that a court may "amend the class definition" or "[d]ecertif[y]" a class after certification). Courts thus recognize that Rule 23(c)(1) continues to "prevent[] plaintiffs from moving for class certification after acquiring a favorable ruling on the

12

merits of a claim." *Costello*, 810 F.3d at 1057; *see In re Citizens Bank, N.A.*, 15 F.4th 607, 617-18 (3d Cir. 2021) (observing that the 2003 amendment "definitely did not 'restore the practice of one-way intervention'").

Plaintiffs similarly err in claiming (Pls.' Br. 4) that one-way intervention causes "no prejudice to the Government." Under plaintiffs' approach, challengers to a government policy could file suit in multiple district courts and then, if even a single court issues a favorable merits decision, move to convert that decision into a nationwide victory. Plaintiffs thus champion a regime in which the challengers to a government policy would need to prevail only once, but the government would need to prevail in every case. Nothing in the Federal Rules authorizes that "strikingly unfair" outcome. *Costello*, 810 F.3d at 1057-58 (quoting *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1207 (7th Cir. 1971) (Stevens, J., dissenting)).

The unfairness inherent in one-way intervention is exacerbated by two features of this case that the government previously highlighted and that plaintiffs ignore. First, plaintiffs failed to identify any reason it would not have been "practicable" to move for certification before the district court issued a merits decision. Fed. R. Civ. P. 23(c)(1). Thus, the only purpose served by plaintiffs' delay is that it allowed unnamed class members to "benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one." *American Pipe*, 414 U.S. at 547. Second, plaintiffs persuaded the district court to certify a nationwide class. As the Supreme Court has explained, certification of a nationwide class threatens to

"foreclos[e] adjudication [of a legal issue] by a number of different courts," and plaintiffs' request to certify a nationwide class therefore triggers particularly exacting review. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Instead of grappling with Rule 23's text or the rationale underlying the rule against one-way intervention, plaintiffs propose that this Court create an exception that would swallow the rule. They emphasize (Pls.' Br. 28) that the complaint included class allegations, and argue those allegations alone are sufficient to alleviate the fairness concerns animating the rule. That contention has no basis in Rule 23(c)(1)'s text, which does not address the contents of a complaint and instead dictates that a court "must determine . . . whether to certify" a class "at an early practicable time." And because a plaintiff generally cannot move for class certification unless their complaint includes class allegations, the rule against-one way intervention would rarely if ever apply under plaintiffs' novel theory.

Plaintiffs are likewise mistaken in seeking to shift the burden of addressing class certification to the government. Plaintiffs maintain (Pls.' Br. 29) that because the government moved to dismiss the complaint without raising the issue of class certification, it "waive[d]" any reliance on the rule against one-way intervention. But as our opening brief explained (at 28-29), it is plaintiffs, not the government, who have the burden of seeking and demonstrating the propriety of class certification. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Indeed, although the Federal Rules specifically identify aspects of a complaint to which a defendant must respond

in its motion to dismiss, *see* Fed. R. Civ. P. 8(c), 12(h)(1), the Rules do not require a defendant to preemptively raise objections to class certification.

The absence of support for plaintiffs' position is highlighted by the cases on which they rely. The sole court of appeals decision plaintiffs invoke does not involve an instance of one-way intervention or otherwise discuss that practice. Pls.' Br. 29 (citing *Kim v. Commandant, Def. Language Inst.*, 772 F.2d 521, 524 (9th Cir. 1985)). Likewise, none of the district court decisions plaintiffs cite (Pls.' Br. 26-29) allowed a plaintiff to move for certification after the court had resolved the merits.

Plaintiffs do not advance their argument by asserting (Pls.' Br. 26) that the district court had discretion to disregard the rule against one-way intervention. "A district court abuses its discretion when it materially misapplies the requirements of Rule 23." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). In this case, the district court recognized that the rule against one-way intervention applies but believed that the government had waived reliance on the rule. *See* JA117, JA120. For the reasons given above and in our opening brief (at 28-30), that determination materially misapplies the Federal Rules.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JESSICA D. ABER
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
ABBY C. WRIGHT

*s/ Steven H. Hazel*
STEVEN H. HAZEL
*Attorneys, Appellate Staff
Civil Division, Room 7217
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2498
Steven.H.Hazel@usdoj.gov*

February 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 3,785 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven H. Hazel*
Steven H. Hazel

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Steven H. Hazel*

Steven H. Hazel