**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 23-2085**

───────────

JOSHUA CLAY MCCOY; TYLER DALTON MCGRATH; IAN FLETCHER SHACKLEY; JUSTIN TIMOTHY FRASER, on behalf of themselves and all others similarly situated as a Class,

        Plaintiffs – Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; STEVEN DETTELBACH, in his official capacity as Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; PAMELA JO BONDI, in her official capacity as Attorney General of the United States,

        Defendants – Appellants.

----------------------------------

GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE; BRADY CENTER TO PREVENT GUN VIOLENCE; ILLINOIS; ARIZONA; CALIFORNIA; COLORADO; CONNECTICUT; DELAWARE; DISTRICT OF COLUMBIA; HAWAII; MARYLAND; MASSACHUSETTS; MICHIGAN; MINNESOTA; NEVADA; NEW JERSEY; NEW YORK; NORTH CAROLINA; OREGON; PENNSYLVANIA; RHODE ISLAND; VERMONT; WASHINGTON,

        Amici Supporting Appellants.

───────────

Appeal from the United States District Court for the Eastern District of Virginia at Richmond.  Robert E. Payne, Senior District Judge.  (3:22−cv−00410−REP)

───────────

Argued:  January 30, 2025               Decided:  June 18, 2025

———————

Before WILKINSON, QUATTLEBAUM, and HEYTENS, Circuit Judges.

———————

Reversed and remanded with directions to dismiss by published opinion. Judge Wilkinson wrote the opinion, in which Judge Heytens joined. Judge Heytens wrote a concurring opinion. Judge Quattlebaum wrote a dissenting opinion.

———————

**ARGUED:** Courtney Lynn Dixon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Elliott Michael Harding, HARDING COUNSEL, PLLC, Charlottesville, Virginia, for Appellees. **ON BRIEF:** Brian M. Boynton, Principal Deputy Assistant Attorney General, Mark B. Stern, Michael S. Raab, Abby C. Wright, Steven H. Hazel, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellants. Beatriz L. Albornoz, SULLIVAN & CROMWELL LLP, Washington, D.C., for Amici Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence. Esther Sanchez-Gomez, Kelly Percival, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, San Francisco, California; Robert A. Sacks, Leonid Traps, Sophie A. Kivett, New York, New York, Elizabeth A. Rose, Madeline B. Jenks, Cason J.B. Reily, SULLIVAN & CROMWELL LLP, Washington, D.C., for Amicus Giffords Law Center to Prevent Gun Violence. Douglas N. Letter, Shira Lauren Feldman, BRADY CENTER TO PREVENT GUN VIOLENCE, Washington, D.C., for Amicus Brady Center to Prevent Gun Violence. Kwame Raoul, Attorney General, Jane Elinor Notz, Solicitor General, Alex Hemmer, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Kris Mayes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona, for Amicus State of Arizona. Rob Bonta, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California, for Amicus State of California. Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. Anne E. Lopez, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAI'I, Honolulu, Hawai'i, for Amicus State of Hawai'i. Andrea Joy Campbell, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Matthew J. Platkin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT,

Hartford, Connecticut, for Amicus State of Connecticut. Brian L. Schwalb, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Aaron D. Ford, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Carson City, Nevada, for Amicus State of Nevada. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Josh Stein, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH CAROLINA, Raleigh, North Carolina, for Amicus State of North Carolina. Michelle A. Henry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF PENNSYLVANIA, Harrisburg, Pennsylvania, for Amicus Commonwealth of Pennsylvania. Charity R. Clark, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington.

WILKINSON, Circuit Judge:

18 U.S.C. § 922(b)(1) prohibits the commercial sale of handguns to individuals under the age of 21. Appellees are four 18- to-20-year-olds who want to buy handguns. The question in this case is whether § 922(b)(1) violates appellees' Second Amendment rights.

We hold that it does not. From English common law to America's founding and beyond, our regulatory tradition has permitted restrictions on the sale of firearms to individuals under the age of 21. Section 922(b)(1) fits squarely within this tradition and is therefore constitutional. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (establishing text, history, and tradition test for the Second Amendment).

## I.

### A.

Federal law prohibits any person from "engag[ing] in the business of importing, manufacturing, or dealing in firearms" without a Federal Firearms License. 18 U.S.C. § 923(a). Upon obtaining a license, Federal Firearm Licensees ("FFLs") become subject to a number of statutory restrictions. One restriction concerns the buyer's age. Section 922(b)(1) makes it unlawful for FFLs to sell "any firearm" to individuals under the age of 18 or, as relevant here, any firearm "other than a shotgun or rifle" to individuals between 18 and 20. It reads as follows:

> It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver—any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or

4

rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age.

18 U.S.C. § 922(b)(1). An FFL who "willfully violates" this provision can be fined, imprisoned for up to five years, or both. 18 U.S.C. § 924(a)(1)(D). The law does not penalize the underage individuals who buy firearms.

When it comes to 18- to 20-year-olds, § 922(b)(1)'s prohibition on sales of firearms "other than a shotgun or rifle" was "primarily designed to reduce access to *handguns*." S. REP. NO. 90-1097, at 189 (1968) (statement of Sen. Tydings). After years of investigation, Congress found "a causal relationship between the easy availability of [handguns] and juvenile and youthful criminal behavior" and sought to prohibit handgun sales "to emotionally immature" and "thrill-bent juveniles and minors." Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 225–26.

Section 922(b)(1) is narrow in several respects. First, the law regulates only *transactions* involving firearms. It does not prohibit anyone from owning, possessing, or using firearms.

Second, the provision regulates only the *commercial sale* of firearms. It applies only to FFLs, who are sellers "engage[d] in the business of . . . dealing in firearms." 18 U.S.C. § 923(a). A seller engages in the business of dealing in firearms only if he "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(21)(C). Sellers not engaged in the business of dealing in firearms are not required to have a license, and unlicensed sellers are not covered by § 922(b)(1). As a

5

result, gifts and private sales are beyond the law's reach. *See United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016).

Third, when it comes to 18- to 20-year-olds, § 922(b)(1) applies only to firearms "*other than* a shotgun or rifle." That qualification leaves much of the firearms market untouched. *See NSSF Releases Most Recent Firearm Production Figures*, NAT'L SHOOTING SPORTS FOUND. (Jan. 15, 2025). The law does not, for example, prohibit the sale of hunting rifles and other long guns.

B.

Appellees are four 18- to 20-year-olds who wish to buy a handgun from an FFL but cannot because of § 922(b)(1). In June 2022, appellees sued the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in the Eastern District of Virginia. They claimed that § 922(b)(1) violates the Second Amendment and sought declaratory and injunctive relief.

The district court granted appellees' motion for summary judgment. Applying the text, history, and tradition test outlined in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the court first determined that "the Second Amendment's protections apply to 18-to-20-year-olds" and that "the right to purchase a gun falls within the Second Amendment's plain text." *Fraser v. ATF*, 672 F. Supp. 3d 118, 130, 136 (E.D. Va. 2023). It then concluded that the government failed to demonstrate a relevant tradition of firearm regulation that could support the constitutionality of § 922(b)(1). With respect to the founding era, the district court found the government's evidence of analogous regulation lacking. It also emphasized that "the Founders understood that militia service began at the

6

age of 18" which, in the district court's view, indicated that 18- to 20-year-olds had an unlimited constitutional right to purchase a handgun. *Id.* at 143. Turning to the nineteenth century, the court acknowledged that numerous states prohibited the sale of handguns to individuals under the age of 21 but concluded that these laws "tell[] us nothing" because they came long after the ratification of the Second Amendment. *Id.* at 144–45.

The government timely appealed. It argues that the district court erred in concluding that § 922(b)(1) violates the Second Amendment. We agree and reverse the district court's grant of summary judgment.[1]

## II.

The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court set forth a two-part test for determining "whether modern firearm regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26.

---

[1] After the district court ruled for appellees on the merits, appellees moved for class certification and the district court certified a nationwide class. On appeal, the government argues that the district court erred in certifying a class after issuing a favorable ruling on the merits for appellees. *See* Fed. R. Civ. P. 23(c)(1)(A) ("At an early practicable time after a person sues . . . the court must determine by order whether to certify the action as a class action."). The government argues that appellees should not receive the benefit of class-wide relief when they strategically withheld their class certification motion to avoid being bound by an unfavorable ruling. Opening Br. at 26. We agree with the government that the district court did not certify the class at "an early practicable time." Fed. R. Civ. P. 23(c)(1)(A). We therefore hold that the district court's decision to certify the class was an error.

At step one, we must determine whether "the Second Amendment's plain text covers [the] individual's conduct." *Bruen*, 597 U.S. at 17. If it does, "the Constitution presumptively protects that conduct" and we must proceed to step two. *Id.*

At step two, the burden shifts to the government to "demonstrate that the [challenged] regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Determining whether the challenged regulation comports with our country's regulatory tradition involves "analogical reasoning." *Bruen*, 597 U.S. at 28. The key question is "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 29). "How and why the regulations burden" Second Amendment rights are "central to this inquiry." *Bruen*, 597 U.S. at 29; *Rahimi*, 602 U.S. at 692. Put differently, we must ask whether the "modern and historical regulations impose a comparable burden" on the right and whether "that burden is comparably justified." *Bruen*, 597 U.S. at 29.

Importantly, the challenged law need not "precisely match its historical precursors." *Rahimi*, 602 U.S. at 692. As the Supreme Court has explained, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition," not applications of those principles found in particular laws. *Id.* (emphasis added); *see also id.* at 740 (Barrett, J., concurring)

8

("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold."). That is why the government must distill a relevant principle from a "historical *analogue*," but it need not unearth a "dead ringer" or "historical *twin*." *Bruen*, 597 U.S. at 30.

When discerning a relevant principle from our regulatory tradition, we are mindful that "not all history is created equal." *Bruen*, 597 U.S. at 34. "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' The Second Amendment was adopted in 1791." *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008)). A regulatory practice from around that date, therefore, is more likely to be consistent with the principles of the Second Amendment than a practice that existed long before or emerged long after the Amendment's ratification. *See id.* at 34–36.

That is not to say that pre- or post-enactment history is without value. If a founding-era practice stemmed from a "long, unbroken line of common-law precedent," that is strong evidence that the practice was part of a deeply rooted tradition and thus a "part of our law." *Bruen*, 597 U.S. at 35. Likewise, a founding-era practice that gave rise to an enduring tradition is more likely to reflect the widespread understanding of the founding generation than a practice that was short-lived and may have been an outlier. *See id.* at 37, 66 n.28.

III.

Starting with *Bruen*'s first step, we look to the text of the Second Amendment. As *Heller* made clear, handguns are "Arms" because they are "the quintessential self-defense weapon." *Heller*, 554 U.S. at 629. And the parties do not dispute that appellees' intended

9

action—purchasing a handgun for lawful purposes—is part of the "conduct" protected by the Amendment. *Bruen*, 597 U.S. at 31–32. The parties do seem to dispute, however, whether individuals between the ages of 18 and 20 are part of "the people" protected by the Second Amendment. Like the Eleventh Circuit, we assume without deciding that appellees are part of "the people" and are therefore covered by the Amendment's text. *See NRA v. Bondi*, 2025 WL 815734, at *15 (11th Cir. Mar. 14, 2025) (en banc).

IV.

Turning to the narrower focus of step two, we conclude that the burden § 922(b)(1) imposes on the Second Amendment rights of 18- to 20-year-olds is relevantly similar to the burden imposed by the founding-era rule that contracts with individuals under the age of 21 were unenforceable.

A.

At English common law, a person under the age of 21 was considered an "infant" for purposes of contracting, and infants were not bound by their contracts. *See* EDWARD COKE, THE FIRST PART OF THE INSTITUTES OF THE LAWES OF ENGLAND 171–72 (1628). As Blackstone put it in his influential eighteenth-century treatise, "an infant can neither aliene his lands, nor do any legal act, nor make a deed, nor indeed any manner of contract, that will bind him." 1 WILLIAM BLACKSTONE, COMMENTARIES *453.

The common law understanding of contracting was broad. Like today, contracts could be "express or implied." 2 BLACKSTONE, *supra*, at *443. They could also be "executed," as when two parties make an exchange "immediately," or "executory," as when two parties agree to make an exchange later. *Id.*; *see also* 1 SAMUEL COMYN, A

10

TREATISE OF THE LAW RELATIVE TO CONTRACTS AND AGREEMENTS NOT UNDER SEAL 151 (1809).

Like many common law principles, the infancy doctrine made its way across the Atlantic, and early American courts routinely applied it. *See, e.g.*, *Pool v. Pratt*, 1 D. Chip. 253, 253 (Vt. 1814) ("It is an ancient doctrine, as old as the common law, that an infant shall not, in general be bound by his contract; he is under an incapacity to bind himself by his contract."); *Collins' Lessee v. Rigua*, 2 Del. Cas. 78, 79 (Com. Pl. 1797); *Evans v. Terry*, 3 S.C.L. (1 Brev.) 80, 80 n.b1 (Const. Ct. App. 1802); *Johnson v. Van Doren*, 2 N.J.L. 372, 373 (N.J. 1808); *Beeler v. Young*, 4 Ky. (1 Bibb.) 519, 520 (1809); *Commonwealth v. Murray*, 4 Binn. 487, 491 (Pa. 1812). Indeed, by the time of the founding, an infant's inability to contract was a well understood and engrained principle of American law. *See* 1 ZEPHANIAH SWIFT, A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 215 (1795) (noting that contracts with infants are generally unenforceable); 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 191 (1827) (stating that "until the infant has attained the age of twenty-one years," he "cannot, except in a few specified cases, make a binding contract").

The infancy doctrine imposed a severe burden on a minor's ability to purchase goods, including firearms, during the founding era. Eighteenth-century America was a credit economy. From the "account books as survive, it is evident that very little cash changed hands," "purchasers who paid in cash were rare," and because of the "shortage of a circulating medium," "credit rather than cash payment was the rule everywhere." CARL BRIDENBAUGH, THE COLONIAL CRAFTSMAN 153–54 (1961). Under a practice known as

"book credit," merchants recorded promises of future payment from their customers in account books. David T. Flynn, *Credit in the Colonial American Economy*, ECON. HIST. ASS'N (2008). And since infants could "not be held liable for failing to uphold their side of a contract over goods," extending credit to minors was a "considerable risk." HOLLY BREWER, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY 265 (2005). Put simply, "whoever entered into a contract with an infant could lose substantial amounts of money" because courts refused to hold minors accountable for payment. *Id.* at 270; *see also, e.g.*, *Counts v. Bates*, 16 S.C.L. (Harp.) 464, 467 (Const. Ct. App. 1824) (holding that infant can keep a horse without paying credit amount owed). That "high risk made infants effectively unable to" purchase goods on credit. *See* BREWER, *supra*, at 270.

Nor could minors rely on buying a firearm with cash. First, coin was scarce during the founding era. *See* BRIDENBAUGH, *supra*, at 153–54. In addition, infants "lacked disposable income" because "they either worked for their parents for no wages, or any wages earned belonged to their parents." *Bondi*, 2025 WL 815734, at *7 (citing Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 RUTGERS U. L.R. 101, 108 (2024); 1 BLACKSTONE, *supra*, at *453). Furthermore, even if an infant had enough coin to buy a gun, merchants would have been unwilling to sell because they bore the risk that the minor would rescind the transaction and be entitled to a full refund under the infancy contract doctrine. *See, e.g.*, *Riley v. Mallory*, 33 Conn. 201 (1866) (holding that seller of a firearm was required to give a full refund to minor who insisted on returning used gun).

In arguing that the infancy doctrine did not apply to purchases of firearms, appellees point us to the "necessaries" exception. *See* Oral Arg. at 35:34. It is true that at English common law an infant could be bound by a contract for necessaries. But by the time of the founding, courts "began to view necessaries in very narrow terms." BREWER, *supra*, at 266. If an "infant live[d] with his father or guardian," for example, he could not "bind himself even for necessaries." 2 KENT, *supra*, at 196. And even where the necessaries exception did apply, it covered "victuals, clothing, medical aid, and 'good teaching or instruction.'" *Id.* There is no evidence that the exception was ever extended to firearms. Indeed, at least one court explicitly held that it did not apply to "pistols." *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. (1 McCord) 572, 572 (Const. Ct. App. 1822).

Appellees next argue that "infancy" in contract doctrine was tethered not to the age of 21 but to a generally applicable "age of majority" that changes over time. Appellees derive this general age of majority by considering the critical mass of age restrictions for important civic activities, such as the age to vote and to serve on juries. They then observe that while at the founding the age threshold for these civic activities was 21, today it is 18. From this appellees conclude that, even if our Nation's regulatory tradition supports restrictions on an infant's ability to buy a gun, the scope of that tradition today is limited to those who are under 18, given the change in the "age of majority." See Response Brief at 15.

The problem is that "infancy" in contract law was not tied to a dynamic, generally applicable age of majority. The definition of an "infant" at common law varied with the nature of the activity. *See* SAMUEL CARTER, THE INFANTS LAWYER: OR, THE LAW

13

(ANCIENT AND MODERN) RELATING TO INFANTS 44 (2d ed. 1712) (describing "the Several Ages of Infants in the Law"). For example, the age of consent to marry ranged from twelve to fourteen and the age of criminal responsibility was fourteen. *Id.* at 45, 47. Sometimes the age of infancy even varied within an area of law. An individual could execute a will "as to Goods and Chattels" at eighteen "but not as to Lands" until he was twenty one. *Id.* at 49. For contracting it was determined that a person was "an infant till the age of 21 years" because such individuals lacked "judgment and discretion in their contracts and transactions with others" and it was therefore necessary to protect them from "persons of more years and experience." 1 COMYN, *supra*, at 148.

In sum, the infancy doctrine demonstrates that there was an early American tradition of burdening the ability of 18- to 20-year-olds to purchase goods, including firearms. We now hold that § 922(b)(1) fits comfortably within this tradition because it is analogous in both "how" it burdens their Second Amendment rights and "why." *See Bruen*, 597 U.S. at 29; *Rahimi*, 602 U.S. at 692.

With respect to "how," the infancy doctrine and § 922(b)(1) both make it exceedingly difficult for a minor to purchase a handgun from a commercial seller, and they do so in similar ways. Both subject sellers to a risk of loss if they sell a handgun to a minor. Because of that risk, sellers are far less likely to transact with a minor and, in turn, a minor's ability to purchase a handgun is severely burdened.

To be sure, the risk sellers face under § 922(b)(1) is more severe than under the infancy doctrine. Section 922(b)(1) includes the possibility of imprisonment, whereas the infancy doctrine exposed sellers only to the risk of financial loss. But the relevant burden,

14

for purposes of our analysis, is the burden on the minor purchasers challenging the law. And from the perspective of a minor purchaser, the effects of § 922(b)(1) and the infancy doctrine are virtually the same. Whether he faces criminal penalties or a law that transforms his sales into free giveaways, a rational merchant is highly unlikely to sell a gun to a minor.

As for "why," § 922(b)(1) and the infancy doctrine share a common rationale. Both were motivated by a recognition that individuals under the age of 21 lack good judgment and reason. As we have explained, the infancy doctrine responded to the concern that infants lack the "judgment and discretion" to transact with more sophisticated adults. 1 COMYN, *supra*, at 148; *see also* 2 KENT, *supra*, at 191. Similarly, Congress enacted § 922(b)(1) to prohibit firearm sales to "emotionally immature" and "thrill-bent juveniles and minors prone to criminal behavior." Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 225–26.

Because § 922(b)(1) is "relevantly similar" to founding-era restrictions on the commercial sale of firearms, we are satisfied that the Second Amendment permits the law's burden on an 18- to 20-year-old's right to purchase a handgun.

## B.

The district court held, and appellees here argue, that the Militia Act of 1792 demonstrates that 18- to 20-year-olds have a constitutional right to purchase handguns. *See also Reese v. ATF*, 127 F.4th 583, 596 (5th Cir. 2025) (holding the same). The Act required that "each and every free able-bodied white male citizen of the respective states . . . who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein of after excepted), shall severally and respectively be enrolled in the militia." Militia

15

Act, § 1, 1 Stat. 271, 271 (1792). It further required that "every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock." *Id.* Given this requirement to serve in an armed militia, the district court and appellees conclude that 18- to 20-year-olds must have had a constitutional right to purchase firearms.

We disagree for two reasons. One, the Militia Act did not mandate 18 as the universal age of militia eligibility. It explicitly allowed states to exempt individuals from militia service "notwithstanding their being above the age of eighteen." Militia Act, § 2, 1 Stat. 271, 272 (1792). This reflected the fact that the age of enrollment fluctuated a great deal around the founding. Many state laws set the age of militia service at 21, for example.[2] So even if the Militia Act is evidence of some constitutional right to purchase firearms, it cannot stand for the proposition that such a right vested firmly at 18.

Two, any constitutional right derived from the Militia Act would not conflict with § 922(b)(1)'s narrow restriction on purchase. Again, the Act required a militiaman to "*provide himself* with a good musket or firelock." Militia Act, § 1, 1 Stat. 271, 271 (1792) (emphasis added). Not *purchase* for himself. There were of course many ways for an infant to "provide" himself with a firearm without going out and purchasing one himself. A minor

---

[2] *See, e.g.*, An Act for Raising Levies and Recruits to Serve in the Present Expedition Against the French, on the Ohio, ch. II, §§ 1–3, *reprinted in* 6 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 438–39 (William Waller Hening ed., 1819) (setting age of militia service at 21); Act of June 2, 1779, ch. XXIV, §§ 3–4, 1779 N.J. Acts 58, 59–60 (same); Ga. Code § 981, (1861) (same).

16

could use the family gun, for instance. Indeed, "[b]y 1826, at least 21 of the 24 states admitted to the Union—representing roughly 89 percent of the population—had enacted laws that placed the onus on parents to provide minors with firearms for militia service." *Bondi*, 2025 WL 815734, at *8; *see also id.* at *7 (collecting state statutes).

The 1792 Militia Act therefore does nothing to undermine our analysis regarding the founding-era tradition of restricting the sale of firearms to infants.

C.

Finally, our analysis is reinforced by later nineteenth-century history, which, when consistent with founding-era history, is helpful "confirmation" of original meaning. *See Bruen*, 597 U.S. at 37, 66 & n.28. Beginning in 1856, at least twenty jurisdictions enacted laws criminalizing the sale of firearms, often handguns specifically, to individuals under the age of 21.[3] An illustrative example is Indiana's 1875 law, which made it "unlawful for

---

[3] Act of Feb. 2, 1856, No. 26, 1856 Ala. Acts 17; Tenn. Code § 4864 (1858), *reprinted in* 1 THE CODE OF TENNESSEE ENACTED BY THE GENERAL ASSEMBLY OF 1857-8, at 871 (Return J. Meigs & William F. Cooper eds., 1858); Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241, 245; Act of Feb. 27, 1875, ch. XL, 1875 Ind. Acts 59; Act of Feb. 17, 1876, No. CXXVIII (O. No. 63), 1876 Ga. Laws 112; Act of Feb. 28, 1878, ch. 66, § 2, 1878 Miss. Laws 175, 175; Mo. Rev. Stat. § 1274 (1879), *reprinted in* 1 THE REVISED STATUTES OF THE STATE OF MISSOURI 1879, at 224 (Hockaday et al. eds., 1879); Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716, 716; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73, 73; Act of Mar. 24, 1882, ch. CXXXV, 1882 W. Va. Acts 421–22; Act of May 3, 1882, ch. 242, 1882 Md. Laws 656; Act of Mar. 5, 1883, ch. CV, 1883 Kan. Sess. Laws 159; Act of Apr. 3, 1883, ch. 329, §§ 1-2, 1883 Wis. Sess. Laws 290, 290; Act of Mar. 29, 1884, ch. 78, 1884 Iowa Acts 86; Act of July 1, 1890, No. 46, 1890 La. Acts 39; Penal Code of the Territory of Oklahoma, ch. XXV, art. 47, §§ 1–3, 1890 Okla. Sess. Laws 412, 495; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Sess. Laws 127, 140; Act of July 13, 1892, ch. 159, §§ 1, 5, 27 Stat. 116, 116–17 (District of Columbia); Act of Mar. 6, 1893, ch. 514, 1893 N.C. Sess. Laws 468; Act of May 14, 1897, ch. 155, 1897 Tex. Gen. Laws 221; *see also Bondi*, 2025 WL 815734, at *9 (collecting these statutes and relevant cases).

any person to sell . . . to any other person, under the age of twenty-one years, any pistol." Act of Feb. 27, 1875, ch. XL, § 1, 1875 Ind. Acts 59, 59.

Like the infancy contract doctrine, these nineteenth-century laws burdened 18- to 20-year-olds' ability to purchase handguns by making it far less likely that merchants would sell to them. And these laws were enacted for a familiar reason: a concern that youths lacked the maturity and judgment to responsibly buy their own pistols. *See* PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY 156, 404–05 (2019) (collecting contemporaneous sources).

These nineteenth-century laws also support our understanding that restrictions specific to handguns fall within the tradition we have identified. Because handgun ownership was not prevalent until the mid-nineteenth century, it is not surprising that the government cannot point us to a "historical twin" from the founding era. But as soon as handguns came on the scene, legislatures quickly prohibited their sale to minors, consistent with our Nation's regulatory tradition of restricting firearm sales to infants. These nineteenth-century laws were celebrated by the public and went largely unchallenged. *See* CHARLES, *supra*, at 156. As far as we can tell, the Tennessee Supreme Court was the only court to consider the constitutionality of these laws, and it held that they were constitutional. *See State v. Callicutt*, 69 Tenn. 714, 716–17 (1878).

Last, it is not lost upon us that in modern times "[m]any states (and the District of Columbia) proscribe or restrict the sale of handguns to persons under 21." *NRA v. ATF*, 700 F.3d 185, 190 n.4 (5th Cir. 2012). These widespread restrictions on handgun sales to

those under 21 are testament to the continuity of the historical tradition that we have identified.

Moreover, the New York law struck down in *Bruen* and the D.C. law invalidated in *Heller* were both identified as outliers by the Supreme Court. *See Bruen*, 597 U.S. at 79 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[T]he Court correctly holds that New York's outlier 'may-issue' licensing regime for carrying handguns for self-defense violates the Second Amendment."); *id.* at 78 (Alito, J., concurring) ("The District of Columbia law [in *Heller*] was an extreme outlier."); *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"). The law before us is anything but. The only "outlier" would be our ruling unconstitutional a federal statute that is so consonant with our historical and contemporary tradition. If we were to hold that it is beyond the power of a legislature to bar an 18-year-old from purchasing a handgun, why stop at 18? What principle of law would allow a legislature to prohibit handgun sales to a 14- or 16-year-old? *See* Heytens, J., concurring, at 22. Appellees would have us pursue a path more sweeping and unlimited than any reasonable interpretation of the Constitution can bear.

## V.

Declaring an Act of Congress to be unconstitutional is a big step for a court to take. Just as the Second Amendment protects the right of the people to keep and bear arms, the democratic process protects the right of the people to the blessings of self-government. *Bruen* and *Rahimi* acknowledge the latter right. *See Bruen*, 597 U.S. at 30 (noting that history and tradition is not a "regulatory straightjacket"); *Rahimi*, 602 U.S. at 691

(emphasizing that *Bruen* did not transform the Second Amendment into "a law trapped in amber"). It seems clear from the Court's decisions that individual and democratic rights do not extinguish one another in this important area and, further, that it is not impermissible for lower courts to attempt some demonstration of respect for both.

Basic respect for traditional democratic authority is a modest ask. Our holding here simply acknowledges that legislatures *may* enact these sorts of age restrictions, not that they *must*. If § 922(b)(1) proves unpopular, lawmakers remain free to take a different course. But to date they have not done so, and firearms regulation is not the kind of thing that tends to escape legislative attention. Indeed, Congress has had many chances to amend and revise the compromises reflected in the age provision at issue here, but it has passed them by. *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213; Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993); Violence Against Women Act of 1994, Pub. L. 103-322, 108 Stat. 1796. Into the middle of this longstanding legislative compromise, the plaintiffs now come charging, inviting us to improve on Congress's work. Respectfully, we must decline.

\*          \*          \*

We have done our best to faithfully apply the analytical framework set out in *Bruen*. There plainly exists a robust tradition that supports the constitutionality of § 922(b)(1). Our analysis is reinforced by the Supreme Court's repeated insistence across its Second Amendment cases that "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, 554 U.S. at 626–27 (Scalia, J.); *see McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (Alito, J.); *Bruen*,

597 U.S. at 80–81 (Kavanaugh, J., joined by Roberts, C.J., concurring); *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring) (calling these laws "traditional exceptions to the right"). We have no reason or right to call such expressions into question. By conditioning the sale of handguns on a buyer's age, § 922(b)(1) is presumptively lawful. *Bruen* analysis confirms that the law is indeed constitutional.

For the foregoing reasons, the district court's judgment is reversed, and the case is remanded with instructions to dismiss it.

*REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS*

TOBY HEYTENS, Circuit Judge, concurring:

Judge Wilkinson's opinion for the Court explains why the plaintiffs' arguments fail on their own terms. I write to highlight another—and, to my mind, fatal—flaw.

\* \* \*

Do 16- and 17-year-olds have a constitutional right to buy handguns? To be sure, the plaintiffs—like others before them—have carefully limited their requested relief to those 18 and older.[*] But "[i]t is usually a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases." *Ramos v. Louisiana*, 590 U.S. 83, 104 (2020) (opinion of Gorsuch, J.). And the plaintiffs are on the horns of a dilemma, because their arguments for why 18-year-olds have a constitutional right to buy handguns suggest that younger people do too—a startling result that the plaintiffs seek to obscure and for which they offer no defense.

\* \* \*

The plaintiffs' arguments have a facile appeal. The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the argument goes, those 18 and older are part of "the people" and were generally eligible for militia

---

[*] See *National Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1114 (11th Cir. 2025); *Reese v. ATF*, 127 F.4th 583, 586 (5th Cir. 2025); *Hirschfeld v. ATF*, 5 F.4th 407, 422 & n.13, vacated as moot, 14 F.4th 322 (4th Cir. 2021). In a related case that was argued with this one, the plaintiffs admitted that it would be "absurd" to suggest that "there cannot be *any* minimum age requirements with respect to firearms" but offer no rationale for drawing the line at 18. Appellees Br. at 39, *Brown v. ATF*, No. 23-2275 (4th Cir. Feb. 21, 2024).

service at the Founding. Serving in the militia entailed "bear[ing] Arms," and Founding-era militia members were expected to provide their own weapons. There were also no Founding-era statutes regulating firearm sales based on age. Ergo, the Second Amendment protects today's 18-to-20-year-olds' individual right to buy a handgun.

So what about today's 16- and 17-year-olds? After all, 16- and 17-year-olds also served in Founding-era militias, and they were not subject to any Founding-era firearm sales restrictions based on age. Indeed, none of the arguments in the previous paragraph are limited to those 18 and older. Thus, any decision accepting the plaintiffs' logic would suggest that—any *ipse dixit* aside—today's high school juniors *also* have a constitutionally protected right to buy handguns.

The plaintiffs respond that today's society has come to treat 18 as the critical age for most (though, of course, not all) purposes. That argument chases its own tail. For example, the plaintiffs point to the Twenty-Sixth Amendment, which says: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. But that amendment was ratified in 1971—three years after the statute challenged here was enacted. See Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 230. It seems implausible that 18 U.S.C. § 922(b)(1) was constitutional as applied to 18-to-20-year-old purchasers on the day it took effect only to become unconstitutional a mere three years later.

True, the Supreme Court has treated 18 as a dividing line for other constitutional provisions that do not mention age—specifically, the Eighth Amendment's prohibition

against "cruel and unusual punishments." U.S. Const. amend. VIII; see *Roper v. Simmons*, 543 U.S. 551 (2005); *Miller v. Alabama*, 567 U.S. 460 (2012). But the Supreme Court has made clear—over and over—that Eighth Amendment analysis requires considering "the evolving standards of decency that mark the progress of a maturing society." *Roper*, 543 U.S. at 561 (quoting *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) (plurality opinion)). In contrast, Second Amendment analysis is "centered on constitutional text and history." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 22 (2022). It should be no surprise that these different approaches sometimes produce different outcomes. Cf. *Heller v. District of Columbia*, 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (noting that "governments appear to have *more* flexibility and power to impose gun regulations under a test based on text, history, and tradition than they would under strict scrutiny").

*    *    *

For Second Amendment purposes, it does not matter that today's 18-year-olds have come to enjoy statutory—and even constitutional—rights they would not have possessed at the Founding. Instead, the question is whether the "*pre-existing* right" that Amendment "codified" in 1791 already encompassed a right for 18-year-olds to buy firearms. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Because text, history, and tradition show the answer is no, I concur.

QUATTLEBAUM, Circuit Judge, dissenting:

Plaintiffs—18- to 20-year-olds who want to buy handguns—challenge federal laws prohibiting licensed firearms dealers from selling those weapons to them. They argue the federal handgun purchase ban violates their Second Amendment rights. The district court agreed. Now my colleagues in the majority reverse, upholding the handgun purchase ban as consistent with our Nation's history and tradition of regulating firearms. They reach this conclusion primarily by reviewing a founding-era contract law principle that permitted 18- to 20-year-olds to void all types of contracts they entered. But that principle does not impose a comparable governmental burden (a "how"), nor is it based on a comparable justification (a "why") to the federal handgun purchase ban. So, it does not support the constitutionality of the federal handgun purchase ban. Considering actual founding-era firearm regulations, the purchase ban is inconsistent with our Nation's history and tradition.

I recognize that to many, banning sales of handguns to those under 21 makes good sense. I appreciate that sentiment, especially during a time when gun violence is a problem in our county. But that is a policy argument. As judges, we interpret law rather than make policy. Under Supreme Court precedent, this federal handgun purchase ban violates the Second Amendment. Thus, I respectfully dissent.

# I. BACKGROUND

## A.    The Second Amendment and the Federal Handgun Purchase Ban

The Second Amendment of the United States Constitution states, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

Plaintiffs—18- to 20-year-olds—challenge several federal statutes. They contest the validity of two provisions of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197. The first provision, 18 U.S.C. § 922(b)(1), prohibits a federally licensed importer, manufacturer, dealer or collector from selling or delivering a firearm, "other than a shotgun or rifle, . . . to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age." The provision also prohibits the sale or delivery of "any firearm" to an individual less than 18. *Id.* So in effect, the statute prohibits licensees from selling or delivering handguns to 18- to 20-year-olds. The second provision, 18 U.S.C. § 922(c)(1), imposes the same prohibition on sales to a person not physically present at the licensee's business. Plaintiffs also challenge Bureau of Alcohol, Tobacco, Firearms and Explosives regulations that repeat this prohibition. *See, e.g.*, 27 C.F.R. § 478.99(b). For convenience, I refer to these statutes and regulations as the federal handgun purchase ban.

## B.    Procedural History

Plaintiffs sued "on behalf of other similarly situated members of a class": all 18- to 20-year-olds. *Fraser v. ATF*, 672 F. Supp. 3d 118, 122 (E.D. Va. 2023). Before plaintiffs moved for class certification, the parties agreed to proceed with dispositive motions. The

government moved to dismiss, and plaintiffs moved for summary judgment. The district court granted plaintiffs' motion for summary judgment. Applying the analytical framework from *Bruen*, the court concluded the handgun purchase ban violated the Second Amendment. *Fraser*, 672 F Supp. 3d at 126–47 (citing *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)). Plaintiffs then moved for class certification and a permanent injunction. The court concluded Federal Rule of Civil Procedure 23 permitted class certification after summary judgment and that plaintiffs satisfied Rule 23(b)(2)'s requirements. *See Fraser v. ATF*, No. 3:22-cv-00410, 2023 WL 5616011, at *3, 11 (E.D. Va. Aug. 30, 2023). And it awarded the class—all 18- to 20-year-olds—a declaratory judgment and a permanent injunction. *See Fraser v. ATF*, 689 F. Supp. 3d 203, 210, 218 (E.D. Va. 2023). The government timely appealed.[1]

## II. THE SECOND AMENDMENT

In *District of Columbia v. Heller*, the Supreme Court interpreted the Second Amendment to protect an individual's "inherent right" to self-defense. 554 U.S. 570, 628 (2008). More recently, the Court in *Bruen* laid out a two-step analytical framework for applying the Second Amendment. 597 U.S. at 24. At step one, courts must first assess whether "the Second Amendment's plain text covers an individual's conduct." *Id.* If it does not, our inquiry ends—there is no Second Amendment problem. But if the text covers the

---

[1] The district court exercised jurisdiction under 28 U.S.C. § 1331. We exercise appellate jurisdiction under 28 U.S.C. § 1291. We review *de novo* a district court's ruling on the constitutionality of a statute. *See Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021).

conduct, "the Constitution presumptively protects that conduct," and we must go to step two. *Id.* At step two, the government must overcome the presumption of unconstitutionality by demonstrating that "its regulation . . . is consistent with the Nation's historical tradition of firearm regulation." *Id.* During that historical inquiry, courts must consider the "how" and "why" of historical regulations. *Id.* at 29. For the "how," we ask whether the "modern and historical regulations impose a comparable burden on the individual's right." *Id.* For the "why," we ask whether that burden is "comparably justified." *Id.*

In *United States v. Rahimi*, the Court clarified that Second Amendment jurisprudence is not "a law trapped in amber." 602 U.S. 680, 691 (2024). The historical inquiry focuses not on finding a "historical twin" but "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. But that clarification maintained the need for courts to compare the "how" and "why" of the challenged regulation with that of its historical comparators. "Why and how the regulation burdens the right are central to this inquiry." *Id.* Explaining further, the Court emphasized the importance of historical firearm regulations under this comparison of principles:

> For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a new law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster."

*Id.* (quoting *Bruen*, 597 U.S. at 30). This two-step inquiry frames our analysis of the federal handgun purchase ban.

A.      **The Second Amendment's Text**

This case presents two questions at *Bruen*'s first step—whether plaintiffs are part of "the people" and whether the Second Amendment's text protects plaintiffs' proposed course of conduct.[2] 597 U.S. at 31–32; *see United States v. Price*, 111 F.4th 392, 400 (4th Cir. 2024) (en banc). I address them in turn.

*1.  "The People"*

First, are 18- to 20-year-olds part of "the people" protected by the Second Amendment? This is a question of first impression in this circuit.[3] But several circuits, after *Rahimi*, have concluded 18- to 20-year-olds are part of "the people." *See Reese v. ATF*, 127 F.4th 583, 590–95 (5th Cir. 2025); *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 435–38 (3d Cir. 2025); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114–16 (10th Cir. 2024); *Worth v. Jacobson*, 108 F.4th 677, 688–92 (8th Cir. 2024), *cert. denied*, No.

---

[2] In *Bruen*, the Court held that the Second Amendment's text covers weapons that are "in common use" for a lawful purpose. 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627). Our court later held that the question of whether the weapons at issue are commonly used for a lawful purpose should be considered at step one. *United States v. Price*, 111 F.4th 392, 400 (4th Cir. 2024) (en banc); *but see id.* at 415 (Quattlebaum, J., concurring in the judgment). Here, no party disputes that handguns are "in common use" for a lawful purpose. "[T]he American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629; *see also Bianchi v. Brown*, 111 F.4th 438, 451 (4th Cir. 2024) (en banc) (contrasting "weapons of crime and war" with "the handgun").

[3] Prior to *Bruen*, a panel of this Court concluded that "the Constitution's text, structure, and history affirmatively prove that 18-year-olds are covered by the Second Amendment." *Hirschfeld v. ATF*, 5 F.4th 407, 440 (4th Cir. 2021). But the panel vacated its opinion for mootness when the plaintiff turned 21. *See Hirschfeld v. ATF*, 14 F.4th 322, 326 (4th Cir. 2021).

24-782, 2025 WL 1151242, at *1 (U.S. April 21, 2025) (mem).[4] No federal court of appeals has found "the people" excludes 18- to 20-year-olds. For good reason, the majority assumes they are part of the people. *See* Maj. Op. at 10.

In *Heller*, the Supreme Court described "the people" as referring "to all members of the political community, not an unspecified subset." 554 U.S. at 580. The *Heller* Court also referenced the Supreme Court's earlier description that "'the people' protected by the Fourth Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Under either definition, "the people" covers 18- to 20-year-olds.[5] They enjoy—as part of "the people"—the protections of the First and Fourth Amendments. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985). And the Second Amendment protects them too. *See Verdugo-Urquidez*, 494 U.S. at 265. When read consistently across the Constitution, "the people" must include 18- to 20-year-olds. *See Polis*, 121 F.4th at 116.

---

[4] *Lara* and *Worth* considered state laws prohibiting 18- to 20-year-olds from carrying firearms in certain circumstances. *Lara*, 125 F.4th at 432; *Worth*, 108 F.4th at 683. *Polis* considered a Colorado law prohibiting anyone younger than 21 from purchasing a firearm. 121 F.4th at 104. And *Reese* considered the federal handgun purchase ban that we review today. 127 F.4th at 586.

[5] Any distinction between "political community" and "national community" makes no difference in today's case. *See Worth*, 108 F.4th at 690 n.5.

The government hints that 18- to 20-year-olds are excluded from "the people" based on the term's meaning in 1791. And amicus flat out makes that argument. *See* Everytown Amicus Curiae Br., *Brown v. ATF*, Case No. 23-2275 (4th Cir. Jan. 29, 2024), ECF No. 24 at 4–5. The argument relies on the fact that during the late eighteenth century, 18- to 20-year-olds were minors who could not vote. Since they could not vote, amicus reasons, they are not part of "the people" and thus are not protected by the Second Amendment. *Id.* But that cannot be right. The logic behind that view ties "the people" to those who were part of the national or political community in the 1770s. But applying that logic consistently would not only exclude those who couldn't vote because of age; it also would exclude those who couldn't vote "based on property ownership, race, or gender." *Reese*, 127 F.4th at 592 (describing founding-era voting limitations based on property ownership and longstanding voting restrictions based on race and gender); *see also Lara*, 125 F.4th at 437 ("the people" in the late eighteenth century consisted "solely of white, landed men").

The proper inquiry is to use the principle of the relevant national or political community but apply it today. *See Heller*, 554 U.S. at 580–82; *see also Rahimi*, 602 U.S. at 692 (noting that the Court would be "mistaken" to "apply[] the protections of the right only to muskets and sabers"). Under that approach, just as the First and Fourth Amendments apply to today's national and political communities, so does the Second Amendment.

### 2. *"Keep and Bear"*

Second, does "the plain text of the Second Amendment protect [plaintiffs'] proposed course of conduct"—purchasing a handgun from a federal licensee? *Bruen*, 597

U.S. at 32. To answer this question, we must consider whether "the regulation 'infringes' the Second Amendment right to keep and bear arms." *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 220 (4th Cir. 2024) (en banc). Once again, the majority assumes the answer here to be yes. *See* Maj. Op. at 9–10. But not the government. It argues the Second Amendment does not protect a right to purchase handguns from commercial sellers when they are available from other sources.

It is correct that the Amendment's plain text does not contain the word "purchase." It uses the phrase "keep and bear Arms." U.S. Const. amend. II. But an explicitly recognized right implicitly protects closely related acts needed to exercise the right itself. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 192–94 (2012) (Predicate-Act Canon). The Supreme Court has followed this interpretative canon. For example, in *Carey v. Population Services International*, the Court noted that the right to choose contraception requires the ability to purchase contraception, therefore casting doubt on a prohibition of sale. 431 U.S. 678, 687–88 (1977). In the same way, the right to keep and bear arms includes the right to purchase them. Otherwise, the expressly granted right would be rendered hollow.

The other circuits that have addressed this question have acknowledged the Second Amendment implicitly protects "a corresponding right to acquire [firearms] and maintain proficiency in their use." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *see Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." (cleaned up)); *Reese*, 127 F.4th at 590 ("Because constitutional

rights impliedly protect corollary acts necessary to their exercise, we hold that" the Second Amendment covers "commercial purchases"); *Polis*, 121 F.4th at 140 (McHugh, J., concurring) ("Keeping and bearing arms . . . implies the right to *acquire* arms in order to use them for self-defense."); *see also Andrews v. State*, 50 Tenn. (3 Heisk) 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them . . . .").

That makes sense. If you cannot buy a handgun, it's pretty hard to keep and bear it. True, a friend or relative might give you a handgun. But are the Second Amendment's protections so cramped that they only apply to those fortunate enough to have friends or family willing and able to transfer handguns as gifts? Surely not.

Also, applying the Second Amendment to the purchase ban conforms with the ordinary meaning of "infringe" during the founding era. Recall that the amendment instructs the right "shall not be infringed." U.S. Const. amend. II. Contemporaneous dictionaries defined "infringe" as "[t]o violate" and "[t]o destroy; to hinder." 1 Samuel Johnson, *A Dictionary of the English Language* (1st ed. 1755); *see* 1 Noah Webster, *American Dictionary of the English Language* (1828) (similarly defining "infringe"); *see also* 1 Johnson, *supra*, (defining "hinder" as "[t]o obstruct" and "to impede"); 1 Webster, *supra*, (defining "hinder" as "[t]o impose obstacles or impediments"). So, the ordinary meaning of "infringe" at the founding did not require a total deprivation. Barring "the people" from purchasing handguns from the only consistent commercial source at the very least hinders or impedes their ability to keep and bear arms. *See Nunn v. State*, 1 Ga. 243, 251 (1846) ("The right of the whole people . . . to keep and bear arms of every description . . . shall not be infringed, curtailed, or broken in upon, in the smallest

degree . . . ."); *cf. United States v. Scheidt*, 103 F.4th 1281, 1284 (7th Cir. 2024) (concluding an information disclosure requirement does not "'infringe' the right to keep and bear arms").

### 3. Conditions and Qualifications on Commercial Sale

The government makes another argument that the purchase ban falls outside the protection of the Second Amendment. This time, it channels *Heller*'s non-exhaustive list of "longstanding," "presumptively lawful regulatory measures." 554 U.S. at 626–27 & n.26. Those measures include "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. The government argues that the federal handgun purchase ban is such a condition on commercial sale.

But this argument conflicts with our precedent. A condition or qualification on the sale of arms is a burden on the seller—"a hoop someone must jump through to sell a gun." *Hirschfeld*, 5 F.4th at 416; *see also United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016). This really isn't a burden on the seller though. It's a burden on would-be buyers.

And even if we were to look past that distinction, some burdens go too far. A burden may be "so prohibitive as to turn this condition or qualification into a functional prohibition." *Hosford*, 843 F.3d at 166. For example, in *Hosford*, we upheld a requirement that firearm dealers obtain a license as a condition and qualification on commercial sale; but only because it did not rise to a functional prohibition on the purchaser's right to keep and bear arms. *Id.* at 166–67.

Following *Hosford*, a sales ban that functionally prohibits the right to keep and bear arms is not a valid condition or qualification on sale. That is exactly what the federal

handgun purchase ban does. While formally aimed at the seller, § 922(b) functionally prohibits an 18- to 20-year-old buyer from purchasing a handgun. *See Hirschfeld*, 5 F.4th at 417. The 18- to 20-year-old can do nothing but wait until he turns 21. Section 922(b) outright prohibits him from purchasing a handgun from a licensed dealer, leaving only private sales and gifts as realistic ways to acquire handguns. Those limited channels fail to satisfy the Second Amendment's command.

I acknowledge not all agree. The Tenth Circuit found a similar state restriction constituted a presumptively lawful condition on the commercial sale of arms. *See Polis*, 121 F.4th at 118. It reasoned that the state ban is a "narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers." *Polis*, 121 F.4th at 123. I agree that such a ban would be objective and definite. But that alone cannot make it constitutional. Bans on selling to those over 25 would also be objective and definite. So would bans on selling to women and Black people. They would also be unconstitutional.

The federal handgun purchase ban, however, is neither narrow nor uniform. Admittedly, it does not preclude possessing a handgun and does not apply to the sale of other arms like rifles or shotguns. But it completely prohibits a category of "the people" from acquiring the quintessential self-defense firearm through ordinary commerce. And it singles out 18- to 20-year-olds for heightened regulation.

For all these reasons, the government's step one arguments fail. Because the federal handgun purchase ban prevents a subset of "the people" from purchasing firearms from the primary source, the Second Amendment protects plaintiffs' proposed course of conduct.

**B.    Principles Underpinning Our Regulatory Tradition**

To justify the federal handgun purchase ban, the government must show its "consisten[cy] with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 34. As noted earlier, while we need not find a "dead ringer" or "historical twin," we must consider "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. "Why and how the regulation burdens the right are central to this inquiry." *Id.*

Considering the relevant historical evidence, I cannot agree with the majority. The government has failed to meet its burden.

### 1.  Founding-Era Evidence

"[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. "The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Id.* The Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37; *see also Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1115 (11th Cir. 2025), *petition for cert. filed sub nom.*, *Nat'l Rifle Ass'n v. Glass*, No. 24-1185 (U.S. May 16, 2025) (looking to founding-era evidence when assessing a similar state purchase ban). So, I begin by analyzing the founding-era evidence.

### a.  Contract Law Principles

The majority relies on founding-era contract law. It explains, correctly, that contracts entered by people under 21 were voidable by the minor at common law. *See* Maj.

Op. at 10–13; *see also Nat'l Rifle Assoc.*, 133 F.4th at 1117–18. Then, the majority reasons this common law contracting principle is sufficiently similar to the federal handgun purchase ban at issue here. *See* Maj. Op. at 14–15. Both, according to the majority, (1) increase the difficulty for 18- to 20-year-olds to purchase firearms (the "how") and (2) are based on a common rationale—people of that age group lack the judgment of adults (the "why"). Because of the similarities, the majority concludes that the purchase ban does not offend the Second Amendment.

For several reasons, I disagree.

First, the contract principle relied on by the majority does not share a comparable "how" and "why" with the federal handgun purchase ban. As to "how," founding-era contract law did not ban the sale of guns to 18- to 20-year-olds. In fact, it did not ban anything. It gave minors the benefit of voiding a contract they had entered. *See Nat'l Rifle Association*, 133 F.4th at 1165–67 (Branch, J., dissenting) (noting a "long recognized [] difference between forming a contract and that same contract later being declared unenforceable"). It did not impose any governmental burden on contracts.

The majority attempts to shoehorn the minor's ability to void a contract into a governmental burden by considering what the practical impact of the voidability principle may have been. Perhaps a seller of guns would hesitate to enter a contract to sell something to an 18-year-old. But any voluntary hesitancy is not a governmental regulation of such sales. It comes from a different source. Any burden imposed on the right to buy a handgun comes not from the government, but from the seller's economic choices.

And the burdens are not similar either. Under the voidability principle, the only "risk" generated by the voidability principle was the possibility the 18-year-old might "rescind the transaction and be entitled to a full refund." Maj. Op. at 12. In a worst-case scenario, the merchant returned the money and got the gun back, losing only the time he took to sell the gun to the 18-year-old. Refunds are a standard part of commercial life with benefits to both retailers and consumers. They are not to be seriously compared with the threat of prison. So, the "how" here is distinct.

So is the "why." The contract principle "results from the inability of infants to take care of themselves." 2 James Kent, *Commentaries on American Law* 191 (O. Halsted ed., 1827). The handgun purchase ban was intended to bar "emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior" from obtaining firearms. Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 225–26. Perhaps these rationales have some relationship. But they are not sufficiently similar. The former is paternalistic; the latter targets public safety. *See, e.g.*, *See Bruen*, 597 U.S. at 30–31 (explaining that the historical, narrow "sensitive places" regulations lack similarity to a declaration that an entire city is a gun-free zone). And no matter how the majority views it, public safety is not a matter of contract law.

Maybe in the future, the Supreme Court will permit more flexibility in the historical evidence courts can consider when reviewing modern firearm regulations. But we apply current law, rather than predict the law's evolution. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997); *see also Ohio v. Becerra*, 87 F.4th 759, 770 (6th Cir. 2023) ("In other words, we apply directly applicable Supreme Court precedent as it currently stands, without

38

projecting where it may be headed."). Wayne Gretzky, perhaps the greatest hockey player of all time, owed much of his success to his ability to anticipate. He said, "I skate to where the puck is going to be, not where it's been." John Robert Colombo, *Colombo's New Canadian Quotations* 162 (1987).[6] While that worked for Gretzky, it doesn't work for us. Our job is to stay where the puck is now. That means we follow the Supreme Court's current jurisprudence. When we do so, the common law contract principle that permitted minors to void contracts does not support the constitutionality of the federal government banning 18- to 20-year-olds from buying handguns.

Second, the majority points to no evidence that the contract principle limited the ability of 18- to 20-year-olds to acquire guns in the founding era. It declares that age group lacked access to cash and would only be able to purchase with credit. *See* Maj. Op. at 11–12. And it declares that sellers would not sell guns to minors on credit because the contracts could be voided. *Id.* But those statements are not evidence of what actually happened. It is certainly possible that the risk of an 18- to 20-year-old voiding a contract spooked some sellers. But why isn't it just as possible that sellers would have taken the risk knowing they could get the gun back from a voided contract? And isn't it also possible that if minors lacked cash, they would trade property they did have for guns? After all, bartering was an accepted form of founding-era commerce. *See, e.g.*, William T. Baxter, *Observations on*

---

[6] The quote is famously attributed to Wayne Gretzky, but apparently his father Walter Gretzky stated it. *See* Barry Libert, *Skate to the Where the Puck is Going . . . AI*, Forbes (Feb. 21, 2025, at 8:56 ET), https://www.forbes.com/sites/libertbarry/2025/02/21/skate-to-the-where-the-puck-is-goingai/ [https://perma.cc/28PQ-CKRG].

*Money, Barter and Bookkeeping*, 31 Accounting Historians J. 129, 133–36 (2004). Finally, rather than avoiding selling to minors altogether, isn't it possible that sellers might have negotiated collateral or a guarantee in selling a gun to a minor? Ultimately, the majority rests its decisions on economic speculation, not historical evidence.

In fact, we need not speculate about which of these possibilities is more likely correct. There is actual historical evidence. As Judge Branch points out, the historical record reflects merchants selling on credit to minors, including sales of firearms, despite the risk. *See Nat'l Rifle Assoc.*, 133 F.4th at 1166 (Branch, J., dissenting) (first citing *Soper v. President & Fellows of Harv. Coll.*, 18 Mass. 177, 183–84 (1822) (acknowledging that merchants "will nevertheless give credit" to "young men"); then citing *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. (1 McCord) 572, 572 (1822) (concluding a minor's purchase of "pistols" and "powder" was voidable because the items were not "necessaries")). The evidence just doesn't support the majority's claims.[7] For those reasons, I cannot agree that

---

[7] The contract principle may not have even applied to firearms in some circumstances. A minor could not void contracts for "his necessary meat, drink, apparel, physic, and such other necessaries." 1 William Blackstone, Commentaries *454. Are firearms necessaries? The Constitutional Court of Appeals of South Carolina concluded pistols were not a necessary, but only on the facts of that case. *See Saunders Glover*, 12 S.C.L. at 572. And as explained in more detail below, the federal Militia Act of 1792 and contemporaneous laws in all states required militiamen—including 18- to 20-year-olds—to equip themselves with firearms. If the law required 18- to 20-year-olds to obtain arms for militia service, then those arms may have been "necessaries." *See, e.g.*, *Coates v. Wilson* (1807) 170 Eng. Rep. 769, 769; 5 Esp. 152, 152 (concluding a tailor could enforce a contract against a minor soldier because the soldier's uniform was a necessary); Militia Act of 1792, ch. 33, sec. 1, 1 Stat. 271, 272 (exempting "arms, ammunition and accoutrements" obtained for militia service from "all suits, distresses, executions or sale, for debt or for the payment of taxes").

the contract principle expresses a relevantly similar historical tradition of firearm regulation.

b.  <u>Minority Status</u>

The government marshals other founding-era evidence of 18- to 20-year-olds' minority status. Blackstone described the age of majority as 21. 1 William Blackstone, Commentaries *451. As a result, founding-era legislatures prohibited persons under 21 from marrying without parental approval. *See* 4 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 153 (James T. Mitchell & Henry Flanders eds. 1897) (citing a 1729 act). Persons under 21 could not vote until the ratification of the Twenty-Sixth Amendment in the 1970s. U.S. Const. amend. XXVI. Because jury service was often tied to the franchise, persons less than 21 could not serve on juries. *See* Albert W. Alschuler & Andrew G. Deiss, *A Brief History of Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 877 n.52 (1994). These restrictions were premised on the belief that "infants [had an inability] to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years." Kent, *supra*, at 191. John Adams and Gouverneur Morris—two founding fathers—expressed concerns about the "prudence" of those under 21. Gov. Br. at 13–14.

But this evidence only shows that some rights at the founding extended to those under 21 and some didn't. That's because, as already discussed, the First and Fourth Amendments extended to 18- to 20-year-olds. *See Brown*, 564 U.S. at 794; *T.L.O.*, 469

U.S. at 334.[8] So, the fact that 18- to 20-year-olds did not have the full panoply of rights as adults at the founding merely requires that we roll up our sleeves and examine the evidence on a right-by-right basis. When we do that, the historical evidence indicates that the Second Amendment, like the First and Fourth, applied to 18- to 20-year-olds.

Also, this evidence about minority status is not evidence of firearm regulations. At most, it is evidence about how some general principles might apply to firearms. Thus, for the same reasons discussed in the previous analysis of contract law principles, this minority status evidence is not the type of evidence that *Bruen* and *Rahimi* require to overcome the presumption of unconstitutionality.

c.   Constables

The government also points to a South Carolina treatise barring "infants" from serving as constables—deputized law enforcement officers—as evidence that 18- to 20-year-olds lacked access to firearms. *See* John Faucheraud Grimke, *The South-Carolina Justice of Peace* 117–18 (3d ed. 1810) (originally published in 1788). According to the government, since minors could not be constables and constables carried firearms, the exclusion of minors shows that they lacked access to guns. The government then claims

---

[8] As Blackstone's Commentaries makes clear, the relevant age of majority depended on the particular individual's capacity or activity. 1 William Blackstone, Commentaries *451; see also *id.* at *453 (noting the "different capacities which [individuals] assume at different ages"). For example, a man could take an oath of allegiance at age 12, be capitally punished in a criminal case at age 14, and serve as an executor at age 17. *Id.* at *451–52. And a woman could consent to marriage at age 12, choose a guardian at age 14, and serve as an executrix at age 17. *Id.* at *451. Both sexes had to wait until age 21 to dispose of their lands. *Id.* So while the full age of majority was 21 at common law, that only mattered for specific activities. *Id.*

the constable regulation is based on the same reasoning as the federal handgun purchase ban—that minors lack the judgment to carry firearms.

This argument is remarkably weak. First, the treatise says nothing about the ability of minors to acquire firearms. Second, it also prohibits "[j]ustices of the peace, clergyman, attorneys, infants, lawyers, madmen, physicians, idiots, poor, old and sick persons" from serving as constables. *Id.* at 117. There can be no credible argument that others ineligible to be constables—like clergyman, lawyers and physicians—lack the judgment to carry guns.[9] As a result, the constable restriction cannot share the same "why" as the federal handgun purchase ban; it's not excluding persons because of their poor judgment when carrying firearms.

Nor does it share the same "how"—it does not prohibit "infants" from purchasing or possessing firearms, but rather excludes them from performing constable duty.[10] This source does not provide a relevantly similar principle justifying the handgun purchase ban.

---

[9] I realize this is a bit of a hanging curveball. Many might contend that lawyers fall in the same category as madmen and idiots. But even taking lawyers out of the equation, clergyman and physicians surely possess the judgment to carry guns.

[10] Amici cite several college regulations preventing students from possessing firearms. But these regulations applied to *all* students, not just minors, and required disarmament in particular locations. *See Reese*, 127 F.4th at 596–97. They appear to be "sensitive place" regulations, with a "why" of securing peace and discipline on a college campus and a "how" of temporary disarmament. *See id.; Bruen*, 597 U.S. at 30–31. What's more, to the extent these regulations affected minors, they actually demonstrate minors had access to guns. After all, why ban guns on college campuses if minor students could not obtain them?

d.  <u>The Militia Act</u>

In contrast to the evidence relied on by the majority and the government, the Militia Act of 1792—enacted shortly after the Second Amendment's ratification—provides strong evidence that the Second Amendment protected 18- to 20-year-olds. The Act required "[t]hat each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as herein after excepted) shall severally and respectively be enrolled in the militia." Militia Act of 1792, ch. 33, sec. 1, 1 Stat. 271, 271. Each militiaman had a duty to "provide himself with a good musket or firelock . . . or with a good rifle." *Id.* After Congress enacted this statute, every state set the age for militia service at 18. *See Jones v. Bonta*, 34 F.4th 704, 719, 738 (9th Cir. 2022), *vacated on reh'g and remanded in light of Bruen*, 47 F.4th 1124 (mem.); *Hirschfeld*, 5 F.4th at 428–434. As the federal and state militia laws required 18- to 20-year-olds to show up with a musket, firelock or rifle, these laws illustrate that folks of that age could acquire the weapons. Thus, the various militia laws undermine any supposed traditional principle that permits depriving 18- to 20-year-olds of their Second Amendment right.

The government and the majority offer several retorts. None are persuasive.

First, according to the majority, the Militia Act of 1792 merely required a militiaman to "provide himself" with a musket or firelock but did not require him to "purchase" one. Maj. Op. at 16. But the "provide himself" language applied to all militiamen, not just 18- to 20-year-olds. Given that, the best reading of the Act indicates all militiamen, including

44

18- to 20-year-olds, had the ability to acquire firearms. Congress could not have expected all 18- to 20-year-old militiamen across the entire country to obtain firearms by gift.

Second, the majority and government point out that some states raised the militia age above 21. True, Virginia did so in 1738 before returning it to 18 or less in 1757—in the midst of the French & Indian War. *See* 5 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 16 (1823); *see also* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 579 (2019). And New Jersey set a militia age of 21 for an expedition of 500 men to Canada during King George's War. *See* 3 Bernard Bush, *Laws of the Royal Colony of New Jersey*, at 15, 17 (1980); *see also* Kopel & Greenlee, *supra*, at 536 (discussing this 1746 New Jersey act); *Hirschfeld*, 5 F.4th at 431–33 (discussing Virginia, New Jersey and Pennsylvania statutes). But these isolated examples were withdrawn decades before the Second Amendment's ratification when every state required enrollment by age 18.

Third, the government and the majority believe that parental provisioning statutes imply minors could not buy firearms. And it is true that an 1810 Massachusetts act, as one example, required parents to equip minor militiamen "with the arms and equipments, required by this act." Act of Mar. 6, 1810, ch. 107, sec. 28, 1810 Mass. Acts 157, 176. I agree that meant parents had to provide a "good musket" if the minor didn't have one. *Id.* sec. 1, 1810 Mass. Acts 151, 152. But that does not establish that minors could not acquire guns themselves. In fact, under the same act, parents also had to provide "two spare flints, and a knapsack, a pouch with a box therein, to contain not less than twenty-four cartridges,

suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball." *Id.* Surely an 18-year-old could buy a "knapsack" and a "pouch" in 1810, and yet the law required parents to provide them. Considering the state militia laws as a whole, parental provisioning requirements do not signal a firearm purchasing restriction; instead, they recognize that some minors might not have had the necessary equipment for militia service. In those instances, parents bore the financial burden of equipping.

The government makes two additional arguments that, for good reason, the majority steers clear of. The government points to militia parental consent statutes. A 1755 Pennsylvania act required parental approval for persons less than 21 to join the militia. But it applied for only one year at the start of the French & Indian War. *See 5 Statutes at Large of Pennsylvania from 1682 to 1801*, at 200 (James T. Mitchell & Henry Flanders eds. 1898); *see also* Kopel & Greenlee, *supra*, at 561. A 1746 New Jersey act had a similar parental consent requirement and was also enacted during wartime. *See* Bush, *supra*, at 15, 17; *see also* Kopel & Greenlee, *supra*, at 536; *Hirschfeld*, 5 F.4th at 433–34 (discussing a nineteenth-century New York statute). These consent statutes are hardly sufficient to overcome the strong, contemporaneous evidence from the Militia Act that minors had access to guns during the founding era.

Finally, the government argues the Militia Act should not be considered because *Heller* detached the Second Amendment right from militia service. This misreads *Heller*. True, *Heller* held that the Second Amendment conferred an individual right and not a right solely tied to service in the militia. 554 U.S. at 582–83. But the Supreme Court did not completely eliminate the relationship between the Second Amendment and the militia.

According to *Heller*, a purpose of the amendment was "to prevent elimination of the militia." *Id.* at 599. Although not the only reason for the right, "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other [pre-existing] English rights—was codified in a written Constitution." *Id.* The people had a right to keep and bear arms so that they could form a militia to protect their interests. As jurist Thomas M. Cooley explained, "the people, from whom the militia must be taken, shall have the right to keep and bear arms." Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880).

In sum, none of the evidence marshaled by the majority or the government demonstrates the federal handgun purchase ban's consistency with our Nation's historical tradition of firearm regulation so as to overcome the presumption of unconstitutionality. In contrast, the Militia Act of 1792 is "good circumstantial evidence of the public understanding at the Second Amendment's ratification as to whether 18-to-20-year-olds could be armed." *Lara*, 125 F.4th at 444.[11]

---

[11] Justice Barrett has cautioned that relying on a dearth of eighteenth-century gun regulations to strike down a twenty-first-century regulation "assumes that founding-era legislatures maximally exercised their power to regulate." *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring). That makes sense to me. Even so, I'm not sure what to do with it. *Bruen* and *Rahimi* say that if conduct is covered by the text of the Second Amendment, it is presumptively unconstitutional. The government must then identify evidence that supports the modern regulation. Just like a tie goes to the runner in baseball, that seems to mean silence in the historical record goes against the government when considering step two of a Second Amendment analysis.

In concurrence, Judge Heytens criticizes McCoy's reliance on militia statutes because the logical extension of McCoy's position would be the Second Amendment permits 16- and 17-year-olds to purchase firearms. I do not share his concerns.

First, because this case does not present the issue, the record before us does not sufficiently address a historical tradition of restricting 16- and 17-year-olds' access to firearms. But as we stated in *Hirschfeld*, "the history of the right to keep and bear arms, including militia laws, may well permit drawing the line at 18." 5 F.4th at 422 n.13. After all, within one year of the Bill of Rights' ratification, the Militia Act of 1792 set the age of service at 18. All states followed suit. So, immediately after the Second Amendment's ratification, the federal government and all states set a service age of 18. To be sure, some evidence exists supporting a service age younger than 18. But that evidence is scattered across different colonies and states at different times, most of it predating the Bill of Rights' ratification. At least on the record before us, the 16- to 17-year-old evidence is not as persuasive as the 18- to 20-year-old evidence.

Second, even if the evidence was more persuasive, *Bruen* does not permit such consequential reasoning. It requires us to assess the challenged regulation against our historical tradition of firearm regulation. If the historical tradition supports the rights of 16- to 17-year-olds to purchase firearms, then *Bruen* dictates that they have that right under the Second Amendment.

That might be jarring to some. For that matter, some may find permitting 18-year-olds to purchase handguns equally jarring. But those feelings, no matter how legitimate, really are saying a little infringement into the Second Amendment's protections is okay if

48

it's for a good enough reason. But as we all know, *Bruen* confirmed we do not apply such means/ends analysis in the Second Amendment context. *See* 597 U.S. at 24. Courts cannot functionally resurrect means/ends analysis by avoiding the formalities of its language.

Also, these arguments, at their core, involve policy—at what age *should* persons under 21 be able to purchase handguns? Making policy decisions is outside our job description. We make decisions based on the law. That means we must follow Supreme Court precedent faithfully, wherever it takes us. We cannot stray from that obligation when we do not like the result.

### 2. *Nineteenth-Century Evidence*

The government turns to nineteenth-century evidence to meet its burden. And the majority concludes this evidence "reinforce[s]" the founding-era history. *See* Maj. Op. at 17. Admittedly, the government provides evidence of relevantly similar restrictions on 18- to 20-year-olds' ability to purchase handguns from the decades before and after the Fourteenth Amendment's ratification. For example, Alabama, Tennessee and Kentucky each passed statutes prohibiting the sale of pistols or other dangerous weapons to minors before the Civil War. *See* An Act to Amend the Criminal Law, No. 26, sec. 1, 1856 Ala. Acts 17, 17; An Act to Amend the Criminal Laws of this State, ch. 81, secs. 2-3, 1856 Tenn. Acts 92, 92; Act of Jan. 12, 1860, ch. 33, sec. 23, 1860 Ky. Acts 241, 245. The Supreme Court of Tennessee rejected a constitutional challenge to one of these statutes, explaining the statute's purpose as "suppress[ing] [] the pernicious and dangerous practice of carrying arms." *State v. Callicutt*, 69 Tenn. 714, 716 (1878). So, these statutes share a similar "how"—prohibiting sale of dangerous weapons to persons under 21, with small

exceptions—and a similar "why"—public safety—with the federal handgun purchase ban. And states enacted more of these restrictions after the Civil War. *See* Maj. Op. at 17 n.3.

Were this evidence present during the founding era, this might be a different case. But it wasn't. As such, it deserves little weight under *Bruen*. That is because these mid-nineteenth-century statutes contradict the original meaning of the Second Amendment. *See Reese*, 127 F.4th at 599. While the Supreme Court has acknowledged the importance of the Second Amendment's interpretation from immediately after ratification through the end of the nineteenth century, *Heller*, 554 U.S. at 605, "we must also guard against giving postenactment history more weight than it can rightly bear," *Bruen*, 597 U.S. at 35. A regular course of practice may demonstrate a settled meaning of a disputed constitutional phrase. *Bruen*, 597 at 35–36 (citing *Chiafalo v. Washington*, 591 U.S. 578, 592–93 (2020)). "But to the extent later history contradicts what the text says, the text controls." *Id.* at 36. Post-ratification laws *inconsistent* with the constitutional text's original meaning cannot overcome that text. *Id.* (citing *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). The government's nineteenth-century statutes contradict the founding-era understanding that 18- to 20-year-olds may buy firearms because (1) there is no evidence of a relevant restrictive principle of firearm regulation from the founding era and (2) 18- to 20-year-olds had to equip themselves with firearms under the Militia Act of 1792 and contemporaneous militia laws in every state.

The majority argues that because handguns became more common in the early nineteenth century, we must accord greater weight to the nineteenth-century evidence. *See* Randolph Roth, *Why Guns Are and Are Not the Problem*, in *A Right to Bear Arms?: The*

*Contested Role of History in Contemporary Debates on the Second Amendment* 113, 117–24 (Jennifer Tucker et al. eds., 2019). But the former doesn't require the latter. It is correct that *Bruen* acknowledges that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27. At the same time, *Bruen* still instructs us to apply the historical principles analysis in those cases—"history guide[s] our consideration of modern regulations that were unimaginable at the founding." *Id.* at 28. And under a *Bruen* analysis, the mid-nineteenth-century statutes contradict the original public meaning of the Second Amendment. *See Lara*, 125 F.4th at 441–42.

Also, it is not clear that these mid-nineteenth-century regulations responded to an "unprecedented societal concern[] or dramatic technological change[]." *Bruen*, 597 U.S. at 27. Handguns existed at the founding. Some American households owned pistols in the mid-eighteenth century. Roth, *supra*, at 116. True, mid-nineteenth-century revolvers offered ease of use, speed and effectiveness that earlier muzzle-loading pistols could not. Roth*, supra*, at 121–22. And as a result, breech-loading pistols became more popular. But under the historical principles analysis, the content of the nineteenth-century statutes reveal they were not enacted to remedy this technological change. The supposedly relevantly similar nineteenth-century statutes addressed weapons like knives in addition to pistols. *See, e.g.*, 1856 Ala. Acts at 17 (prohibiting the sale of a pistol, air gun, "a bowie knife, or knife or instrument of the like kind or description, by whatever name called"). Those weapons existed long before the mid-nineteenth century and were not subject to a

"dramatic technological change[]" when sale to 18- to 20-year-olds was banned. *Bruen*, 597 U.S. at 27.[12]

Because the government has not shown a relevant principle of restricting 18- to 20-year-olds' access to self-defense weapons at the time of the founding, it has failed to justify the federal handgun purchase ban. I would find the ban violates the Second Amendment.

## III. REMEDIES

For the reasons above, I would affirm the district court's Second Amendment conclusions. I would also affirm its remedy—enjoining the federal handgun purchase ban as to the class of 18- to 20-year-olds.

The government argues the district court abused its discretion by certifying a Rule 23(b)(2) class after granting summary judgment. We review the district court's certification of a class for abuse of discretion. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014).

An earlier version of Federal Rule of Civil Procedure 23 required courts to determine class certification "[a]s soon as practicable after the commencement of an action brought as a class action." Fed. R. Civ. P. 23(c)(1) (1966). This prevented potential parties

---

[12] The majority concludes that unlike the regimes struck down in *Heller* and *Bruen*, the federal handgun purchase ban is no "outlier." *See* Maj. Op. at 19. In fact, it posits that holding this law unconstitutional would be the outlier. *Id.* Not so. The Fifth Circuit found the federal handgun purchase ban to be unconstitutional, *Reese*, 127 F.4th at 600, and the Third Circuit struck down a similar state prohibition on carrying arms, *Lara*, 125 F.4th at 446. *See also Worth*, 108 F.4th at 698 (concluding age-based carry prohibition was unconstitutional); *but see Bondi*, 133 F.4th at 1130 (upholding a similar state purchase restriction); *Polis*, 121 F.4th at 118 (finding substantial likelihood that state purchasing restriction was a presumptively lawful condition and qualification on commercial sale).

from "await[ing] developments in the trial or even final judgment on the merits" before deciding to join the class. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974). The Supreme Court has referred to this situation as "one-way intervention." *Id.* The modern version of the rule slightly amended the timing language: "At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A) (2003). The advisory committee explained that courts may need time and even limited discovery to make the certification decision. Fed. R. Civ. P. 23(c) advisory committee's notes to 2003 amendment.

According to the district court, it had wide discretion to decide whether to reach class certification before or after resolving the summary judgment question. *Fraser*, 2023 WL 5616011, at *3. While certifying a class after granting summary judgment gives me pause, I cannot say the district court abused its discretion here. First, there is no one-way intervention concern because Rule 23(b)(2) class members have no opportunity to opt in or out. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011). Rule 23(b)(2) creates a "mandatory" class and a district court need not even notify members of the action. *Id.*; *see also Gooch v. Life Invs. Ins. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) (one-way intervention prohibition does not apply to Rule 23(b)(2) class certifications). Second, unlike many cases, this facial constitutional challenge involved no discovery before summary judgment. So, certification was at an "early practicable time." Fed. R. Civ. P. 23(c)(1)(A). Finally, there is no concern about "fairness to both sides." *Gooch*, 672 F.3d at 433 (quoting *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982)). The parties

conferenced and agreed to proceed with dispositive motions—the government moved to dismiss and plaintiffs moved for summary judgment. Both parties should have understood the risks of moving forward with dispositive motions before the class certification decision. I, therefore, see no abuse of discretion in the district court's certification of a Rule 23(b)(2) class after it granted summary judgment to plaintiffs.

## IV. CONCLUSION

For these reasons, I respectfully dissent. The federal handgun purchase ban implicates the Second Amendment's text because 18- to 20-year-olds are part of "the people," a ban on purchasing infringes the right to "keep and bear" arms and the federal handgun purchase ban is not a presumptively valid condition or qualification on commercial sale. The government has not met its burden to justify the regulation with relevant principles from our Nation's historical tradition of firearm regulation.